2013-1549

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

═══════════════════════════════════════════════════════════════════

K/S HIMPP,

Appellant,

v.

HEAR-WEAR TECHNOLOGIES, LLC,

Appellee.

Appeal from the United States Patent and Trademark Office, Patent
Trial and Appeal Board in Reexamination No. 95/001,022.

## CORRECTED PRINCIPAL BRIEF FOR APPELLANT K/S HIMPP

Robert Greene Sterne
*Counsel for Appellants*
Jon E. Wright
Jason D. Eisenberg
STERNE, KESSLER, GOLDSTEIN &
FOX, PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
(202) 772-8555

**APPEALED DEPENDENT CLAIM 3**
**(for reproduction inside front cover of brief)**

1. An at least partially in-the-canal module for a hearing aid comprising:

a speaker module that generates audio signals from an electrical driving signal, said speaker module having a tubular structure with a diameter that is smaller than the canal, said speaker module including an arcuate raised ridge; and

a cushion tip of elastic deformable material, said cushion tip including a tubular body enclosing said speaker module that applies an elastic force to said arcuate raised ridge to prevent removal of said speaker module from said cushion tip, said tubular body being longer than said speaker module to cause said cushion tip to deflect during navigation through the canal, and wherein a tip portion of said cushion tip possesses sufficient structural rigidity to prevent said speaker module from being pushed through said cushion tip during navigation through the canal,

wherein during deflection said tip portion assumes an offset angle relative to said tubular body and said speaker module.


2. The at least partially in-the-canal module for a hearing aid of claim 1 further comprising: an insulated wiring portion fixidly attached to said speaker module that enables said speaker module and said cushion tip to be removed from said canal and that communicates said electrical driving signal


3. *The at least partially in-the-canal module for a hearing aid of claim 2 wherein said insulated wiring portion is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to an audio processing module.*

# CERTIFICATE OF INTEREST

Counsel for the Appellant <u>Robert Greene Sterne</u> certifies the following:

1.    The full name of every party or amicus represented by me is:

K/S HIMPP

2.    The name of the real party in interest represented by me is:

K/S HIMPP

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus represented by me are:

K/S HIMPP, also known as the Hearing Instrument Manufacturers Patent Partnership, is a partnership formed in 1996 whose members include the major hearing aid manufacturers in the world. The K/S HIMPP partnership is controlled by a board of directors comprising representatives from each member hearing aid company. The board member companies are: Widex A/S, William Demant Holdings A/S, GN ReSound A/S, Sonova Holding A/G, Siemens Audiologische Technik GmbH, Starkey Laboratories, Rion Co. Ltd, Sound Design Technologies Ltd., and IntriCon Corp.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C: Robert Greene Sterne, Jason D. Eisenberg, and Jon E. Wright

SUGHRUE MION, P.L.L.C: David J. Cushing.

Dated: November 1, 2013

    /s/ Robert Greene Sterne
Sterne, Kessler, Goldstein & Fox, PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
(202) 772-8555
(202) 371-2540
rsterne@skgf.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......................................................................... ii

TABLE OF CONTENTS ................................................................................... iii

TABLE OF AUTHORITIES ............................................................................. vi

STATEMENT OF RELATED CASES .................................................................1

STATEMENT OF APPELLATE JURISDICTION ................................................1

STATEMENT OF THE ISSUES.........................................................................2

STATEMENT OF THE CASE.............................................................................3

STATEMENT OF FACTS ..................................................................................4

I.     The '512 Patent and Original Prosecution.........................................4

II.    Request for *Inter Partes* Reexamination .........................................9

III.   Conduct of *Inter Partes* Reexamination With Respect to Claims 3 and 9....13

      A.    Prosecution before the CRU................................................ 13

      B.    Appeal to the Board............................................................ 15

      C.    The Board's disposition of the remaining claims ............... 18

IV.   Hear-Wear's Information Disclosure Statements Filed in the *Inter Partes* Reexamination. ...............................................................19

V.    The *Ex Parte* Reexamination of Claims 3 and 9. ..........................22

SUMMARY OF ARGUMENT ..........................................................................27

ARGUMENT ...................................................................................................31

I.     Standard of Review..........................................................................31

II.    HIMPP was entitled to rely on the knowledge of the skilled artisan when making its *prima facie* case of obviousness; the Board erred by requiring documentary evidence before substantively evaluating HIMPP's the proposed rejection...........................................................................31

iii

A. An obviousness determination must consider the knowledge of a person of ordinary skill in the art. ..................................................... 32

B. Documentary evidence is not required to prove facts well-known to the skilled artisan that defy dispute. .................................................. 33

C. Here, the CRU examiners and the Board erred by requiring documentary evidence before substantively evaluating HIMPP's proposed rejection. ............................................................ 35

D. The Office should adopt a proposed rejection that establishes at least a *prima facie* case of obviousness......................................................... 37

E. When properly evaluated, HIMPP's proposed rejection should have been adopted......................................................................................... 38

III. On the Record Evidence in This Case, Dependent Claims 3 and 9 Carry No Patentable Weight as a Matter of Law. .........................................................41

A. The CRU examiners knew that the limitation recited in claims 3 and 9 was in the prior art; but despite having full authority to enter new grounds of rejection, they nonetheless confirmed patentability. ....... 42

B. The Board had before it the same record and the same authority to enter new grounds of rejection, but again confirmed claims 3 and 9. 42

C. This Court, having the full record in the case before it, now has the same authority as the Board and the CRU examiners to determine that, as a matter of law, claims 3 and 9 are not entitled to any patentable weight. ............................................................................................. 43

    1. This Court may take "judicial notice" of well-known facts, and it should do so here. ............................................................. 44

    2. Even if the Court does not take judicial notice that the limitations of claim 3 and 9 would have been known to the skilled artisan at the time of invention, it should still find the claims unpatentable in view of Prentiss................................. 46

IV. The Practical Reality of the Board's Confirmation of Claims 3 and 9 Is a Broad Removal of Conventional Hearing Aid Technology..........................48

CONCLUSION AND RELIEF SOUGHT ...........................................................49

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Citation**                                                                 **Page(s)**

*Brown v. Piper*,
  91 U.S. 37 (1875)...........................................................................33, 38, 44

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)....................................................31, 32, 39, 44, 48

*Hyatt v. Dudas*,
  492 F.3d 1365 (Fed. Cir. 2007) ........................................................38

*In re Ahlert*,
  424 F.2d 1088, (C.C.P.A. 1970) ...............................................44, 45

*In re Fox*,
  471 F.2d 1405 (C.C.P.A. 1973) ........................................................33

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) .........................................................40

*In re Klein*,
  647 F.3d 1343 (Fed. Cir. 2011) .......................................................31

*In re Lettvin*,
  339 F.2d 249 (C.C.P.A. 1964) .........................................................32

*In re Oetiker*,
  977 F.2d 1443 (Fed. Cir. 1992) .......................................................38

*In re Piasecki*,
  745 F.2d 1468 (Fed. Cir. 1984) .......................................................38

*In re Raynes*,
  7 F.3d 1037 (Fed. Cir. 1993) ....................................................33, 38

*In re Rinehart*,
  531 F.2d 1048 (C.C.P.A. 1976) .......................................................31

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)..............................................................*passim*

## TABLE OF AUTHORITIES (cont'd)

**Citation**                                                        **Page(s)**

*Massachusetts v. Westcott,*
   431 U.S. 322 (1977)....................................................................25

*Perfect Web Techs, Inc. v. InfoUSA, Inc.,*
   587 F.3d 1324 (Fed. Cir. 2009) ..........................................34

## Statutes

35 U.S.C. § 103(a) ..............................................................32

Pre-AIA 35 U.S.C. § 311 ....................................................37

Pre-AIA 35 U.S.C. § 312(a) (2010).................................9, 37

Pre-AIA 35 U.S.C. § 312(a) (2012)........................................9

Pre-AIA 35 U.S.C. § 314(a) (2012)......................................38

Pre-AIA 35 U.S.C. § 314(b)(2) (2012) ................................14

U.S. Const., Art. I, § 8, cl. 8...............................................44

## Regulations

Pre-AIA 37 C.F.R. § 1.104 ..................................................37

37 C.F.R. § 1.11(d) ............................................................24

37 C.F.R. § 1.555 ...............................................................19

Pre-AIA 37 C.F.R. § 1.923 ..................................................37

Pre-AIA 37 C.F.R. § 1.935 ..................................................37

37 C.F.R. § 1.98(a)(2) .........................................................20

Pre-AIA 37 C.F.R. § 1.989 .............................................23, 24

37 C.F.R. § 41.61(a)(2).....................................................16, 22

37 C.F.R. § 41.67(c)(1)(vi)...............................................16, 22

37 C.F.R. § 41.69(d) .........................................................27, 41

## TABLE OF AUTHORITIES (cont'd)

| **Citation** | **Page(s)** |
|---|---|
| 37 C.F.R. § 41.77(b) | 19, 43 |

**Other Authorities**

| | |
|---|---|
| MPEP § 2660(IV) | 13 |
| Pre-AIA MPEP § 2686.01 | 24 |
| Pre-AIA MPEP § 2686.01(I) | 24 |
| Pre-AIA MPEP § 2686.01(III) | 24 |

## STATEMENT OF RELATED CASES

This appeal is taken from the *inter partes* reexamination of U.S. Patent No. 7,016,512. The '512 patent is one of the patents-in-suit in a civil action for patent infringement brought by the patent owner-appellee, Hear-Wear Technologies, LLC in the United States District Court for the Northern District of Oklahoma. The case is styled as *Hear-Wear Technologies, LLC v. Oticon, Inc., et al.*, Civil Action No. 07-CV-212-CVE-FHM.[1] That civil action, filed on April 15, 2007, is currently stayed pending the outcome of this and other reexamination proceedings of other patents in suit by an order dated July 22, 2008. (A6143.)

During the underlying *inter partes* reexamination from which this appeal is taken, the '512 patent was the subject of a co-pending *ex parte* reexamination (90/011,599), also filed by HIMPP. That reexamination has since concluded with a reexamination certificate that issued on July 17, 2012.

## STATEMENT OF APPELLATE JURISDICTION

This is an appeal under 35 U.S.C. § 141(b) from the April 26, 2013, Decision on Request for Rehearing from the Patent Trial and Appeal Board ("Board") of the United States Patent and Trademark Office ("PTO" or "Office") involving the *inter partes* reexamination of U.S. Pat. No. 7,016,512, having

---

[1] In addition to the '512 patent, U.S. Patent Nos. 7,110,562, 7,139,404, and 5,606,621 are also asserted in the stayed litigation.

Control No. 95/001,022. The Notice of Appeal was timely filed on June 25, 2013.

This Court has jurisdiction under 35 U.S.C. § 141(b) and 28 U.S.C. §

1295(a)(4)(A).

## STATEMENT OF THE ISSUES

The Office confirmed only dependent claims 3 and 9 of the '512 patent

following an *inter partes* reexamination and appeal to the Board. These claims are

substantively identical and recite the feature of terminating an insulated wire "*by a

plurality of prongs to provide a detachable mechanical and electrical connection*"

between two conventional parts of a hearing aid. Simply put, they recite the

termination of an insulated wire with an electrical plug. The only issue on appeal is

whether these sole remaining dependent claims are entitled to any patentable

weight.

**Issue 1:** Notoriously well-known facts do not need to be supported by

citation to prior art. HIMPP's request for reexamination did not cite to prior art for

the well-known feature of terminating an insulated wire with the multi-pronged

plug recited in dependent claims 3 and 9. Instead, its proposed rejection relied

solely on the knowledge of a person of ordinary skill in the art ("POSA"). The

examiner refused to evaluate HIMPP's proposed rejection on the merits, alleging

that documentary evidence should have been provided. On that lack of evidence

2

alone, the examiner refused to adopt HIMPP's proposed rejections, and confirmed claims 3 and 9. Did the Board err when it took the same position as the examiner?

**Issue 2:** Obviousness is a legal conclusion that must take into account both the knowledge of a POSA and the prior art of record. The patent owner, Hear-Wear, introduced prior art into this proceeding that discloses exactly the limitation recited in claims 3 and 9. The examiner was irrefutably aware of that prior art and could have rejected claims 3 and 9. The Board should have been aware of that prior art, and similarly could have rejected claims 3 and 9. Should this Court now review the record evidence introduced by Hear-Wear, take judicial notice of the knowledge of a POSA, and finally find claims 3 and 9 unpatentable as a matter of law?

## STATEMENT OF THE CASE

HIMPP requested *inter partes* reexamination of the '512 patent. The '512 patent has 12 total claims, with claims 1 and 7 being independent. The examiner accepted each alleged substantial new question of patentability and ordered reexamination of all 12 claims. Having ordered the reexamination, the examiner then maintained rejections of all claims through appeal to the Board, except for dependent claims 3 and 9, which the examiner consistently confirmed.

The Board, after full briefing and an oral hearing, entered multiple new grounds of rejection for all claims, except for claims 3 and 9. Hear-Wear chose not

3

to reopen prosecution over the new rejections, but instead filed a request for rehearing. The Board denied Hear-Wear's request for rehearing and maintained its multiple new grounds of rejection. The net result was the final rejection of claims 1-2, 4-8, and 10-12, with the patentability of dependent claims 3 and 9 confirmed.

HIMPP's appeal to this Court is taken from the Board's confirmation of patentability of dependent claims 3 and 9 of the '512 patent. Hear-Wear chose not to appeal to this Court the Board's multiple new grounds of rejection. The remaining claims in the '512 patent are thus concededly unpatentable.

## STATEMENT OF FACTS

The only issue on appeal is the patentability of dependent claims 3 and 9 of the '512 patent. These claims recite the feature of terminating an insulated wire "*by a plurality of prongs that provide a detachable mechanical and electrical connection*" between two conventional portions of a hearing aid. All other claims in the '512 patent stand rejected by the Board — a decision that the patent owner Hear-Wear did not appeal.

## I.     The '512 Patent and Original Prosecution

The '512 patent is directed to a hearing aid. For the purpose of this appeal, the claimed hearing aid has three main parts—a behind-the-ear audio processing module 30, an in-the-canal module 10, and a connector 20 between the two. (A61,

'512 patent, 5:24-30.)[2] An annotated version of FIG. 1 from the '512 patent is set forth below to illustrate these main parts. (A47; annotated.)



---

[2] The attached Addendum is identical to the first 70 pages of the Joint Appendix. Thus, a citation to A61 of the Joint Appendix will also be found at Add61 of the attached Addendum. Parallel citations to the Addendum are therefore not included for these pages. But parallel citations are included for Addendum pages Add71-79. Citations to U.S. Patents are by column and line number so that a citation to 1:1-10 refers to column 1, lines 1-10.

Dependent claims 3 and 9, the only confirmed claims in the *inter partes* reexamination, are directed to the connector 20, and in particular to the termination of insulated wire 21/22 with a plurality of prongs. According to the '512 patent, the connector 20 may comprise wire cables 22 that are disposed within insulated tubing 21. (A64; '512 patent, 12:47-52.)

Claims 3 and 9 are substantively identical and are reproduced below with [annotations] that match FIG. 1:

> 3. The at least partially in-the-canal module [10] for a hearing aid of claim 2 wherein said insulated wiring portion [20/21/22] is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to an audio processing module [30]. (A70, 23:41-45.)

> 9. The hearing aid of claim 8 wherein said insulated wiring portion [20/21/22] is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to said behind-the-ear module [30]. (A70, 24:36-39.)

The "plurality of prongs" that "provide a detachable mechanical and electrical connection" to the BTE module 30 are visible in the cut-away portion of element 31 in FIG. 1 above, and highlighted in green. An embodiment is also illustrated, for example, in FIG. 12C of the '512 patent (A51; annotated):



FIG. 12C

100

1220

1222

1212

12

plurality of prongs

insulated wiring portion

in-the-canal module

Dependent claims 3 and 9 were rejected during original prosecution as being nothing more than the application of well-known technology. (A4281-83.) Specifically, the original examiner relied on prior-art patents to Iseberg[3] (claim 3) and Reiter[4] (claim 9) as primary references and concluded that:

> Since providing a plurality of prongs for the electrical connections or for the plugs is known in the art; it therefore would have been obvious to one skilled in the art to provide the prongs for the electrical connections at the end cap (29) or for the plug (17) of Iseberg for providing a better electrical connections.

> Regarding claim 9, as broadly claimed, Reiter teaches the prongs from the insulated wiring portion (22, 130, figure 2D) as claimed (col 2, lines 38-52).

---

[3] U.S. Patent No. 5,887,070 to Iseberg *et al*. (A3116-26.)

[4] U.S. Patent No. 5,606,621 to Reiter *et al*. (A2967-76.)

(A4281-83.) To understand the original examiner's rejection, Reiter's FIGs. 2C and D are reproduced below and annotated to show where element 130 is in FIG. 2D:



(A2968.) Reiter thus shows an insulated wire 140 that terminates in multiple wires 130 (prongs, according to the original examiner) where it connects to the behind-the-ear module 150.

Hear-Wear never challenged the original examiner's findings with respect to dependent claims 3 and 9 during original prosecution. Instead, Hear-Wear focused on demonstrating the patentability of independent claims 1 and 7, from which claims 3 and 9 ultimately depend. Specifically, Hear-Wear amended claims 1 and 7 (A4294-95), and argued that the prior art did not show a tip portion "wherein during deflection said tip portion assumes an offset angle relative to said tubular

8

body and said speaker module." (A4297-99.) Based on that allegedly unique feature, all the claims were allowed (A4304) and the application matured into the '512 patent.

## II. Request for *Inter Partes* Reexamination

HIMPP, a partnership of the world's major hearing aid manufacturers, requested *inter partes* reexamination of all claims in the '512 patent. At the time of HIMPP's request, the standard for initiating an *inter partes* reexamination was the demonstration of a substantial new question ("SNQ") of patentability. Pre-AIA 35 U.S.C. § 312(a) (2010).[5] Accordingly, HIMMP's reexamination request[6] focused on demonstrating where the allegedly patentable features of the "tip portion" were present in prior art not previously considered by the Office. (A233 and 251-53.) One of HIMPP's primary references in its reexamination request was WO99/07182 to Shennib. (A251-53.)

---

[5] The standard for initiating *inter partes* reexamination changed in September 2011 to "a reasonable likelihood that the requester would prevail with respect to at least one of the claims challenged in the request." Pre-AIA 35 U.S.C. § 312(a) (2012).

[6] The Request referred to herein is the Corrected Request filed February 26, 2008. (A219-60.)

Shennib teaches an "earpiece" with "acoustic couplers that seal comfortably and that are adapted to be deeply inserted into an individual's ear canal." (A4642; *see also* A4646.) Importantly, Shennib teaches that its earpiece can be used with all "hearing aids, and audio and communication devices." (*Id.*) The Office agreed that Shennib, among other references, presented a substantial new question of patentability with respect to claims 1-12. The Office thus initiated reexamination of claims 1-12 on that basis, and others.

For dependent claims 3 and 9, HIMPP's reexamination request took the same approach taken by the original examiner. It argued that the primary reference Shennib taught all of the features of the claims from which claims 3 and 9 depend—namely the in-the-canal speaker module for a hearing aid. (A138-41.) HIMPP then argued that multi-pronged, detachable, electro-mechanical connections (e.g., electrical plugs) were known in the art, and would have been a predictable modification to Shennib's in-the-canal speaker module by a skilled artisan seeking to improve ease of repair, maintenance, and interchangeability of components (*id.*)—i.e., the known disadvantages the '512 patent sought to overcome (A59, 2:38-A60, 3:16).

The claim chart from HIMPP's request for reexamination, which set forth its proposed rejections for claims 3 and 9, is reproduced below:

| 3. The at least partially in-the-canal module for a hearing aid of claim 2 wherein said insulated wiring portion is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to an audio processing module. | Although Shennib '182 does not specify a detachable connection between the wiring portion 39 and the speaker assembly 48 or processing module, such detachable connections were known at the time of the alleged invention as concluded by the Examiner during prosecution of the '879 application. See e.g., Office Action dated February 9, 2005, pgs. 3-4.<br><br>Modifying the Shennib '182 device to include such detachable connections for signal cable 39 would have been no more than the predictable use of prior art elements according to their established functions, |
| | providing the well known benefits of ease of repair/maintenance and interchangeability of components. See *KSR Int'l Co.*, 127 S. Ct. at 1740. |
| 9. The hearing aid of claim 8 wherein said insulated wiring portion is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to said behind-the-ear module. | Although Shennib '182 does not specify a detachable connection between the wiring portion 39 and the speaker assembly 48 or a BTE component, such detachable connections were known at the time of the alleged invention as concluded by the Examiner during prosecution of the '879 application. See e.g., Office Action dated February 9, 2005, pgs. 3-4. |
| | Modifying the Shennib '182 device to include such detachable connections for signal cable 39 would have been no more than the predictable use of prior art elements according to their established functions, providing the well known benefits of ease of repair/maintenance and interchangeability of components. See *KSR Int'l Co.*, 127 S. Ct. at 1740. |

(A138-141.)

HIMPP's request candidly acknowledged that Shennib did not specify how

its in-the-canal module could be connected by its wiring portion to a behind-the-

ear module. Shennib's FIG. 20 is illustrative:



Terminating end of insulated wire running from eartip

*FIG. 20*

But Shennib also does not limit what its earpiece is connected to, or how it is connected. For example, Shennib states "[t]he invention described herein is used to couple acoustic signals in an individual's ear canal. An earpiece and acoustic coupler are *adapted for use with any hearing device or any audio system to couple sound to the ear canal*." (A4648; emphasis added.) With respect to the connection between the earpiece and the external audio system, Shennib teaches that its in-the-canal speaker assembly may be "coupled, either electrically via a signal cable 39 or by other means, to the earpiece, as shown in Figure 20." (A4648-49.)

Shennib thus left it to a person of ordinary skill in the art to connect the end of its insulated wire 37/39 to any hearing aid or audio/communication device using any known coupler configuration. As HIMPP set forth in its request, the only missing element from Shennib with regards to claims 3 and 9 was the predictable use of prior art elements according to established functions—namely, a detachable, multi-pronged plug at the end of an insulated wire.

12

## III.    Conduct of *Inter Partes* Reexamination With Respect to Claims 3 and 9.

The PTO's central reexamination unit ("CRU") is charged with carrying out the prosecution phase of *inter partes* reexaminations. A panel of three CRU examiners evaluates each reexamination. One examiner typically maintains substantive control of the proceeding with all Office actions signed by that examiner and by two other "conferees." (MPEP § 2660(IV).)

### A.    Prosecution before the CRU

The CRU examiner found that HIMPP's request established multiple substantial new questions of patentability, including ones over Shennib. (A268-373.) Accordingly, it ordered reexamination of *all* claims in the '512 patent, including dependent claims 3 and 9. (*Id.*)

But in a corrected non-final Office action, the CRU examiner chose not to adopt HIMPP's proposed rejections for dependent claims 3 and 9, despite having ordered reexamination of those claims. Specifically, the examiner stated that:

> Claim 3:  Requester set forth a rejection for claim 3 on pages 2-3 of Exhibit CC-C.  The rejection provides no evidence in support of requester's contention, referring instead to an Office action in a prior prosecution of the '512 patent.  A position set forth by the examiner in a prior Office action does not constitute an admission on the part of patent owner and cannot be used as evidence on its own.  Thus, the examiner **does not agree with or adopt** the rejection of claim 3 set forth by requester.

(A415; emphasis in original.)

> Claim 9: Requester set forth a rejection for claim 9 on pages 4-5 of Exhibit CC-C. The rejection provides no evidence in support of requester's contention, referring instead to an Office action in a prior prosecution of the '512 patent. A position set forth by the examiner in a prior Office action does not constitute an admission on the part of patent owner and cannot be used as evidence on its own. Thus, the examiner **does not agree with or adopt** the rejection of claim 9 set forth by requester.

(A416; emphasis in original.)

The CRU examiner did not evaluate HIMPP's contention that the detachable connections described in claims 3 and 9 were already known in the art. Nor did the examiner rebut HIMPP's contention. Rather, the examiner took issue with HIMPP's citation to prior prosecution of the '512 patent, stating that it could not be used as evidence, on its own, to support HIMPP's contention. On that basis alone, the CRU examiner refused to substantively evaluate or adopt HIMPP's proposed rejections.

Because claims 3 and 9 were not rejected in the corrected first Office action, Hear-Wear did not address them in its reply. (A494-554.) In *inter partes* reexamination, third-party requesters such as HIMPP are permitted by statute to once file "written comments" each time the patent owner substantively responds to an Office action. Pre-AIA 35 U.S.C. § 314(b)(2) (2012). The comments are permitted to address "issues raised by the action of the Office or the patent owner's response thereto." *Id.* Among other arguments, HIMPP's comments twice tried to address the Examiner's reasons for confirmation of claims 3 and 9. Both times,

14

Hear-Wear petitioned the Office to have the comments returned because they allegedly went beyond the scope of the first Office action and Hear-Wear's reply. (A566-73 and A636-38.)[7] Both times, the Office agreed and expunged HIMPP's comments and accompanying declaratory evidence in their entirety. (A627-29 and A681-87.)

With HIMPP's comments pertaining to the non-final Office action all returned and expunged, the CRU examiner maintained the confirmation of dependent claims 3 and 9 in her action closing prosecution ("ACP"), merely incorporating by reference the Office action. (A709.) Hear-Wear chose not to respond to the ACP, even though the rules permitted a response. Because Hear-Wear did not respond to the ACP, HIMPP had no opportunity to file any further comments. Prosecution before the CRU thus ended with HIMPP effectively shut out of the proceeding. Absent any response to the ACP, the CRU examiner issued a right of appeal notice ("RAN"), which again maintained the patentability of dependent claims 3 and 9. (A759.)

## B.    Appeal to the Board

HIMPP appealed the patentability of dependent claims 3 and 9 to the Board. (A781-83.) Hear-Wear appealed the rejected claims. (A773-74.) Having been shut

---

[7] The now-expunged comments are in the record at A574-621 since they were filed as an exhibit to Hear-Wear's petition to expunge A566-73.

out of prosecution before the CRU, HIMPP appealed the confirmation of claims 3 and 9. *See, e.g.,* 37 C.F.R. § 41.61(a)(2) ("the requester may appeal to the Board with respect to any final decision favorable to the patentability, including any final determination not to make a proposed rejection"). But HIMPP was limited to the narrow arguments raised in the Request. *See, e.g.,* 41.67(c)(1)(vi) ("No new ground of rejection can be proposed by a third party requester appellant, unless such ground was withdrawn by the examiner during the prosecution of the proceeding, and the third party requester has not yet had an opportunity to propose it as a third party requester proposed ground of rejection.") HIMPP therefore carefully limited its arguments on appeal because the Board expunges briefs and terminates appeals if they find a brief raises a new ground of rejection.[8]

After briefing and an oral hearing (A1526-71), the Board reversed the examiner on all grounds, except for claims 3 and 9, and issued *sua sponte* five new grounds of rejection based on the art in HIMPP's reexamination request for each of claims 1-2, 4-8, and 10-12. (A1-31.) Despite its willingness to enter multiple new rejections for most of the claims, the Board confirmed the patentability of dependent claims 3 and 9. (A23-25.)

---

[8] *See*, *e.g.*, August 30, 2011 Board Decision and March 16, 2012 Decision on Rehearing for 95/001,036.

With respect to claims 3 and 9, HIMPP was confined to repeating the argument it made in its original request for reexamination. Specifically, HIMPP argued that claims 3 and 9 were obvious because they recite features that were "common knowledge" or "known at the time of the invention." (*See, e.g.,* A919-23.) HIMPP also pointed to the original prosecution examiner and argued that the examiner had effectively taken "official notice" of that fact. (A921.) HIMPP argued that because Hear-Wear never challenged the examiner's statement, it became an admission. (A921-22.)

The Board rejected HIMPP's arguments for claims 3 and 9. The Board did not agree that Hear-Wear had admitted claims 3 and 9 were in the prior art during original prosecution. (A24.) The Board also rejected HIMPP's contention that the use of multi-pronged plugs to terminate and couple an insulated wire was known in the art at the time of invention. *Id.* But rather than assess HIMPP's contention on the merits that it was notoriously well known, the Board stated "we observe that although HIMPP asserts that the content of claims 3 and 9 is 'well known,' notably, HIMPP does not direct us to any portion of the record for underlying factual support for the assertion." (A25.) According to the Board, "while HIMPP urges that 'the predictable use of prior art elements according to their establish[ed] functions' establishes the obviousness of claims 3 and 9, we are not persuaded that

the record before us adequately conveys that the particular distinct connection structures set forth in those claims are disclosed." *Id.*

Like the CRU examiner, the Board concluded that since HIMPP provided no documentary evidence in the record to support of its contention, it could not prove that the "particular distinct connection structures" of 3 and 9—i.e., a multi-pronged plug at the end of an insulated wire—were known in the art and thus obvious. (A24-25.) And like the CRU examiner, the Board made no attempt to independently evaluate or rebut HIMPP's contention that such structures would have been well known to the skilled artisan at the time of invention.

## C.     The Board's disposition of the remaining claims

With respect to the remaining claims, the Board, *sua sponte*, entered multiple new grounds of rejection for claims 1-2, 4-8, and 10-12 using art from HIMPP's request for reexamination. The new rejections are briefly summarized below:

- Claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Iseberg.
- Claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Iseberg.
- Claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Voroba.
- Claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Voroba.
- Claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Baum.
- Claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Baum.

- . Claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Leedom.
- Claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Leedom .
- Claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Oliveira.
- Claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Oliveira.

For these new grounds of rejection, Hear-Wear could choose between two courses of action—(1) reopen prosecution with new evidence or amendments, or (2) request rehearing. *See* 37 C.F.R. § 41.77(b). Hear-Wear requested rehearing. (A1603-21.) Nine months later, the Board denied Hear-Wear's request for rehearing and affirmed its initial decision. (A32-42.) HIMPP appealed the confirmation of claims 3 and 9 to this Court. Hear-Wear did not file its own appeal as to rejected claims 1-2, 4-8, and 10-12. The unpatentability of those claims is now final.

## IV. Hear-Wear's Information Disclosure Statements Filed in the *Inter Partes* Reexamination.

Over the course of the *inter partes* reexamination, Hear-Wear filed almost a dozen information disclosure statements ("IDSs") with the Office. They were filed, ostensibly, to comply with 37 C.F.R. § 1.555, which sets forth the patent owner's duty of disclosure during reexaminations. Hear-Wear's IDS filings are listed below:

| IDS Filing Date | Appendix Page No. |
|---|---|
| 12/26/2007 | A81-A82 |
| 4/22/2008 | A374 |
| **5/6/2009** | **A425-A430** |
| 5/14/2009 | A555-A559 |
| 3/16/2010 | A660 |
| 3/30/2010 | A667-A673 |
| 6/23/2010 | A717-A720 |
| 8/3/2010 | A722 |
| 12/7/2010 | A728 |
| 3/29/2011 | A762 |
| 10/25/2011 | A1413 |
| 11/4/2011 | A1432 |
| 1/24/2012 | A1442 |
| 10/9/2012 | A1681-A1682 |

In the May 6, 2009, IDS, Hear-Wear cited to the Office U.S. Patent No. 3,123,678 to Prentiss (A427; Ref. AG). U.S. Patents listed in an IDS do not need to be submitted to the PTO in their entirety. 37 C.F.R. § 1.98(a)(2). But they are nonetheless part of the official record in any proceeding and a full copy of Prentiss is provided for ease of reference at A6144-6152 and Add71-79.

As explained next, HIMPP relied on Prentiss, as well as other prior art documents, in a parallel *ex parte* reexamination request to show that termination of an insulated wire with a multi-pronged plug was known in the hearing-aid art nearly 45 years before the earliest filing date of the '512 patent.

For example, annotated Figures 1-3 of Prentiss are shown below:



(A6144.)

Across the multiple IDS filings and notices of concurrent proceedings, Hear-Wear chose to file selected file histories from several related reexamination proceedings (e.g., A722, Ref. CA; A762, Refs. CA and CB; and A768-69). But even though its duty of disclosure under Rule 555 remained throughout the entire

21

proceeding before the PTO, Hear-Wear never submitted to the Office the file history of the most relevant co-pending reexamination, filed by HIMPP on March 25, 2011—namely, the *ex parte* reexamination of the '512 patent (90/011,599).

## V. The *Ex Parte* Reexamination of Claims 3 and 9.

After the CRU examiner issued the March 16, 2011, right of appeal notice in the *inter partes* reexamination, it became clear to HIMPP that the CRU examiner was not going to adopt HIMPP's proposed rejections for claims 3 and 9. And Office rules did not permit HIMPP to suggest new grounds of rejection or new evidence on appeal to the Board. 37 C.F.R. §§ 41.61(a)(2); 41.67(c)(1)(vi). So to bring to the Office's attention actual art that supported HIMPP's contention that use of multi-pronged plugs to terminate and couple an insulated wire was well-known, HIMPP filed an *ex parte* reexamination against claims 3 and 9 on March 25, 2011. (A4684-793; 90/011,599.)

One basis for HIMPP's *ex parte* reexamination for claims 3 and 9 was U.S. Patent No. 3,123,678 to Prentiss.[9] As noted above, Hear-Wear cited Prentiss to the

---

[9] HIMPP cited four other references, Zenith Diplomat Hearing Aid, The Radio Museum published 1957, Sonotone Model 300X Hearing Aid shown in the Hearing Aid Museum published 1965, U.S. Patent No. 3,457,375 (Haggerty) issued July 22, 1969, and U.S. Patent No. 5,887,070 (Iseberg) issued March 23, 1999 - which was used to reject the claims during original examination. Each

Office in an information disclosure statement in the *inter partes* reexamination on

May 6, 2009. (A427; Ref. AG.) Prentiss is therefore part of the official record in

this case. The annotated figures below compare the features recited in claims 3 and

9 with Prentiss.

| '512 patent, FIG. 12C (representative of dependent claims 3 and 9) | Prior art patent to Prentiss, FIG. 1-3 |
| --- | --- |



The Office can merge reexaminations proceedings and records when two

reexamination requests are filed for the same patent. *See* Pre-AIA 37 C.F.R. §

reference also showed the claimed features of claims 3 and 9. But, other than

Iseberg, that art was not before the Office in the *inter partes* reexamination, as

Prentiss was.

1.989; Pre-AIA MPEP § 2686.01. The Office can decide merger *sua sponte*, or in response to either party filing a petition to merge. *See* Pre-AIA 37 C.F.R. § 1.989; Pre-AIA MPEP § 2686.01. When merged, the Office requires identical, duplicate records in the files to maintain consistency. *See* Pre-AIA MPEP § 2686.01(I) and (III).

In this case, Hear-Wear petitioned the Office NOT to merge the two proceedings. (A890-95.) HIMPP opposed, urging merger was necessary for consistency between the two proceedings. (A982-86.) The Office granted Hear-Wear's petition and did not merge the proceedings. (A1419-31.) On February 29, 2012, HIMPP again tried to merge the proceedings, petitioning the Office to merge the appeals for judicial efficiency and consistency. (A1450-54.) The Office again refused to merge and the reexaminations proceeded separately.

Nevertheless, the *ex parte* reexamination is still part of the record in this case since it is an intrinsic part of the overall file history for the '512 patent. It is also explicitly cited in HIMPP's various appeal briefs as a related proceeding. (A910, A967, A1200, and A1367.) HIMPP also referred the Board to the *ex parte* reexamination in its oral hearing. (A1558.) The *ex parte* reexamination proceeding is also part of the public record for the '512 patent. 37 C.F.R. § 1.11(d) ("All papers or copies thereof relating to a reexamination proceeding which have been

24

entered of record in the patent or reexamination file are open to inspection by the general public....").

The following table tracks events that occurred while the two reexaminations of the '512 patent were being prosecuted in parallel by *the same CRU examiner team*. Even if not part of the official file wrapper of the *inter partes* reexamination, this Court may take judicial notice of these administrative actions.[10] For ease of reference, the docket sheet for the *ex parte* reexamination of the '512 patent is provided at A4683.

A summary of the relevant events is set forth below:

| '512 Patent | |
|---|---|
| **Inter partes reexamination (95/001,022)** | **Ex parte reexamination (90/011,599)** |
| **March 16, 2011**- right of appeal notice | |
| | **March 25, 2011** - Request for reexamination of claims 3 and 9 |
| | **May 12, 2011** - Order granting *ex parte* reexamination mailed (SNQ accepted for claims 3 and 9) |
| **June 14, 2011** – HIMPP's appeal brief | |
| **July 8, 2011** – Hear-Wear's corrected appeal brief | |
| **July 14, 2011** – Hear-Wear's respondent brief | |
| **August 4, 2011** – HIMPP's respondent brief | |

---

[10] *Massachusetts v. Westcott*, 431 U.S. 322, 323 n. 2 (1977) (public records "may be judicially noticed").

| '512 Patent | |
|---|---|
| **Inter partes reexamination (95/001,022)** | **Ex parte reexamination (90/011,599)** |
| | **August 18, 2011** – Office action issues (**Rejecting claims 3 and 9**) |
| **August 19, 2011** – examiner's answer issues (**Confirming claims 3 and 9**) | |
| **September 19, 2011** – Hear-Wear's rebuttal brief | |
| **September 16, 2011** – HIMPP's rebuttal brief | |
| **October 31, 2011** – Decision denying merger of the two reexams | **October 31, 2011** – Decision denying merger of the two reexams |
| | **November 7, 2011 -** Final Office action issues (**rejecting claims 3 and 9**) |
| **February 29, 2011** - HIMPP petitions the Office to consolidate the appeals. | |
| | **March 5, 2012** – Hear-Wear's principal brief on appeal |
| **April 11, 2012** – Oral Argument | |
| | **May 21, 2012** - Notice of Intent to Issue Reexamination Certificate (**confirming claims 2 and 8**) |
| **July 16, 2012** - Board decision mailed (**rejecting claims 1-2, 4-8, and 10-12 under five rejections; confirming claims 3 and 9**) | |
| | **July 17, 2012** – Reexamination Certificate issued with claims 2, 3, 8, and 9 confirmed |
| **April 26, 2013** - Board decision on rehearing mailed (**rejecting claims 1-2, 4-8, and 10-12 under five rejections**) | |

The most important fact to take away from the table above is that on August 18, 2011, the CRU examiners issued an Office action rejecting dependent claims 3

and 9 over Prentiss, among other art, in the *ex parte* reexamination. The very next day, on August 19, 2011, the same CRU examiners issued an examiner's answer that confirmed the patentability of dependent claims 3 and 9 in the *inter partes* reexamination. The CRU examiners confirmed claims 3 and 9 in the *inter partes* reexamination despite having full authority to reopen prosecution and enter a new ground of rejection at that time. 37 C.F.R. § 41.69(d) ("Any new ground of rejection, or any new determination not to make a proposed rejection, must be made in an Office action reopening prosecution.")

The second most important fact to take away from the table is that, in a sudden shift, the Office ultimately *confirmed* dependent claims 2 and 8 in the *ex parte* reexamination. That confirmation happened the day *after* the oral hearing in the *inter partes* reexamination. The net result is that claims 3 and 9, which depend from claims 2 and 8, ultimately survived HIMPP's *ex parte* reexamination, thus necessitating HIMPP's appeal in this case.

## SUMMARY OF ARGUMENT

Dependent claims 3 and 9 are the only claims on appeal. They recite the feature of terminating an insulated wire "by a plurality of prongs that provide a detachable mechanical and electrical connection" between two conventional portions of a hearing aid. As claimed, this feature is nothing more than a

conventional electrical cord, which has been present in the art since the dawn of the electrical age.

**The Office should have adopted HIMPP's proposed rejections for dependent claims 3 and 9, which established at least a *prima facie* case of obviousness.**

HIMPP's request for reexamination of claims 3 and 9 relied on the knowledge of a person of ordinary skill in the art ("POSA") to establish a *prima facie* case of unpatentability. Specifically, HIMPP argued that terminating an insulated wire with a plurality of prongs was well known and predictable—just as the original examiner did in his rejection of those claims during prosecution of the application that led to the '512 patent. Both the CRU examiner and the Board failed to consider a POSA's knowledge. Instead, they refused to adopt HIMPP's proposed rejection solely because HIMPP did not cite to any supporting documentary evidence. That was legal error. The knowledge of one skilled in the art is always relevant; and documentary evidence is not required for notoriously well-known facts that defy dispute. HIMPP's reexamination request was therefore sufficient to at least establish a *prima facie* case of obviousness. The Board erred by not adopting the rejection and at least shifting the burden of persuasion to Hear-Wear to establish the patentabilty of claims 3 and 9.

**This Court can now review the record facts, take judicial notice of a POSA's knowledge, and find that, as a matter of law, dependent claims 3 and 9 are not entitled to any patentable weight.**

Even if HIMPP's reliance on the knowledge of a person of skill in the art was not justified, the Office still should have rejected dependent claims 3 and 9 on its own—at least by the time that the examiner's answer was due to the Board. Given the record facts, this Court should now fulfill that role.

The CRU examiners knew that the limitation recited in claims 3 and 9 was in the prior art, at least by the time they submitted the examiner's answer on appeal to the Board. But despite that knowledge, and despite having full authority to enter new grounds of rejection, they chose not to act.

The Board also had before it sufficient evidence in the record to enter new grounds of rejection for dependent claims 3 and 9. The Board was aware of the *ex parte* reexamination, but apparently chose not review that record. Yet despite having full authority to enter new grounds of rejection, the Board also chose not to act.

Despite the Office's refusal to evaluate the knowledge of POSA or to recognize the prior-art patent to Prentiss, this Court can still act. This Court has the authority to take "judicial notice" of the fact that terminating an insulated wire with a multi-pronged plug to form an electro-mechanical connection was well-known in the art at the time the application leading to the '512 patent was filed. So taken, dependent claims 3 and 9 have no patentable weight.

Even if this Court does not take judicial notice of the state of the prior art, it can still turn to Prentiss and determine that claims 3 and 9 are unpatentable. Prentiss is indisputably part of the record below. HIMPP did everything in its power to bring Prentiss into the *inter partes* reexamination. The fact that the CRU examiners chose to ignore Prentiss and the Board similarly never reviewed the *ex parte* reexamination means that HIMPP did not waive this argument.

A comparison of Prentiss to the features recited in claims 3 and 9 is set forth below.

| '512 patent, FIG. 12C (representative of dependent claims 3 and 9) | Prior art patent to Prentiss, FIG. 3 |
|---|---|
|  |  |

There is sufficient evidence of unpatentability in the record of the *inter partes* reexamination—evidence that was available to both the CRU examiners and to the Board, and is now available to this Court. The facts are of sufficient notoriety that this Court may now take judicial notice thereof and find claims 3 and 9 unpatentable as a matter of law, even if the Board did not.

## ARGUMENT

### I. Standard of Review

There are no disputed facts. This case is about whether HIMPP's request for reexamination established at least a *prima facie* case of obviousness for claims 3 and 9, and whether those claims are ultimately patentable on the record at hand. Whether *prima facie* obviousness is established is a question of law. *In re Rinehart*, 531 F.2d 1048, 1052 (C.C.P.A. 1976). "[T]he ultimate question of patent validity [i.e., obviousness] is one of law." *Graham v. John Deere Co.,* 383 U.S. 1, 17 (1966). The Board's ultimate obviousness decision is also reviewed *de novo*, while the Board's underlying factual findings are reviewed for substantial evidence. *In re Klein*, 647 F.3d 1343, 1347 (Fed. Cir. 2011).

### II. HIMPP was entitled to rely on the knowledge of the skilled artisan when making its *prima facie* case of obviousness; the Board erred by requiring documentary evidence before substantively evaluating HIMPP's proposed rejection.

An obviousness determination must consider the knowledge of a person of ordinary skill in the art. Here, the CRU examiners and the Board never

31

substantively evaluated HIMPP's contention regarding what one of ordinary skill in the art would have known about terminating an insulated wire to detachably connect it with another electrical device. Instead, they both improperly found that HIMPP's failure to provide documentary evidence of notoriously well-known facts was fatal to HIMPP proposed obviousness rejections for claims 3 and 9. The Board erred when it required documentary evidence before shifting the burden of rebutting HIMPP's *prima facie* case of obviousness to Hear-Wear.

### A. An obviousness determination must consider the knowledge of a person of ordinary skill in the art.

It is well-settled that the knowledge of "a person having ordinary skill in the art" at the time the invention was made is relevant and must be evaluated. 35 U.S.C. § 103(a). As the Supreme Court stated in *Graham v. John Deere Co.*, "[t]he section is cast in relatively unambiguous terms. Patentability is to depend, in addition to novelty and utility, upon the 'non-obvious' nature of the 'subject matter sought to be patented' to a person having ordinary skill in the pertinent art." 383 U.S., at 14. The knowledge of a person having ordinary skill in the art is a legal tool to assess what was commonly known in the pertinent technology at the time of the alleged invention. *In re Lettvin*, 339 F.2d 249, 251 (C.C.P.A. 1964) ("before we can conclude that any disclosed invention is 'obvious' … we must evaluate facts from which to determine … the knowledge which a person of ordinary skill in the

art possessed at the time the invention was made."). This knowledge must be assessed before the ultimate legal conclusion can be made.

### B. Documentary evidence is not required to prove facts well-known to the skilled artisan that defy dispute.

Courts do not require proof of every fact. *Brown v. Piper*, 91 U.S. 37, 42 (1875) ("To require proof of every fact … would be utterly and absolutely absurd.") (internal citations omitted). As *Brown* demonstrated, this is true for obviousness determinations regarding notoriously well-known facts. Indeed, well-known facts are often the least documented.

This Court and its predecessor court have similarly taken judicial notice of notoriously well-known facts, without requiring the Office to provide supporting documentary evidence. *In re Fox*, 471 F.2d 1405, 1407 (C.C.P.A. 1973) (not requiring documentary evidence before taking judicial notice of "the fact that tape recorders commonly erase tape automatically when new 'audio information' is recorded on a tape which already has a recording on it."); *In re Raynes*, 7 F.3d 1037, 1040 (Fed. Cir. 1993) (not requiring documentary evidence to take judicial notice that "the use of video to display programming and other information is so ubiquitous as to warrant judicial notice.") The rationale, of course, is to prevent unlawful appropriation of things that are "within the circle of what was well known before, and belong[] to the public." *Brown*, 91 U.S. at 41. This includes the

"common sense" possessed by the skilled artisan. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007).

Establishing proof of such knowledge does not require explicit documentary support. Indeed, the Supreme Court in *KSR* admonished against "overemphasis on the importance of published articles and the explicit content of issued patents" when, for example, ascertaining the propriety of combining prior art references. *KSR*, 550 U.S. at 419. Consistent with Supreme Court guidance, this Court has also recognized that an obviousness analysis may "include recourse to logic, judgment, and common sense available to the person of ordinary skill in the art that do not necessarily require explication in any reference or expert opinion." *Perfect Web Techs, Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009). In *Perfect Web*, for example, this Court found a claimed step (D) for repeating steps (A)-(C) until a condition was met was obvious, even though it was not disclosed in any cited reference. *Perfect Web*, 587 F.3d at 1331. There, the repeating step "was one of the 'inferences and creative steps that a person of ordinary skill would employ.'" *Id.* (*citing KSR*, 550 U.S. at 418). This Court recognized in *Perfect Web* that notorious facts need not be documented.

### C. Here, the CRU examiners and the Board erred by requiring documentary evidence before substantively evaluating HIMPP's proposed rejection.

The CRU examiners erred when they refused to evaluate or rebut HIMPP's contention of what would have been known at the time of the invention solely because HIMPP provided "no evidence in support" of its contention. Specifically, the CRU examiner stated that:

> Claim 3: Requester set forth a rejection for claim 3 on pages 2-3 of Exhibit CC-C. The rejection provides no evidence in support of requester's contention, referring instead to an Office action in a prior prosecution of the '512 patent. A position set forth by the examiner in a prior Office action does not constitute an admission on the part of patent owner and cannot be used as evidence on its own. Thus, the examiner **does not agree with or adopt** the rejection of claim 3 set forth by requester.

(A415; emphasis in original; *see also* A416 for claim 9.) The CRU examiners thus made no attempt to substantively evaluate HIMPP's contention that for dependent claims 3 and 9, "such detachable connections were known at the time of the alleged invention." (A139-41.) Instead, the CRU examiners misunderstood the statement in the Request and took issue with the fact that HIMPP pointed the Office to the original examination of the application that led to the '512 patent, where the original prosecution examiner arrived at the same conclusion as HIMPP. (*Id*.) Deeming that citation to be insufficient as an admission, even though that was

not HIMPP's position, the CRU examiners refused to entertain the proposed rejection.

The Board took the same approach. It made no attempt to evaluate or rebut HIMPP's contention about what was well-known in the art—even though the examiner in the original prosecution, experienced in the hearing aid arts, took the same position (A22-24). The Board simply concluded that because HIMPP provided no documentary evidence in its request to support its contention, its argument must fail.

Specifically, the Board stated "we observe that although HIMPP asserts that the content of claims 3 and 9 is 'well known,' notably, HIMPP does not direct us to any portion of the record for underlying factual support for the assertion." (A25.) According to the Board, "while HIMPP urges that 'the predictable use of prior art elements according to their establish[ed] functions' establishes the obviousness of claims 3 and 9, we are not persuaded that the record before us adequately conveys that the particular distinct connection structures set forth in those claims are disclosed." *Id.*

The CRU examiner and the Board committed legal error by refusing to substantively evaluate HIMPP's contention that the detachable connections recited in claims 3 and 9 were well known in the art. Instead, they both improperly

dismissed HIMPP's contention solely because it lacked evidentiary support. As in *Brown*, there was a failure here to recognize what was notoriously well-known.

### D. The Office should adopt a proposed rejection that establishes at least a *prima facie* case of obviousness.

In reexamination, the requester initially assumes the role the Office would take during original prosecution of a patent application. To initiate a reexamination, HIMPP was required to demonstrate a substantial new question of patentability with respect to at least one claim. Pre-AIA 35 U.S.C. § 312(a) (2010); Pre-AIA 37 C.F.R. § 1.923. There is no dispute that HIMPP met that standard since the CRU examiners found an SNQ for each of the 12 claims in reexamination.

Thereafter, HIMPP was required to explain the pertinence and manner of applying the cited art. Pre-AIA 35 U.S.C. § 311. This is understood as the portion of the reexamination request where the requester applies the cited art and sets forth a set of proposed rejections upon which the Office may rely. Again, HIMPP complied with this requirement by submitting claim charts that set forth its proposed rejections of claims 1-12, including claims 3 and 9.

Once reexamination is ordered, the CRU examiners evaluate the request and determine whether and how to reject the challenged claims, which is then set forth in the first Office action. Pre-AIA 37 C.F.R. §§ 1.104 and 1.935. There is no statute or rule that constrains the Office in rejecting the claims under

reexamination. Indeed, the statute states that "[e]xcept as otherwise provided in this section, reexamination shall be conducted according to the procedures established for initial examination under the provisions of sections 132 and 133." Pre-AIA 35 U.S.C. § 314(a) (2012).

In deciding whether to adopt a proposed rejection, the Office should rely on this Court's *prima facie* case standard. The *prima facie* case standard is "a procedural device that enables an appropriate shift of the burden of production." *Hyatt v. Dudas*, 492 F.3d 1365, 1369 (Fed. Cir. 2007) (citing *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992)); *see also In re Piasecki*, 745 F.2d 1468, 1472 (Fed. Cir. 1984). The Office satisfies its initial burden of production by "adequately explain[ing] the shortcomings it perceives so that the [Patent Owner] is properly notified and able to respond." *Hyatt*, 492 F.3d at 1370. There is no reason why the same *prima facie* case standard should not apply in reexamination when the Office determines whether to adopt a proposed rejection.

### E. When properly evaluated, HIMPP's proposed rejection should have been adopted.

HIMPP was entitled to rely on the knowledge of a person of ordinary skill in the art. *See Brown*, 91 U.S. at 42; *KSR*, 550 U.S. at 420; *In re Raynes*, 7 F.3d at 1041. The claim charts from HIMPP's request for reexamination, which set for its proposed rejections for claims 3 and 9, are reproduced below:

| 3. The at least partially in-the-canal module for a hearing aid of claim 2 wherein said insulated wiring portion is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to an audio processing module. | Although Shennib '182 does not specify a detachable connection between the wiring portion 39 and the speaker assembly 48 or processing module, such detachable connections were known at the time of the alleged invention as concluded by the Examiner during prosecution of the '879 application. See e.g., Office Action dated February 9, 2005, pgs. 3-4.<br><br>Modifying the Shennib'182 device to include such detachable connections for signal cable 39 would have been no more than the predictable use of prior art elements according to their established functions, |
| | providing the well known benefits of ease of repair/maintenance and interchangeability of components. See *KSR Int'l Co.*, 127 S. Ct. at 1740. |
| 9. The hearing aid of claim 8 wherein said insulated wiring portion is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to said behind-the-ear module. | Although Shennib '182 does not specify a detachable connection between the wiring portion 39 and the speaker assembly 48 or a BTE component, such detachable connections were known at the time of the alleged invention as concluded by the Examiner during prosecution of the '879 application. See e.g., Office Action dated February 9, 2005, pgs. 3-4. |
| | Modifying the Shennib'182 device to include such detachable connections for signal cable 39 would have been no more than the predictable use of prior art elements according to their established functions, providing the well known benefits of ease of repair/maintenance and interchangeability of components. See *KSR Int'l Co.*, 127 S. Ct. at 1740. |

(A138-141.)

The factual inquiries set forth in *Graham* for establishing obviousness under 35 U.S.C. § 103(a) are (1) determining "the scope and content of the prior art," (2) ascertaining the "differences between the prior art and the claims at issue," and (3) resolving "the level of ordinary skill in the pertinent art…." *Graham,* 383 U.S. at

17. These factual inquires must be tied together by "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). In *KSR*, the Supreme Court stated "common sense" features could not result in patentability. *KSR*, 550 U.S. at 420-21.

HIMPP's request for reexamination met at least the *prima facie case* standard. The request determined the scope and content of Shennib when it applied Shennib to independent claims 1 and 7 and dependent claims 2 and 8. (A83-138 and 140.) The request then ascertained the differences between Shennib and claims 3 and 9, candidly concluding that Shennib did not teach "a detachable connection between the wiring portion 39 and the speaker assembly 48 or processing module...." (A138.) The request then assessed knowledge of the skilled artisan when it alleged that "such detachable connections were known at the time of the alleged invention." (*Id*.) In support of that contention, the request pointed to the prior prosecution of the application that led to the '512 patent, where the examiner reached the same conclusion. (A138 and 140-41; "[D]etachable connections were known at the time of the alleged invention as concluded by the Examiner during prosecution of the '879 application. *See e.g*., Office Action dated February 9, 2005, pgs. 3-4.")

The request then articulated a rationale for modifying Shennib with known detachable connections. Relying on known benefits and goals for hearing aids, and citing to *KSR*, the request argued that "[m]odifying the Shennib '182 device to include such detachable connections for signal cable 39 would have been no more than the predictable use of prior art elements according to their established functions, providing the well known benefits of ease of repair/maintenance and interchangeability of components. *See KSR lnt'l Co*., 127 S. Ct. at 1740." (A138-39.) Similar arguments were presented for claim 9. (A140-41.)

The request therefore established at least a *prima facie* case of obvious—one that if left unrebutted would have rendered claims 3 and 9 unpatentable. HIMPP's proposed rejections for claims 3 and 9 should have been adopted. This Court should at least remand this case with instructions for the Office to adopt the proposed rejection and shift the burden to Hear-Wear to establish patentability.

## III. On the Record Evidence in This Case, Dependent Claims 3 and 9 Carry No Patentable Weight as a Matter of Law.

When the Supreme Court's and this Court's well-settled obviousness jurisprudence is followed, the undisputed facts in this case compel a legal conclusion that dependent claims 3 and 9 are obvious. This Court may take notice of those facts and determine that claims 3 and 9 are unpatentable.

**A.    The CRU examiners knew that the limitation recited in claims 3 and 9 was in the prior art; but despite having full authority to enter new grounds of rejection, they nonetheless confirmed patentability.**

It is beyond dispute that the CRU examiners in the *inter partes* reexamination knew about the *ex parte* reexamination and the art cited therein, including Prentiss. On August 18, 2011, the CRU examiner team in the *ex parte* reexamination issued an Office action rejecting claims 1-3 and 7-9 as obvious over Prentiss in combination with other references. (A4855-67.) The very next day, the same CRU examiner team mailed the examiner's answer in the *inter partes* reexamination confirming claims 3 and 9. (A1281-84.)

At the time of the examiner's answer in the *inter partes* reexamination, the CRU examiners had full authority to enter any new ground of rejection and reopen prosecution of claims 3 and 9. 37 C.F.R. § 41.69(d) ("Any new ground of rejection, or any new determination not to make a proposed rejection, must be made in an Office action reopening prosecution.") In short, despite being fully aware of prior art (including Prentiss)  that would have rendered claims 3 and 9 as obvious, and despite having full authority to act, the CRU examiners did nothing.

**B.    The Board had before it the same record and the same authority to enter new grounds of rejection, but again confirmed claims 3 and 9.**

HIMPP, in each of its briefs to the Board and during the oral hearing, informed the Board of the parallel *ex parte* reexamination of claims 3 and 9.

(A910, A967, A1200, A1367, and A1558.) The Board either chose not to review the *ex parte* reexamination, or the Board reviewed it but ignored it. Either way, the Board had full opportunity to learn the facts of the parallel proceeding.

It is beyond dispute that the Board could have entered new grounds of rejection in its decision. 37 C.F.R. § 41. 77(b) ("Should the Board reverse the examiner's determination not to make a rejection proposed by a requester, the Board shall set forth in the opinion in support of its decision a new ground of rejection.") In fact, the Board did just that in its decision for claims 1-2, 4-8, and 10-12. Specifically, it reversed the appealed ground of rejection for each claim, and then entered five new grounds of rejection on each of the other claims in the '512 patent. Yet it left dependent claims 3 and 9 untouched and confirmed.

**C.    This Court, having the full record in the case before it, now has the same authority as the Board and the CRU examiners to determine that, as a matter of law, claims 3 and 9 are not entitled to any patentable weight.**

This Court now has the full record in this case before it, including Prentiss. All of the claims in the '512 patent stand finally rejected except for dependent claims 3 and 9. The only issue in this appeal is whether those claims are entitled to any patentable weight. This Court may rule on that ultimate legal issue. In *KSR*, the Court explained questions of law can be decided on appeal without remand stating that "[w]here, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the

obviousness of the claim is apparent in light of these factors, summary judgment is appropriate" and remand unnecessary. *KSR,* 550 U.S. at 427.

> **1. This Court may take "judicial notice" of well-known facts, and it should do so here.**

In an 1875 case touching on judicial notice in patent cases, the Supreme Court stated that prior art that "was within the circle of what was well known before" belonged to the public, and that "[n]o one could lawfully appropriate it to himself, and exclude others from using it in any usual way for any purpose to which it may be desired to apply it." *Brown v. Piper*, 91 U.S. 37, 41 (1875) (taking judicial notice of a well-known "method of preserving fish.")

The Supreme Court reiterated this in *Graham*: "Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available." *Graham*, 383 U.S. at 6. And again in *KSR* the Supreme Court stated "the results of ordinary innovation are not the subject of exclusive rights under the patent laws. Were it otherwise patents might stifle, rather than promote, the progress of useful arts. See U.S. Const., Art. I, § 8, cl. 8." *KSR*, 550 U.S. at 427.

Taking judicial notice of facts, however, must be done carefully. This Court's predecessor explained that it may take "judicial notice" of facts that are "capable of such instant and unquestionable demonstration as to defy dispute." *In re Ahlert*, 424 F.2d 1088, 1091, (C.C.P.A. 1970). But even then, *Ahlert* requires

caution. For example the court stated that "[a]ssertions of technical facts in areas of esoteric technology must always be supported by citation to some reference work recognized as standard in the pertinent art." *Id.* Similarly, the court counseled that "[a]llegations concerning specific 'knowledge' of the prior art, which might be peculiar to a particular art, should also be supported [by evidence]." *Id.* Finally, the court noted judicial notice should not be used for a primary issue. *Id.*

None of these cautions is present here. Hear-Wear cannot dispute that terminating an insulated wire with a multi-pronged plug was in the prior art before the earliest filing date of the '512 patent. This fact is capable of instant and unquestionable recognition by this Court. It also does not fall into an exception requiring evidence since terminating insulated wires with multi-pronged plugs is not "esoteric technology," nor is it "peculiar to a particular art"—it has been ubiquitous in the electrical arts for more than a century. A simple electrical cord configured to mate with an electrical outlet is an insulated wire terminated by a plurality of prongs, as recited in dependent claims 3 and 9. This Court may take judicial notice that such technology has been present since the dawn of the electrical age.

    **2.**    **Even if the Court does not take judicial notice that the limitations of claim 3 and 9 would have been known to the skilled artisan at the time of invention, it should still find the claims unpatentable in view of Prentiss.**

Even if the Court does not take judicial notice of the fact that terminating insulated wires with multi-pronged plugs was in the prior-art, it can still find claims 3 and 9 to be unpatentable over Prentiss. Prentiss is undisputedly part of the record in this case. Hear-Wear itself disclosed Prentiss to the Office in this case. (A427; Ref. AG.) Once the CRU examiners finally refused to adopt HIMPP's originally proposed grounds of rejection for claims 3 and 9, HIMPP made every effort to get Prentiss explicitly before the Office, without violating the *inter partes* reexamination rules, as the Office interprets them.

For example, HIMPP requested *ex parte* reexamination of claims 3 and 9 over Prentiss. HIMPP opposed Hear-Wear's petition not to merge the proceedings (A982-86), and affirmatively asked the CRU and the Board to merge the proceedings once claims 3 and 9 had been finally rejected in the *ex parte* reexamination (A1450-54). HIMPP listed the *ex parte* reexamination as a related proceeding in each of its briefs to the Board, as it was required to do (A910, A967, A1200, and A1367). HIMPP also informed the Board of the *ex parte* reexamination of claims 3 and 9 during the oral hearing. (A1558.) But despite HIMPP's best efforts, the Board never explicitly recognized the teachings of Prentiss in the *inter partes* reexamination. Finally, even though Hear-Wear put

other related reexamination proceedings into the record of the *inter partes* reexamination, it conspicuously failed to do the same for the HIMPP's *ex parte* reexamination of claims 3 and 9. For all of these reasons, HIMPP did not waive consideration of Prentiss—the Office's and Hear-Wear's failure to raise Prentiss in the *inter partes* reexamination should not penalize HIMPP.

As Prentiss shows, terminating an insulated wire with a multi-pronged plug has been used in hearing aids since at least 1955. Shown below are annotated drawings from Prentiss that unambiguously show this.

| '512 patent, FIG. 12C | Prentiss, FIG. 3 |
|---|---|
|  |  |

Prentiss proves that there is simply nothing novel or nonobvious about terminating an insulated wire with a plurality of prongs to provide detachable, electro-mechanical connections between conventional portions of hearing aids.

## IV. The Practical Reality of the Board's Confirmation of Claims 3 and 9 Is a Broad Removal of Conventional Hearing Aid Technology.

The impact of the Office's actions, or lack of action in this case, is to improperly remove from the public domain the use of hearing aids with detachable, multi-pronged plugs to connect conventional hearing aid components. *See Graham*, 383 U.S. at 6 and *KSR*, 550 U.S. at 427. That removal from the public domain adversely impacts many commercially available hearing aid products and the development of future products. While claims 3 and 9 may appear to be narrow in view of their claim dependencies, the combination of elements that they cover is very broad in terms of hearing aid devices.

## CONCLUSION AND RELIEF SOUGHT

If the Court agrees that the examiner and the Board erred in refusing to

adopt HIMPP's originally proposed rejections for claims 3 and 9, then it should

vacate the Board's decision and remand the case with instructions to adopt the

proposed rejections. But if the Court finds that claims 3 and 9 are unpatentable as a

matter of law, then it can reverse the Board's decision and no remand is necessary.

Respectfully submitted,

 /s/ Robert Greene Sterne
Sterne, Kessler, Goldstein & Fox, PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
(202) 772-8555
(202) 371-2540
rsterne@skgf.com

Dated: November 1, 2013          *Counsel for Appellant*

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,022 | 02/26/2008 | 7,016,512 | Q105784 | 1648 |

29053        7590        07/16/2012

FULBRIGHT & JAWORSKI L.L.P
2200 ROSS AVENUE
SUITE 2800
DALLAS, TX 75201-2784

| EXAMINER |
|---|
| RIMELL, SAMUEL G |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/16/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

———————

K/S HIMPP
Requester, Cross-Appellant, and Respondent

v.

HEAR-WEAR TECHNOLOGIES, L.L.C.
Patent Owner, Appellant, and Respondent

———————

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1[1]
Technology Center 3900

———————

Before STEPHEN C. SIU, ROBERT A. CLARKE, and
JOSIAH C. COCKS, *Administrative Patent Judges*.

COCKS, *Administrative Patent Judge*.

DECISION ON APPEAL

---

[1]      The patent in this reexamination appeal proceeding (the "'512 Patent") issued to Feeley et al. on March 21, 2006.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

A.    STATEMENT OF THE CASE

Summary

Patent Owner Hear-Wear Technologies, L.L.C. ("Hear-Wear")[2] appeals under 35 U.S.C. §§ 134(b) and 315(a) the Examiner's decision to reject claims 1, 2, 4, 5-8, and 10-12 based on prior art.[3]  Third-Party Requester K/S HIMPP[4] ("HIMPP") contends that the Examiner's decision to reject claims 1, 2, 4, 5-8, and 10-12 should be affirmed.[5]

HIMPP cross-appeals under 35 U.S.C. §§ 134(c) and 315(b) the Examiner's refusal to reject claims 1-12 based on certain alternative prior art grounds.[6]  Hear-Wear urges that the Examiner's decision not to enter the alternative prior art rejections should be affirmed.[7]

---

[2]    *See* Patent Assignment Abstract of Title, Reel 014457 Frame 0097 which was entered into the record of this proceeding as "Title Report" on March 3, 2008.

[3]    *See* "Amended Appeal Brief of Appellant Hear-Wear, L.L.C. Under 37 CFR 41.67(D)" filed July 8, 2011 ("Hear-Wear's App. Br.") and Hear-Wear's "Patent Owner Rebuttal Brief Under 37 CFR 41.71" filed September 19, 2011 ("Hear-Wear's Reb. Br.").

[4]    "HIMPP" stands for "Hearing Instrument Manufacturers Patent Partnership."  *See* "Request for Inter Partes Reexamination of U.S. Patent 7,016,512" filed February 26, 2008.

[5]    See HIMPP's "Third-Party Requester's Respondent Brief Under 37 C.F.R. § 41.68" ("HIMPP's Resp. Br.").

[6]    *See* HIMPP's "Third-Party Requester's Brief on Appeal Under 37 C.F.R. § 41.67" filed June 14, 2011 ("HIMPP's App. Br.") and "Third-Party

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

We have jurisdiction under 35 U.S.C. §§ 134(b)-(c) and 315(a)-(b).
An oral hearing was conducted on April 11, 2012.

We summarize our decision as follows:

Appeal of Hear-Wear

We do not agree with the Examiner's basis for rejecting claims 1, 2,
4-8, and 10-12. Accordingly, we reverse the Examiner's decision to reject
claims 1, 2, 4-8, and 10-12.

Cross-Appeal of HIMPP

We conclude that the Examiner should have rejected claims 1, 2, 4-8,
and 10-12 over certain additional prior art references as urged by HIMPP.
Accordingly, we reverse the Examiner's decision not to enter rejections to
claims 1, 2, 4-8, and 10-12 based on that prior art. We affirm the
Examiner's decision not to enter rejections proposed by HIMPP to claims 3
and 9.

The Invention

Claim 1, which is illustrative of the appealed subject matter, reads as
follows (HIMPP's App. Br., Claims App'x., p.1; Hear-Wear's App. Br.,
Claims App'x., p. 1):

1.      An at least partially in-the-canal module for a hearing aid
comprising:

---

Requester's Rebuttal Brief Under 37 C.F.R. § 41.71" filed September 16,
2011 ("HIMPP's Reb. Br.").

[7]     *See* Hear-Wear's "Patent Owner Respondent Brief Under 37 CFR
§ 41.68" filed July 14, 2011 ("Hear-Wear's Resp. Br.").

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

a speaker module that generates audio signals from an electrical driving signal, said speaker module having a tubular structure with a diameter that is smaller than the canal, said speaker module including an arcuate raised ridge; and

a cushion tip of elastic deformable material, said cushion tip including a tubular body enclosing said speaker module that applies an elastic force to said arcuate raised ridge to prevent removal of said speaker module from said cushion tip, said tubular body being longer than said speaker module to cause said cushion tip to deflect during navigation through the canal, and wherein a tip portion of said cushion tip possesses sufficient structural rigidity to prevent said speaker module from being pushed through said cushion tip during navigation through the canal, wherein during deflection said tip portion assumes an offset angle relative to said tubular body and said speaker module.

### The Prior Art

| | | |
|---|---|---|
| Baum | 2,487,038 | Nov. 8, 1949 |
| Voroba et al. ("Voroba") | 4,870,688 | Sep. 26, 1989 |
| Reiter et al. ("Reiter") | 5,606,621 | Feb. 25, 1997 |
| Iseberg et al. ("Iseberg") | 5,887,070 | Mar. 23, 1999 |
| Leedom et al. ("Leedom") | 2002/0027996 | Mar. 7, 2002 |
| Oliveira | EP 0 494 991 B1 | Nov. 2, 1994 |
| Shennib | WO 99/07182 | Feb. 11, 1999 |

### The Adopted Rejections on Appeal

The Examiner rejected claims 1, 2, 4, and 5 under 35 U.S.C. § 102(b) as anticipated by Shennib.

The Examiner rejected claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Reiter.

### The Non-Adopted Rejections on Cross-Appeal

The Examiner declined to reject claim 3 under 35 U.S.C. § 102(b) as anticipated by Shennib.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

The Examiner declined to reject claim 9 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Reiter.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Iseberg.

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Iseberg.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Baum.

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Baum.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Voroba.

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Voroba.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Voroba.

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Voroba.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Leedom.

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Leedom.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Oliveira.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Oliveira.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Baum.

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Baum.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Leedom.

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Leedom.

The Examiner declined to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Oliveira.

The Examiner declined to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Oliveira.

B.    ANALYSIS

Hear-Wear appeals the Examiner's decision adopting certain prior rejections.  HIMPP cross-appeals the Examiner's decision not to adopt other prior rejections.  We evaluate first the merits of Hear-wear's appeal.

<u>APPEAL OF HEAR-WEAR</u>

**Issues**

1.    Did that Examiner correctly find that Shennib anticipates claims 1, 2, 4, and 5?

2.    Did that Examiner correctly determine that claims 6-8 and 10-12 would have been obvious in light of the teachings of Shennib and Reiter?

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

**Discussion**

*Anticipation*

Claim 1 is an independent claim and is directed to an "at least partially in-the-canal module for a hearing aid." (Hear-Wear's App. Br., Claims App'x., p.1) The claim includes a "speaker module" with "an arcuate raised ridge." (*Id.*) The speaker module is enclosed by a "cushion tip" with a tubular body which "applies an elastic force to said arcuate raised ridge to prevent removal of said speaker module from said cushion tip." (*Id.*) At issue in connection with the Examiner's anticipation rejection is the requirement involving the application of "an elastic force."

According to the Examiner, Shennib discloses a "completely-in-canal module (40)" for a hearing aid which includes an "arcuate raised ridge (45)" "a cushion tip (50)" and a "tubular body (52)." (RAN, pp. 4-5.[8]) The Examiner further found that "[t]he cushion tip's tubular body applies an elastic force to the arcuate raised ridge (page 8, lines 26-29)." (*Id.* at p. 5, ll. 5-6.)

In challenging the Examiner's rejection, Hear-Wear argues that the Examiner has mischaracterized Shennib's disclosure. Hear-Wear contends there is no disclosure in Shennib, either at the portions of page 8 referenced by the Examiner or any other portion thereof, of the application of an elastic

---

[8]     The Examiner's Answer mailed August 19, 2011 incorporates by reference the Right of Appeal Notice ("RAN") mailed March 16, 2011 "including all of the grounds of rejection, determinations of patentability, and explanations set forth in the RAN…" Accordingly, citation to the rejections, determinations, and explanations appearing in this opinion are to the RAN.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

force to an arcuate raised ridge so as to prevent removal of a speaker module
from a cushion tip. In support of that contention, Hear-Wear points to the
declaration testimony of Dr. Wayne Stabb.[9] (Hear-Wear's App. Br., pp. 10-
11.)

> Shennib's page 8, lines 25-32 reads as follows:

> During the attachment process, the receiver assembly 48 is inserted
> into the acoustic coupler 50, as shown in Figures 3, 4a, 4b, and 5.
> Attachment is performed by applying axial (push) forces to the
> acoustic coupler which cause deformation of the coupling sleeve 52 as
> it is being pushed against the tapered and partial male thread 45 of the
> receiver assembly 48. As Figures 4a, 4b, and 5 illustrate, the axial
> forces 80 engaging the male threads of the receiver housing create
> radial forces 81 which deform the essentially elastic coupler into an
> elliptical shape, thus allowing the coupler thread to slide over the
> crests of the tapered male thread of the receiver housing.

Evidently, the Examiner is of the view that either the "axial" or
"radial" forces described in the above-quoted portion of Shennib in
connection with an attachment procedure for receiver assembly 48 and
acoustic coupler 50 constitutes the application of the "elastic force" set forth
in claim 1. We do not agree.

Shennib's Figure 5 (reproduced
right) illustrates the nature of the axial
forces 80 and resulting radial forces
81 which arise when receiver
assembly 48 is inserted into coupler



---

[9]    The "Declaration of Dr. Wayne Staab" ("Stabb Decl.") is dated May
4, 2009 and is included in the Evidence Appendix of Hear-Wear's Appeal
Brief.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

50. The radial force develops due to the initial deformation of coupling sleeve 52 caused by the male threads 45 of receiver 48. Once receiver assembly 48 is inserted, male threads 45 are received in coupling threads 53 of coupling sleeve 52. It is apparent that when so received, male threads 45 cooperate with the coupling threads 53 to impede removal of the receiver assembly. It is, however, not apparent that in such a configuration there is any elastic force operating to prevent removal of the receiver assembly. To the extent that radial forces 81 constitute elastic forces, those forces arise only during the act of insertion of the receiver assembly and are not described as being maintained after insertion. Moreover, the Shennib device is configured to permit axial movement of the coupler relative to the receiver assembly to secure the coupler to the receiver while applying minimal axial force. (Shennib 5:32-34.)

With respect to the axial (push) force 80, that is a force that must is applied by a user or operator *to* the acoustic coupler and does not designate a force which is applied *by* the tubular body of the acoustic coupler to a speaker module as is required by the claims. We do not discern how the radial forces or axial forces described in Shennib are reasonably regarded as elastic forces applied by a cushion tip's tubular body which operate to prevent removal of a speaker module from a cushion tip as is required by the claims.

HIMPP also contends that in Shennib the required elastic force "necessarily" exists because some portion of the acoustic coupler is made of elastic material. (HIMPP's Resp. Br., p. 7, ll. 8-10.) We do not agree with that contention. It does not follow that a component implicitly exerts an

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

elastic force on another associated structure simply because that component is formed of an elastic material. HIMPP does not meaningfully explain how Shennib's acoustic coupler, even if it is constructed of an elastic material, is configured so as to exert the required elastic force on an arcuate raised ridge which prevents removal of a speaker module from a cushion tip.

HIMPP further points to another portion of Shennib describing an embodiment in which a "squeeze" force must be applied to the acoustic coupler to allow removal of the receiver assembly as further supporting the assertion that Shennib discloses the required elastic force. (*Id.* at pp. 7-8.) However, in similar fashion as the above-noted "axial" force applied to the coupler, that "squeeze" force is a force that must be also applied by a user or operator to the acoustic coupler and is not applied by the tubular body of an acoustic coupler to a speaker module as is required by the claims. It is simply not apparent on the record that Shennib's device operates such that the particular configuration of the module of the claims is present and involves application of the required elastic force.

Anticipation is established only when a single prior art reference discloses all elements of the claimed invention. *In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990). Here, we have considered HIMPP's arguments presented in its Appeal Brief and Respondent Brief but are not persuaded that Shennib discloses the feature of the claim 1 directed to a cushion tip which applies an elastic force to an arcuate raised ridge that prevents removal of a speaker module from the cushion tip.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

Accordingly, we conclude that the Examiner was incorrect in adopting HIMPP's proposed rejection of claims 1, 2, 4, and 5 as anticipated by Shennib.

*Obviousness*

The Examiner rejected claims 6-8 and 10-12 as unpatentable over Shennib and Reiter. Claim 6 is dependent on claim 1 and claims 8 and 10-12 are dependent on claim 7, which is an independent claim. Claim 7 is drawn to a hearing-aid and, like claim 1, requires a cushion tip with a tubular body which applies an elastic force to an arcuate raised ridge of a speaker module so as to prevent removal of the speaker module from the cushion tip.

The Examiner's rejection is premised on the belief that Shennib itself discloses the above-noted feature and does not account for the required force via any further explanation or rationale. As discussed above in conjunction with claim 1, we do not agree with the underlying basis of the Examiner's rejection. The Examiner relies on Reiter to account for separate requirements of the claims and not to remedy the short-comings of Shennib in connection with the pertinent feature.

Accordingly, we do not sustain the Examiner's rejection of claims 6-8 and 10-12 over Shennib and Reiter.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

<u>CROSS-APPEAL OF HIMPP</u>

**Issues**

    3.    Did that Examiner correctly decline to adopt rejections proposed by HIMPP to claims 1, 2, 4-8, and 10-12 involving various alternative prior art references?

    4.    Did that Examiner correctly decline to adopt rejections proposed by HIMPP with respect to claims 3 and 9?

**Discussion**

    Turning now to HIMPP's cross-appeal, we observe that HIMPP proposed a multitude of prior art rejections which were ultimately withdrawn by the Examiner. Although the Examiner, initially adopted the rejections at issue, the Examiner subsequently withdrew the rejections on the rationale that the relevant rejections were "cumulative and incomplete" and failing to "set forth a complete and adoptable case of obviousness." (ACP[10], 2-3.) Grounds of rejections that are initially made by the Examiner, which are withdrawn without amendment of the claims so rejected, are properly treated by the Examiner as rejections proposed by the third party requester that the Examiner refuses to adopt. (MPEP § 2665.05, Part III, Item (B).) The Examiner offers no further explanation in support of the above-noted rationale for declining to maintain the rejections proposed by HIMPP. HIMPP contends that the Examiner has not articulated an adequate basis for refusing to adopt the proposed rejections. Hear-Wear, on the other hand,

---

[10]    "ACP" designates the Action Closing Prosecution mailed June 23, 2010.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

contends that the Examiner was correct in declining to adopt those
rejections.

At the outset, the Examiner's general statement that the rejections
proposed by HIMPP are cumulative and incomplete does not itself represent
an adequate basis or explanation for refusing to adopt the pertinent
rejections. (MPEP § 2660, Part III.) We, therefore, evaluate the substantive
content of the proposed claim rejections in assessing their merit. In carrying
out that assessment, we consider the involved rejected claims in three
groupings: (1) Claims 1, 4, 5, 6, 7, and 10-12; (2) claims 2 and 8; and (3)
claims 3 and 9.

*Claims 1, 4, 5, 6, 7, and 10-12*

At issue with respect to all of the non-adopted prior art rejections
proposed by HIMPP in connection with claims 1, 4, 5, 6, 7, and 10-12 are
two limitations appearing in each of independent claims 1 and 7. Those
limitations involve: (1) the tubular body of a cushion tip applying an elastic
force to an arcuate raised ridge of a speaker module so as to prevent removal
of the speaker module from the cushion tip; and (2) that the cushion tip
includes a tip portion that is deflected so as to assume an "offset angle
relative to" the tubular body and speaker module when the cushion tip and
speaker module are inserted into an ear canal.

With respect to the limitation reflected in item (1) above, although, as
discussed above, we are not persuaded that Shennib discloses the pertinent
feature, we observe that other of the prior art references provide clear and
unmistakable teachings with respect to such a feature. In particular, we
focus on the teachings of Iseberg.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

Iseberg discloses a device which is intended to be inserted into a person's ear and is described, in particular, as an "insert earphone." (Iseberg, Abstract.) Iseberg's Figure 2 is reproduced below and illustrates an earphone.



**Figure 2 depicts a cross-sectional view of an embodiment according to Iseberg's invention.**

As shown in the figure above, earphone 11 includes a housing member 20 incorporating a receiver 18 which is "operative for generating an acoustic output signal" at an output 22. (Iseberg, 3:14-22.) Housing member 20 further includes a tubular member 35 which is inserted into an acoustic coupling device 38 in the form of an "eartip of soft compliant material." (*Id.* at 3:35-45.) Iseberg further describes that the eartip portion, *i.e.*, a cushion tip, and the housing member, *i.e.*, a speaker module, are configured and arranged so as to be "lock[ed]" with respect to one another. (*Id.* at 3:46-55.) In particular, Iseberg states (*id.*):

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

In accordance with a releasable lock feature of the invention, an end section **42** of the tubular portion **35** is of increased cross-sectional size to provide an external shoulder **43** in facing relation to the wall **32**. In assembly, a portion **44** of the compliant material of the device **38** is stretched over the end section **42** and then expands into the space between the shoulder **43** and the wall **32** as shown, so as to lock the device **38** and the housing member **20** together while permitting disassembly when desired.

Thus, Iseberg sets forth that its eartip 38 is made of a compliant material that is "stretched" over an end section 42 with shoulder 43 of housing member 20 such that the eartip and housing member are locked together. A compliant material that is stretched around another component so as to be locked with respect to that component is readily understood as an elastic material which exerts an elastic force impeding removal of the component. Accordingly, as evidenced by Iseberg, it was recognized in the art that one mechanism for affixing a cushioned eartip portion and a speaker portion involves a configuration in which the eartip portion exerts an elastic force on the speaker portion. In our view, a person of ordinary skill in the art would have reasonably appreciated that such a configuration is available and viable for use in other devices intended for insertion into an ear, such as that of Shennib, in which a cushioned tip component is to be maintained in position with respect to a sound producing component.

With regard to the feature that a tip portion be deflected to assume an offset angle when a cushioned tip is inserted into an ear canal (referenced as item (2) above), the acoustic seal 51 of Shennib's acoustic coupler 50 is described as "conform[ing] to the shape of the ear canal when inserted therein" (Shennib, p. 8, ll. 20-22) and is described as being "positioned

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

deeply within an individual's ear canal" (*id*. at 9, ll. 7-9). Shennib further
discloses that the configuration of the acoustic seal allows the seal to
"conform and seal comfortably within typically odd shaped regions in the
ear canal[.]" (*Id*. at 10, ll. 9-11.) In our view, a person of ordinary skill in
the art would have realized that the acoustic seal, in conforming to regions
of a person's ear canal, would be suitably flexible such that portions of the
seal, such as its tip, would deform so as to assume an angled orientation with
respect to other portions of the seal and/or hearing-aid as a whole.

Even assuming, however, that the Shennib does not explicitly disclose
that, when inserted in to the ear canal, the tip of the acoustic coupler
necessarily deflects to assume an offset angle, we observe that the teachings
of other of the applied prior art references are availing in connection with
that requirement. In particular, each of Baum and Voroba discloses devices
for insertion into a person's ear canal. Baum discloses a "hearing-aid
earphone" for a person's ear canal (Baum, 1:1-7) and Voroba discloses an



"in-the-canal hearing aid" (Voroba,
Abstract). As shown in Figure 1 of
Baum (left), its hearing-aid earphone
includes a sound transmitting device



10 and an ear insert 11. (Baum,
2:10-14.) When inserted into a
person's ear canal, as shown in
Figure 2 (right), the tip 33 of the

16

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

ear insert 11 is deflected so as to be bent, *i.e.*, form an offset angle, with respect to the sound transmitting device 10 and the body sections 31, 32 of the ear insert 11. (*Id.* at 3:5-22.) That configuration allows for the insert 11 to "be readily flexed and assume the bent shape conforming to any peculiar curved shape of the outer ear cavity into which it is inserted." (*Id.* at 3:55-59.)

Similarly, Voroba describes that its hearing aid includes a tubular segment 38 which is inserted to an ear canal and includes a covering sleeve 30 made of a "soft, resilient material." (Voroba, 9:9-28; Figs. 1 and 2.) Voroba further describes that because of the resilient nature of sleeve 30, it includes a "flexible canal tip" (*id.* at 14:4-18) which exhibits "angular displacements" when inserted into a patient's ear canal "to assume the natural hook, twist and tilt" of bends within the canal (*id.* at 13:43-47).

In light of the teachings of the prior art, *e.g.*, Baum and Voroba, a person of ordinary skill in the art would have realized that a device that is intended to be inserted into, and conform with, a person's ear canal, such as the device of Shennib, would desirably be constructed so as to deflect or bend in accordance with the angular bends of the ear canal. We, therefore, conclude that the recitation in claims 1 and 7 of a hearing aid module with a cushioned tip portion deflect so as to assume an offset angle relative to other portions of the module does not structurally distinguish those claims over the prior art.

As a part of its appeal, Hear-Wear urged that in connection with those rejections involving the application of the teachings of Reiter, the Examiner has not provided an adequate reason for combining the teachings of Shennib

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

with Reiter. (*E.g.*, Hear-Wear's App. Br., 21.) We do not agree. As was noted by the Examiner (RAN, 7) and HIMPP (HIMPP's Resp. Br., 15), Reiter identifies a benefit which arises from the use of its completely-in-canal hearing aid in minimizing an undesirable "occlusion effect" when wearing the aid within the "bony portion" of a patient's ear (Reiter, Abstract). Hear-Wear does not explain why one with ordinary skill in the art would not reasonably and readily apply the wearing technique of Reiter to the device of Shennib so as to obtain the occlusion effect minimization benefit. In our view, that is a suitable reason for combining the teachings of Reiter and Shennib.

Based on our review of the record, we conclude that certain of HIMPP's rejections to claims 1, 4, 5, 6, 7, and 10-12 establish an adequate prima facie case of the obviousness of those claims, in particular those involving the teachings of Iseberg. We are cognizant of the evidence of "secondary considerations" proffered by Hear-Wear in alleging non-obviousness (Hear-Wear's App. Br., 25-26; Evidence App'x.), but observe that there is no nexus established between the merits of the claimed invention and the supplied evidence. *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). ("A nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight enroute to conclusion on the obviousness issue.") Indeed, the evidence amounts simply to testimony of one James

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

Feeley[11], a director of Hear-War Technologies, LLC, that the '512 patent was among a group of patents licensed to an unspecified number of companies in the hearing aid industry and an "estimate" that the licensed companies "represent approximately 60% of the total hearing aid market in the United States." (Feeley Decl.) Lacking from that testimony, and the record as a whole, is adequate evidence demonstrating that it is the claimed features of the '512 that merited the noted licensing. Accordingly, while the evidence supplied by HIMPP has been given due consideration, it is ineffective to outweigh the strong evidence of obviousness provided by the prior art.

In summary, we conclude that the record sufficiently establishes that the following rejections should have been adopted by the Examiner:

The rejection of claims 1, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Iseberg.

The rejection of claims 6, 7, and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Iseberg.

The rejection of claims 1, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Voroba.

The rejection of claims 6, 7, and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Voroba.

The rejection of claims 1, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Baum.

---

[11]    See "Declaration of James Feeley" dated May 11, 2009 ("Feeley Decl.") and presented in the evidence appendix of Hear-Wear's Appeal Brief.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

The rejection of claims 6, 7, and 10-12 under 35 U.S.C.
§ 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Baum.

The rejection of claims 1, 4, and 5 under 35 U.S.C. § 103(a) as
unpatentable over Shennib, Iseberg, and Leedom.

The rejection of claims 6, 7, and 10-12 under 35 U.S.C.
§ 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Leedom.

The rejection of claims 1, 4, and 5 under 35 U.S.C. § 103(a) as
unpatentable over Shennib, Iseberg, and Oliveira.

The rejection of claims 6, 7, and 10-12 under 35 U.S.C.
§ 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Oliveira.

With regard to the remaining involved rejections proposed for claims
1, 4, 5, 6, 7, and 10-12, HIMPP does not suitably explain, and we do not see,
how those rejections, which do not incorporate the teachings of Iseberg,
appropriately account for the features of the claims directed to the
application of an elastic force to an arcuate raised ridge so as to prevent
removal of a speaker module from a cushion tip. Accordingly, we do not
discern that the Examiner was incorrect in declining to adopt those rejections
proposed by HIMPP which do not incorporate the teachings of Iseberg.

*Claims 2 and 8*

Claim 2 is dependent on claim 1 and claim 8 is dependent on claim 7.
Each of claims 1 and 7 recite that a speaker module generates audio signals
from an electrical driving signal. Dependent claims 2 and 8 add the
following feature:

an insulated wiring portion fixidly [sic] attached to said speaker
module that enables said speaker module and said cushion tip to be

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

removed from said canal and that communicates said electrical driving signal.

At issue with respect to claims 2 and 8 is the requirement of an insulated wiring portion attached to the speaker module. All of the rejections proposed by HIMPP involve the teachings of Shennib. HIMPP contends that Shennib accounts for the above-noted requirement in its disclosure of wires 37 fixedly attached to receiver assembly 48 and insulated by virtue of cable 39 and handle 38 as shown, for instance, in Figure 20. (HIMPP's Reb. Br., 14-15.) Hear-Wear urges that Shennib lacks the pertinent feature. According to Hear-Wear, its claims require a single element performing the insulation function set forth in claims 2 and 8 and is not satisfied by Shennib's cable 39 and handle 38. (*E.g.*, Hear-Wear's App. Br., 13-14.)

We do not agree with Hear-Wear. The claims do not specify that the wiring portion must be insulated by a singular component to the exclusion of multiple components. Indeed, the claims do not convey that any particular structure is required for insulating the wiring portion. In the context of the '512 Patent, wiring is insulated by a surrounding hollow tubing. ('512 Patent, 12:46-50; Fig. 1.) Shennib's Figure 20 is reproduced below and illustrates an embodiment of its invention:

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1



FIG. 20

**Figure 20 depicts an acoustic coupler
according to Shennib's invention**

As shown in Figure 20 above, wires 37 are disposed in part within signal cable 39 and in-part within handle 38. (Shennib, 8, ll. 3-5.) In our view, and in the context of the '512 patent, wires 37, which are contained within and surrounded by the cable 39 and handle 38 would have been reasonably understood by one of ordinary skill in the art as being insulated to some extent by those components. Thus, we are not persuaded by Hear-Wear that the features of claims 2 and 8 distinguish those claims over the disclosure of the prior art.

*Claims 3 and 9*

Claim 3 is dependent on claim 2 and claim 9 is dependent on claim 8. Each of claims 3 and 9 add a feature directed to a detachable connection of the insulated wiring portion and an audio processing module. But for minor

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

variation, the recitation of the added limitation is similar in each of claims 3
and 9.  The limitation as it appears in claim 3 reads: "wherein said insulated
wiring portion is terminated by a plurality of prongs that provide a
detachable mechanical and electrical connection to an audio processing
module."  (HIMPP's App. Br. 58, Claims App'x.)

HIMPP takes two approaches in contending that claims 3 and 9
should have been rejected.  HIMPP first asserts that the added feature of
claims 3 and 9 should be viewed as "Admitted Prior Art" and thus
ineffective to distinguish claims 3 and 9 over the prior art. (*Id.* at 15.)
Alternatively, HIMPP urges that the detachable connections required by
those claims "were well known to person of ordinary skill in the art at the
time of the invention, and were an obvious variation of what is taught in
Shennib." (*Id.* at 16-17.)

At the outset, we reject HIMPP's contention that the added content of
claims 3 and 9 is properly viewed as admitted prior art.  The premise of that
contention is that the United States Patent and Trademark Office ("Office"),
via a statement of an examiner made during original prosecution of the
application that became the '512 patent, characterized the features of claims
3 and 9 as "known in the art" in an Office Action dated February 9, 2005.
According to HIMPP, that statement constitutes an assertion of "Official
Notice" and should now be taken as admission by Hear-Wear that the entire
added content of claims 3 and 9 constitutes admitted prior art.  (*Id.* at 15.)
Notably, the identified Office Action did not present an explicit basis on
which the Examiner regarded the matter as subject to official notice and
does not use the term "Official Notice."  Neither did the Examiner ever

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

attribute any "admission" to Hear-Wear in connection with general disclosure of the prior art.  (MPEP § 2144.03.)  We have reviewed the record and conclude that it is simply not apparent that the Office took a position of official notice with respect to the features of claims 3 and 9.  It is also not evident that Hear-Wear acquiesced to that alleged position of official notice so as to qualify the limitations of claims 3 and 9 as admitted prior art.

With respect to HIMPP's alternative theory of rejection, we observe that although HIMPP asserts that the content of claims 3 and 9 is "well known," notably, HIMPP does not direct us to any portion of the record for underlying factual support for the assertion.  Furthermore, while HIMPP urges that "the predictable use of prior art elements according to their establish[ed] functions" establishes the obviousness of claims 3 and 9, we are not persuaded that the record before us adequately conveys that the particular distinct connection structures set forth in those claims are disclosed.  Accordingly, given the record at hand, we do not agree with HIMPP that there is a suitable basis for concluding that the particular structural features of 3 and 9 are known "prior art elements" and, on that pretense, those claims would have been obvious.

For the foregoing reasons, we do not discern any error in the Examiner's decision not to adopt any of HIMPP's proposed rejections to claims 3 and 9.

## C.    CONCLUSION

### Appeal of Hear-Wear

1.    The Examiner did not correctly find that Shennib anticipates claims 1, 2, 4, and 5.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

2.     The Examiner did not correctly determine that claims 6-8 and 10-12 would have been obvious in light of the teachings of Shennib and Reiter.

Cross-Appeal of HIMPP

3.     The Examiner did not correctly decline to adopt rejections proposed by HIMPP to claims 1, 2, 4-8, and 10-12 involving, in-part, the teachings of Iseberg, but correctly declined to adopt those proposed prior art rejection which do not incorporate the teachings of Iseberg.

4.     The Examiner correctly declined to adopt rejections proposed by HIMPP with respect to claims 3 and 9.

D.     ORDER

Appeal of Hear-Wear

The Examiner's decision to reject claims 1, 2, 4, and 5 under 35 U.S.C. § 102(b) as anticipated by Shennib is **reversed**.

The Examiner's decision to reject claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Reiter is **reversed**.

Cross-Appeal of HIMPP

*Affirmances*

The Examiner's decision not to claim 3 under 35 U.S.C. § 102(b) as anticipated by Shennib is **affirmed**.

The Examiner's decision not to reject claim 9 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Reiter is **affirmed**.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

The Examiner's decision not to reject claim 3 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Iseberg is **affirmed**.

The Examiner's decision not to reject claim 9 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Iseberg is **affirmed**.

The Examiner's decision not to reject claim 3 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Voroba is **affirmed**.

The Examiner's decision not to reject claim 9 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Voroba is **affirmed**.

The Examiner's decision not to reject claim 3 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Baum is **affirmed**.

The Examiner's decision not to reject claim 9 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Baum is **affirmed**.

The Examiner's decision not to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Baum is **affirmed**.

The Examiner's decision not to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Baum is **affirmed**.

The Examiner's decision not to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Voroba is **affirmed**.

The Examiner's decision not to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Voroba is **affirmed**.

The Examiner's decision not to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Leedom is **affirmed**.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

The Examiner's decision not to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Leedom is **affirmed**.

The Examiner's decision not to reject claims 1-5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Oliveira is **affirmed**.

The Examiner's decision not to reject claims 6-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Oliveira is **affirmed**.

The Examiner's decision not to reject claim 3 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Leedom is **affirmed**.

The Examiner's decision not to reject claim 9 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Leedom is **affirmed**.

The Examiner's decision not to reject claim 3 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Oliveira is **affirmed**.

The Examiner's decision not to reject claim 9 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Oliveira is **affirmed**.

*Reversals*

The Examiner's decision not to reject claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib and Iseberg is **reversed**.

The Examiner's decision not to reject claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, and Iseberg is **reversed**.

The Examiner's decision not to reject claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Voroba is **reversed**.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

The Examiner's decision not to reject claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Voroba is **reversed**.

The Examiner's decision not to reject claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Baum is **reversed**.

The Examiner's decision not to reject claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Baum is **reversed**.

The Examiner's decision not to reject claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Leedom is **reversed**.

The Examiner's decision not to reject claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Leedom is **reversed**.

The Examiner's decision not to reject claims 1, 2, 4, and 5 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Iseberg, and Oliveira is **reversed**.

The Examiner's decision not to reject claims 6-8 and 10-12 under 35 U.S.C. § 103(a) as unpatentable over Shennib, Reiter, Iseberg, and Oliveira is **reversed**.

The above-noted reversals in connection with HIMPP's cross-appeal in effect constitute new grounds of rejection and, pursuant to our authority under 37 C.F.R. § 41.77(b), are hereby designated as such.  37 C.F.R.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

§ 41.77(b) provides that "[a]ny decision which includes a new ground of
rejection pursuant to this paragraph shall not be considered final for judicial
review." The section further provides that the Patent Owner, WITHIN ONE
MONTH FROM THE DATE OF THE DECISION, must exercise one of the
following two options with respect to the new grounds of rejection to avoid
termination of the appeal as to the rejected claims:

(1) *Reopen prosecution.* The owner may file a response requesting
reopening of prosecution before the examiner. Such a response must be
either an amendment of the claims so rejected or new evidence relating to
the claims so rejected, or both.

(2) *Request rehearing.* The owner may request that the proceeding be
reheard under § 41.79 by the Board upon the same record. …

In accordance with 37 C.F.R. § 41.79(a)(1), the "[p]arties to the
appeal may file a request for rehearing of the decision within one month of
the date of: . . . [t]he original decision of the Board under § 41.77(a)." A
request for rehearing must be in compliance with 37 C.F.R. § 41.79(b).
Comments in opposition to the request and additional requests for rehearing
must be in accordance with 37 C.F.R. § 41.79(c) & (d), respectively. Under
37 C.F.R. § 41.79(e), the times for requesting rehearing under paragraph (a)
of this section, for requesting further rehearing under paragraph (d) of this
section, and for submitting comments under paragraph (c) of this section
may not be extended.

An appeal to the United States Court of Appeals for the Federal
Circuit under 35 U.S.C. §§ 141-144 and 315 and 37 C.F.R. § 1.983 for an

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

*inter partes* reexamination proceeding "commenced" on or after November 2, 2002 may not be taken "until all parties' rights to request rehearing have been exhausted, at which time the decision of the Board is final and appealable by any party to the appeal to the Board." 37 C.F.R. § 41.81. *See also* MPEP § 2682 (8th ed., Rev. 8, July 2010).

## AFFIRMED-IN-PART; REVERSED-IN-PART

PATENT OWNER:

FULBRIGHT & JAWORSKI LLP
2200 ROSS AVENUE
SUITE 2800
DALLAS, TX  75201-2784


THIRD-PARTY REQUESTER:

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC  2005

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,022 | 02/26/2008 | 7,016,512 | Q105784 | 1648 |

29053          7590          04/26/2013
FULBRIGHT & JAWORSKI L.L.P
2200 ROSS AVENUE
SUITE 2800
DALLAS, TX 75201-2784

| EXAMINER |
|---|
| RIMELL, SAMUEL G |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/26/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

K/S HIMPP
Requester, Cross-Appellant, and Respondent

v.

HEAR-WEAR TECHNOLOGIES, L.L.C.
Patent Owner, Appellant, and Respondent

———————

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1
Technology Center 3900

———————

Before STEPHEN C. SIU, JOSIAH C. COCKS, and STANLEY M. WEINBERG[1], *Administrative Patent Judges*.

COCKS, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING

———————

[1]     The decision for which rehearing is requested included Judge Robert A. Clarke as a part of the panel.  Judge Clarke has taken another position within the office.  Judge Weinberg has been paneled in his stead to consider the Request for Rehearing.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

A.      INTRODUCTION

Patent Owner Hear-Wear Technologies, L.L.C. ("Hear-Wear")
requests rehearing of our decision mailed July 16, 2012 ("Decision").[2]  Third
Party Requester K/S HIMPP ("HIMPP") has filed comments in response to
Hear-Wear's Request.[3]

Patent 7,016,512 (the "'512 Patent") includes claims 1-12, which are
involved in this *inter partes* reexamination appeal proceeding.  We
summarize the outcome in the Decision with respect to those claims as
follows -- the panel: **(a)** reversed the Examiner's decision to reject claims
1, 2, 4, and 5 as anticipated by Shennib[4]; **(b)** reversed the Examiner's
decision to reject claims 6-8 and 10-12 as unpatentable over Shennib and
Reiter[5]; **(c)** reversed the Examiner's decision not to reject claims 1, 2, 4-8,
and 10-12 as proposed by HIMPP based on various combinations of prior art
all of which involved the combined teachings of Shennib and Iseberg[6]; **(d)**
affirmed the Examiner's decision not to reject claims 1, 2, 4-8, and 10-12
proposed by HIMPP which did not involve the teachings of Iseberg; and **(e)**

---

[2]      *See* Hear-Wear's "Request for Rehearing Under 37 C.F.R. 41.79"
filed August 16, 2012." ("Reh'g Req.")

[3]      *See* HIMPP's ("Third Party Requester Comment to Patent Owner's
Request for Rehearing Under 37 C.F.R. § 41.79" filed September 12, 2012.

[4]      WO 99/07182 published February 11, 1999.

[5]      US 5,606,621 issued February 25 1997.

[6]      US 5,887,070 issued March 23, 1999.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

affirmed the Examiner's decision not to adopt any proposed rejections of claims 3 and 9. (*See* Decision 25-27.)

Hear-Wear's Request for Rehearing focuses on the above-noted item **(c)**. We have considered Hear-Wear's Request but decline to modify the Decision. Accordingly, the Request for Rehearing is **denied**.

## B.  DISCUSSION

A "request for rehearing must state with particularity the points believed to have been misapprehend or overlooked in rendering the Board's opinion reflecting its decision." 37 C.F.R. § 41.79(b)(1). Here, Hear-Wear urges that the Board allegedly misapprehended or overlooked various points in connection with the Decision. (*See* Reh'g Req. 3-4.) In effect, Hear-Wear is of the view that the Board allegedly misapprehended or overlooked deficiencies in the disclosures of each of Shennib and Iseberg in accounting for certain features of the claims. Hear-Wear also takes the position that the Board allegedly misapprehended or overlooked incompatibilities associated with the combination of Shennib with other prior art references, including Iseberg, so as to preclude the proposed combinations.

### i. Shennib

With respect to Shennib, Hear-Wear contends that the reference does not adequately account for the following claim features (1) an "insulated wiring portion fixidly [sic] attached to said speaker module" (Reh'g Req. 3); and (2) that a cushion tip is configured to assume an "offset angle" (*id.*). Neither contention demonstrates that the Board misapprehended or overlooked any points in the Decision.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

With respect to item (1) above, the quoted feature appears in Hear-Wear's claims 2 and 8.  In the Decision, the Board agreed with HIMPP that "an insulated wiring portion fixidly [sic] attached to" the speaker module was satisfied by Shennib's disclosure.  (Decision 21-22.)  As was observed in the Decision, Shennib discloses wires 37 which form an electrical connection with a receiver assembly 48.  (*E.g.*, Shennib 8:3-5; Fig. 20.)  Surrounding those wires are a signal cable 39 and a handle 38.  (*Id.*)  The Board reasoned that one with ordinary skill in the art would have recognized that cable 39 and handle 38, in so surrounding wires 37, constitute an insulating portion for those wires that is fixedly attached to receiver assembly 48, *i.e.*, a speaker module.  (Decision 22.)

Hear-Wear takes the view that handle 38 does not form part of an insulated wiring portion.  The support that Hear-Wear offers for that view, however, is simply to reiterate arguments already made in prior Briefing.  (*E.g.*, Reh'g Req, 14-15.)  As reflected in the Decision, the Board was not persuaded by Hear-Wear's arguments.  While it is clear that Hear-Wear disagrees with the Board's Decision in that regard, disagreement is not itself an appropriate basis for seeking rehearing.  Hear-Wear's disagreement does not demonstrate that the Board misapprehended or overlooked any point in its determination that components of Shennib, including handle 38, suitably account for the limitations set forth in claims 2 and 8.

With respect to the above-noted item (2), Hear-Wear's claims 1 and 7 require that a tip portion of a cushioned tip that is inserted into an ear canal assumes an "offset angle" relative to a tubular body of the cushioned tip and also to a speaker module.  In the Decision, the panel determined that the

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

"offset angle" requirement was met by the operation of Shennib's acoustic
seal 51 which forms part of acoustic coupler 50 and operates to conform and
seal comfortably with an ear canal. (Decision 15-16.)[7]  Once again, while
Hear-Wear disagrees with the Board's determination, that disagreement is
not predicated on points misapprehended or overlooked by the Board, but
instead on arguments that the Board already found unpersuasive. (*See* Reh'g
Req. 16-17.)  The re-presentation of arguments already deemed unpersuasive
does not form a suitable basis for rehearing.

   *ii. Iseberg*

   In the Decision, the Board found that Iseberg disclosed the feature of
claims 1 and 7 directed to a cushion tip with tubular body which encloses a
speaker module and applies an elastic force to an arcuate raised ridge of the
speaker module so as to prevent removal of the module from the cushion tip
inserted in an ear canal. (Decision 13-15.)  In that regard, the Board pointed
to disclosure in Iseberg of portion 44 of eartip 38 made of compliant
material that is "stretched" over the end section of end section 42 of housing
member 20 containing acoustic signal generating component 18 and operates
to "lock" the eartip and housing member together. (*Id.*)  The Board
concluded the following:

   A compliant material that is stretched around another
   component so as to be locked with respect to that component is
   readily understood as an elastic material which exerts an elastic
   force impeding removal of the component.  Accordingly, as

---

[7]    In the Decision, the panel determined alternatively that the "offset
angle" limitation was satisfied when Shennib's disclosure is taken with other
prior art, including either Baum (US 2,487,038 issued November 8, 1949) or
Voroba (US 4,870,688 issued September 26, 1989).  (Decision 16-17.)

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

> evidenced by Iseberg, it was recognized in the art that one
> mechanism for affixing a cushioned eartip portion and a
> speaker portion involves a configuration in which the eartip
> portion exerts an elastic force on the speaker portion.

(Decision 15.)

In its Request for Rehearing, Hear-Wear challenges the Board's
conclusion. (Reh'g Req. 8-9.) According to Hear-Wear, the above-noted
disclosures in Iseberg do not convey, either expressly or inherently, the
application of any "elastic force." (*Id*.) We disagree for the reasons that
were laid out in the Decision. (Decision 13-15.) Hear-Wear has not
demonstrated that the panel misapprehended or overlooked any points in its
assessment of Iseberg's disclosure.

### iii. The combination of Shennib with other prior art

As noted *supra*, in the Decision, the panel reversed the Examiner's
decision not to adopt rejections of claims 1, 2, 4-8, and 10-12 based in-part
on the combined teachings of Shennib and Iseberg. As a part of the
rejections, Iseberg was relied upon as disclosing the application of an
"elastic force" so as to prevent removal of a module from a cushion tip. In
its Request for Rehearing, Hear-Wear contends that the Board overlooked
the argument that Shennib allegedly "teaches away" from the use of such an
elastic force. (Reh'g Req. 6-8.) The argument in that respect echoes the
"teaching away" argument previously advanced by Hear-Wear (*e.g.*, Hear-
Wear App. Br. 16-19.) The panel did not overlook the argument, but rather
found it unpersuasive.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

As noted by Hear-Wear, Shennib discloses that its invention includes an "interlocking, tapered design of the mated threads [that] prevents reasonable pull axial forces from detaching the acoustic coupler." (Reh'g Req. 7; *see also* Shennib 9:4-6.) The prevention of axial forces from detaching the acoustic coupler does not teach away from the use of an elastic force, such as in Iseberg, in which a stretched compliant material operates to "lock" components together. (*See* Iseberg 3:46-55.) Hear-Wear bases its teaching away argument on a "preferred method" disclosed in Shennib in which, while axial detachment forces impede an earpiece's removal, "rotational detachment torque is minimal." (Shennib 15; *see also* Reh'g Req. 7.) Although Hear-Wear summarily concludes that "[a] device designed for removal with such minimal force is incompatible with the application of an elastic force," Hear-Wear does not explain suitably the basis for that statement. It does not follow that Shennib's disclosure of a preference for a minimal "rotational detachment torque" between components which are interlocked and which are impeded from detachment through axial forces precludes any implementation of a particular type of force, *e.g.*, an elastic force, as a part of the interlocking feature. Indeed, Iseberg is understood reasonably as using elastic forces via portion 44 of the compliant material to prevent the separation of components and constitutes an assembly that is characterized as incorporating "a releasable lock feature" (Iseberg 3:46-55.)

Hear-Wear also again points to the testimony of Dr. Wayne Stabb as also purportedly supporting the teaching away argument. (Reh'g Req. 7.) In that regard, Hear-Wear refers to the following testimony: "Shennib's

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

requirement that a minimal force should be used to remove acoustic coupler 50 from speaker assembly 48 conflicts with the application of an elastic force to speaker assembly 48." (*Id.*)  Yet, as noted above, the referenced "minimal force" relates to a "preferred method" disclosed in Shennib and directed specifically to "rotational detachment torque."  The referenced testimony of Dr. Stabb does not explain why that particular scenario creates a "conflict[]" that precludes incorporation of components providing an elastic force.  Hear-Wear has not shown that the panel misapprehended or overlooked its "teaching away" argument in connection with Shennib's disclosure.

Hear-Wear also argues that the combination would allegedly "involve a reconstruction and redesign that changes the principle of operation of Shennib" (Reh'q Req. 11).  That was not an argument made in prior Briefing to the Board.  The Board cannot have misapprehended or overlooked an argument that was not previously made.

In any event, even were we to consider Hear-Wear's argument, it is not persuasive. The argument is premised on alleged physical constraints arising due to the direct insertion of components of Iseberg's earphone device into Shennib's acoustic coupler device.  According to Hear-Wear, such modification allegedly would result in a device that is "too large for insertion deep into the ear canal" or would "no longer function properly." (Reh'g Req. 12.)  Hear-Wear's assertions, however, are speculative in nature and are not supported adequately by evidence of record.  Moreover, whether a component of one device may be inserted directly into another device is not the appropriate inquiry into obviousness. *See In re Sneed*, 710 F.2d

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable to render obvious the invention under review.") Instead, the test for obviousness is what the combined teachings of the references would have suggested to those of ordinary skill in the art. *In re Young*, 927 F.2d 588, 591 (Fed. Cir. 1991).

Here, each of Shennib and Iseberg are directed to acoustic devices intended to be inserted into an ear canal. Each reference expresses a desire to removably interlock an eartip component and a speaker component to one another. Iseberg teaches that one known and viable mechanism for accomplishing that interlocking function is through the operation of a stretched compliant material, *i.e.*, one that exerts an elastic force. A skilled artisan would have recognized reasonably that Iseberg's teachings also apply to other ear insertable acoustic devices for which interlocking of components is desirable, such as the device of Shennib. That some modification may be necessary in implementing Iseberg's teachings onto Shennib's device does not preclude combination of the references. The references reflect that the level of ordinary skill in the art is such that one of ordinary skill, who is also one of ordinary creativity, *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 421 (2007), would have had the necessary technical competence to make routine modifications in implementing Iseberg's teachings onto Shennib. Neither is it apparent that the combination would necessitate a change in the principle under which Shennib's device operates, as is urged by Hear-Wear. Hear-Wear's argument in that regard is unpersuasive and does not demonstrate any misapprehension by the Board.

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

Lastly, Hear-Wear generally challenges the propriety of rejections proposed by HIMPP involving the additional references of Baum, Voroba, Leedom, or Oliveria[8] and which the Board determined should have been adopted. (Decision 17-20.) Hear-Wear, however, provides no substantive discussion of those rejections in its Request for Rehearing, relying on a general assertion that the proposed rejections are "incomplete" and "conclusory" and that adequate reasoning supporting their combination is lacking. (Reh'g Req. 17-18.) In that regard, Hear-Wear makes no particular reference to the analysis of the Board (*e.g.*, Decision 17-20) or the explanation offered by HIMPP in its Request for *inter partes* reexamination in support of the proposed combinations. While it is clear that Hear-Wear generally opposes the rejections which were proposed by HIMPP, that opposition does not demonstrate points misapprehended or overlooked by the Board in determining that those rejections should have been applied.

C.    CONCLUSION

After due consideration of Hear-Wear's Request for Reconsideration, we are not persuaded that the Board misapprehended or overlooked any points in in the Decision. Accordingly, while we have considered the Request we decline to modify the Decision.

The Request for Rehearing is **denied**.


DENIED

---

[8]    Rejections involving these reference were proposed in HIMPP's Request for *Inter Partes* Reexamination filed December 26, 2007 including claim chart exhibits designated "CC-A," "CC-B," and "CC-C."

Appeal 2012-004028
Reexamination Control 95/001,022
Patent 7,016,512 B1

PATENT OWNER:

FULBRIGHT & JAWORSKI LLP
2200 ROSS AVENUE
SUITE 2800
DALLAS, TX  75201-2784

THIRD-PARTY REQUESTER:

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C
1100 NEW YORK AVENUE, N.W.
WASHINGTON, DC  20005

lb

| **Application Number** | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 95/001,022 | 7,016,512 |
| | Examiner | Art Unit |
| | | 3992 |

US007016512B1

(12) **United States Patent**
Feeley et al.

(10) Patent No.: **US 7,016,512 B1**
(45) Date of Patent: **Mar. 21, 2006**

(54) **BTE/CIC AUDITORY DEVICE AND MODULAR CONNECTOR SYSTEM THEREFOR**

(75) Inventors: **Jim Feeley**, Bixby, OK (US); **Mike Feeley**, Tulsa, OK (US)

(73) Assignee: **Hear-Wear Technologies, LLC**, Tulsa, OK (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 144 days.

(21) Appl. No.: **10/651,879**

(22) Filed: **Aug. 29, 2003**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/927,891, filed on Aug. 10, 2001.

(51) **Int. Cl.**
*H04R 25/00* (2006.01)

(52) **U.S. Cl.** ..................................... **381/324**; 381/322

(58) **Field of Classification Search** ................ 381/322, 381/324, 326, 328, 330, 380, 381, 384, 325, 381/327, 329, 382; 181/128–130, 135; 379/430
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,068,954 A | 12/1962 | Strzalkowski |
| 3,123,678 A | 3/1964 | Prentiss et al. |
| 3,688,863 A | 9/1972 | Johnson |
| 3,890,474 A | 6/1975 | Glicksberg |
| 4,089,332 A | 5/1978 | Rose |
| 4,606,329 A | 8/1986 | Hough |
| 5,381,484 A | 1/1995 | Claes et al. |
| 5,606,621 A | 2/1997 | Reiter et al. |
| 5,701,348 A | 12/1997 | Shennib et al. |

| | | |
|---|---|---|
| 5,721,783 A | 2/1998 | Anderson |
| 5,978,146 A | 11/1999 | Kittaka et al. |
| 6,009,183 A | 12/1999 | Taenzer et al. |
| 6,021,207 A | 2/2000 | Puthuff et al. |
| 6,181,801 B1 | 1/2001 | Puthuff et al. |
| 6,275,596 B1 | 8/2001 | Fretz et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 35 02 178 | 8/1985 |

(Continued)

OTHER PUBLICATIONS

Mark Ross and Raymond Cirmo; "Reducing Feedback in a Post-Auricular Hearing Aid by Implanting the Receiver in an Earmold"; The Volta Review (Jan. 1980) pp. 40-44, Jan. 1980.

(Continued)

*Primary Examiner*—Huyen Le
(74) *Attorney, Agent, or Firm*—Fulbright&Jaworski LLP

(57) **ABSTRACT**

In representative embodiments, the present invention is directed to an at least partially in-the-canal module. The module may include a speaker module that generates audio signals from an electrical driving signal. The speaker module has a tubular body with a diameter that is smaller than the ear canal of the user. The speaker module also includes an arcuate raised ridge. A cushion tip of deformable material may be used to enclose the speaker module within a tubular portion that applies an elastic force to the arcuate raised ridge to prevent removal of the speaker from the cushion tip. Also, the tubular portion is longer than the speaker module to cause the cushion tip to deflect during navigation through the canal. Further, the tip portion of the cushion tip possesses sufficient structural rigidity to prevent the speaker from being pushed through the cushion tip during navigation through the canal.

**12 Claims, 12 Drawing Sheets**



# US 7,016,512 B1

Page 2

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 35 08 830 | 9/1986 |
| DE | 36 38 747 | 10/1987 |
| DE | 36 25 891 | 2/1988 |
| EP | 0 158 391 | 10/1985 |
| EP | 0 288 822 | 11/1988 |
| EP | 0 695 108 | 1/1996 |
| FR | 2.058.156 | 5/1971 |
| JP | 62/1987-151100 | 7/1987 |
| WO | WO 95/13430 | 8/1992 |
| WO | WO 99/07182 | 2/1999 |
| WO | WO 00/42817 | 7/2000 |

### OTHER PUBLICATIONS

William K. Vass, MS, and Laura A. Mims, MS; "Exploring the deep canal fitting advantage"; Hearing Instruments; vol. 44, No. 12 (1993) pp. 26 & 27.

Gustav Mueller; "CIC Hearing Aids: What Is Their Impact On The Occlusion Effect?"; The Hearing Journal; vol. 47, No. 11 (Nov. 1994) pp. 29-35.

Webster's Ninth New Collegiate Dictionary, 1990, p. 392.

PCT Search Report for Application No. PCT/US96/07910 (Jun. 14, 1995).

PCT International Search Report in PCT/US03/26849 dated Jan. 22, 2004.

Case: 13-1549 Case: 13-549 Document: 105 Page: 105 Filed: 11/05/2013 Filed: 11/01/2013



*FIG. 1*



*FIG. 2*

Case: 13-1549 Case: PARTICIPANTS ONLY Document: 65 Page: 106 Filed: 11/06/2013



*FIG. 3*

*FIG. 5*

*FIG. 4*

Case: 13-1549 CASE PARTICIPANTS ONLY Document: 105 Page: 107 Filed: 11/01/2013



FIG. 6A

FIG. 7

FIG. 6B

FIG. 8

FIG. 9

Add00049
2/29/08, EAST Version: 2.2.1.0



FIG. 10A

FIG. 10B

FIG. 10C

FIG. 11A

FIG. 11B

Case: 13-1549 Case IPR-Participants Only Document 15 Page 109 Filed: 11/09/2013 Page 109 Filed: 11/01/2013



*FIG. 12A*

*FIG. 12B*

*FIG. 12C*

Case: 13-1549 Case: IDANTs-ONLY Document 15 Page 110 of 139 Filed: 11/01/2013

*FIG. 13A*



1310
1316
1314  1312
1330
1320

*FIG. 13B*



13A
1330
13A

*FIG. 13C*

1330
1316
1314
1312
1310
1320

Case: 13-1549 Case: PARTICIPANTS ONLY Document: 115 Page: 111 Filed: 11/01/2013



*FIG. 14A*

*FIG. 14B*

Case: 13-1549 CASE PARTICIPANTS ONLY Document: 15 Page: 112 Filed: 11/01/2013

*FIG. 15A*



*FIG. 15B*



Case: 13-1549 Case: 13-1549 Document: 15 Page: 113 Filed: 11/03/2013 Page: 113 Filed: 11/01/2013

*FIG. 15C*



*FIG. 15E*



*FIG. 15F*



*FIG. 15D*



Case: 13-1549    Case: PARTICIPANTS ONLY    Document: 145    Page: 114    Filed: 11/01/2013



*FIG. 16A*





*FIG. 17*

Case: 13-1549    Case: 13-549    Document: 115    Page: 116    Filed: 11/06/2013    Filed: 11/01/2013



FIG. 20

US 7,016,512 B1

1

# BTE/CIC AUDITORY DEVICE AND MODULAR CONNECTOR SYSTEM THEREFOR

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation-in-Part claiming priority benefit of and commonly assigned U.S. patent application Ser. No. 09/927,891 entitled "A BTE/CIC AUDITORY DEVICE AND MODULAR CONNECTOR SYSTEM THEREFOR," filed Aug. 10, 2001, the disclosure of which is hereby incorporated herein by reference.

## TECHNICAL FIELD

This invention relates generally to auditory devices, and particularly to a hybrid behind-the-ear (BTE)/completely-in-canal (CIC) auditory device and a modular connector system therefor.

## BACKGROUND OF THE INVENTION

Conventional earpiece auditory devices (e.g., earphones, headphones, headsets, monitors, IFB devices, hearing aids, earplugs, etc.) are often bulky and uncomfortable for a user to wear. In addition, typically, these devices are cosmetically undesirable. For example, generally, use of one of these conventional devices may be easily discovered through casual observation of the user. However, in some circumstances, users may not want others to know they are using an earpiece auditory device. For example, oftentimes hearing aid users do not want others to know they are using such devices. As another example, news anchors using IFB devices may not want the device to be seen on camera. Moreover, use of a bulky and noticeable earpiece auditory device may potentially have more serious consequences. For example, a bulky, noticeable earpiece auditory device may put plain-clothed security personnel at risk of being discovered.

To overcome these problems, earpiece auditory devices have been developed wherein the entire device may be placed behind the ear of the user or within the ear of the user. However such devices, although possibly reducing some of the conspicuousness of the device, create their own set of problems.

For example, placing an auditory device within the outer portion of an ear canal of a user may cause the user to experience the occlusion effect, which is a plugged sensation that results when the ear canal is blocked and air conduction is impeded by the introduction of at least a portion of an earpiece auditory device into the outer portion of the ear canal. The ear canal (sometimes referred to as the external auditory meatus) has two zones: an outer zone and an inner zone. The outer zone, sometimes referred to as the cartilaginous region, makes up approximately two-thirds of the total length of the ear canal. The inner zone, referred to as the bony portion, accounts for the remaining one third of the length of the ear canal. The earlier mentioned plugged sensation is the result of acoustic energy created by the vibration of the walls of the outer portion of the ear canal in response to a bone conducted signal. H. Gustav Mueller, "CIC Hearing Aids" "What Is Their Impact On The Occlusion Effect?", *The Hearing Journal*, Vol. 47, No. 11, p. 29–35 (November 1994). This energy typically escapes when the ear canal is at least partially open. However, unfortunately, when an earpiece auditory device of sufficient

2

size is placed in the outer portion of the ear canal, at least a portion of this energy is trapped in the user's ear, thereby causing the above described plugged sensation. In some existing earpiece auditory devices, a vent(s) or other means whereby bone-conducted energy may escape the ear canal is provided (e.g., the device is designed to leave the ear canal at least partially open), thereby minimizing or even eliminating the occlusion effect.

In addition, certain of the existing earpiece auditory devices (of both the behind the ear and within the ear or ear canal varieties) experience feedback problems. For example, some conventional earpiece auditory devices are designed with a microphone and speaker mounted to the same housing. As a result of such a design, the microphone and speaker are mechanically coupled to each other. One notably undesirable consequence of this mechanical coupling is electroacoustic feedback. Furthermore, in some conventional earpiece auditory devices, irrespective of the mounting of such components, a microphone and speaker of the device are situated in such close proximity to each other that feedback occurs. The above discussed feedback problems increase as the gain of the auditory device increases. As a result, the gain of such auditory devices are limited by the electroacoustic feedback.

In the past, efforts have been made to reduce such electroacoustic feedback by, e.g., physically separating the microphone and the speaker used in such devices. For example, *The Volta Review* January 1980, pp. 40–44, describes a hearing aid in which the receiver is separated from the main body of the aid and mounted in an ear mold that in turn is placed in the user's ear.

While such a design may result in reduced electroacoustic feedback, it would be commercially unacceptable. One reason for this is, similar to earlier discussions, the user will experience the occlusion effect on account of the introduction of the ear mold into the outer portion of the user's ear canal.

In addition to the above, existing earpiece auditory devices are typically designed such that the electrical components of the device (e.g., the speaker, receiver, microphone, etc., or whichever of such components are included in the particular device) are coupled to each other via some fixed connection. For example, in at least one instance, a speaker of an earpiece auditory device is electrically coupled (either directly or indirectly) to a microphone, processing circuitry, and/or a transceiver of a device via some form of fixed wiring. Such fixed wiring is typically done because of the protection from moisture or other undesirable elements that such fixed wiring normally provides to electrical couplings. In addition, fixed wiring is used because it occupies little of the scarce device space.

However, as a result of such fixed couplings, assembly of the devices and/or replacement of defective or expired parts is normally costly, time-consuming, and/or burdensome. To illustrate, currently, when some element of an earpiece auditory device needs to be replaced (e.g., a part has expired or is defective), in most circumstances, the user must return the device to the manufacturer or send the device to a repair lab.

Moreover, in some circumstances, at the manufacturer or the repair lab, the device must be taken apart, the defective or expired part(s) carefully removed, and a replacement part or parts inserted into the device and fixed (e.g., soldered) into place. Under such a process, it is usually several days or weeks before the auditory device is returned to the user.

In addition, for some earpiece auditory devices (e.g., some hearing aids, some ear plugs), at least a portion of the

US 7,016,512 B1

3

earpiece auditory device is normally manufactured to the specific dimensions of a particular user's ear structure and/or the user's intended use for the earpiece auditory device, as determined during a fitting of the user by a technician, representative, salesperson, etc. Although there are some advantages to this procedure (e.g., providing a desired fit to a particular user), one notable disadvantage to customizing these devices in this manner, at least to a manufacturer, is that such devices can then not be mass produced.

Furthermore, another disadvantage of this customizing of portions of earpiece auditory devices to a particular customer's ear shape is that if, upon delivery to the user, it is discovered that the fit of the auditory device is deficient in some manner, as was the case with replacing defective or expired parts, replacement of the ill-fitting earpiece is costly, time-consuming, and burdensome.

BRIEF SUMMARY OF THE INVENTION

In representative embodiments, the present invention is directed to an at least partially in-the-canal module. The module may include a speaker module that generates audio signals from an electrical driving signal. The speaker module has a tubular body with a diameter that is smaller than the ear canal of the user. The speaker module also includes an arcuate raised ridge. A cushion tip of deformable material may be used to enclose the speaker module within a tubular portion that applies an elastic force to the arcuate raised ridge to prevent removal of the speaker from the cushion tip. Also, the tubular portion is longer than the speaker module to cause the cushion tip to deflect during navigation through the canal. Further, the tip portion of the cushion tip possesses sufficient structural rigidity to prevent the speaker from being pushed through the cushion tip during navigation through the canal.

The foregoing has outlined rather broadly the features and technical advantages of the present invention in order that the detailed description of the invention that follows may be better understood. Additional features and advantages of the invention will be described hereinafter which form the subject of the claims of the invention. It should be appreciated by those skilled in the art that the conception and specific embodiments disclosed may be readily utilized as a basis for modifying or designing other structures for carrying out the same purposes of the present invention. It should also be realized by those skilled in the art that such equivalent constructions do not depart from the spirit and scope of the invention as set forth in the appended claims. The novel features which are believed to be characteristic of the invention, both as to its organization and method of operation, together with further objects and advantages will be better understood from the following description when considered in connection with the accompanying figures. It is to be expressly understood, however, that each of the figures is provided for the purpose of illustration and description only and is not intended as a definition of the limits of the present invention.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention, and the advantages thereof, reference is made to the following descriptions taken in conjunction with the accompanying drawing, in which:

FIG. 1 depicts an exploded isometric view of an exemplary embodiment of an earpiece auditory device in accordance with the present invention;

4

FIG. 2 depicts an exemplary embodiment of an assembled portion of the device of FIG. 1;

FIG. 3 depicts another exemplary embodiment of an earpiece auditory device in accordance with the present invention;

FIG. 4 depicts an unassembled portion of an exemplary embodiment of an earpiece auditory device in accordance with the present invention wherein a speaker is at least partially disposed within a speaker fastener;

FIG. 5 depicts an unassembled portion of an exemplary embodiment of an earpiece auditory device in accordance with the present invention prior to a speaker being at least partially disposed within a speaker fastener;

FIG. 6A depicts an exemplary embodiment of at least a portion of the elements of a processing module;

FIG. 6B depicts another exemplary embodiment of at least a portion of the elements of a processing module;

FIG. 7 depicts an exemplary embodiment of another assembled portion the device of FIG. 1;

FIG. 8 depicts an exemplary embodiment of an unassembled portion of the device of FIG. 1;

FIG. 9 depicts an exemplary embodiment of the device of FIG. 1 when assembled;

FIG. 10A depicts an exploded isometric view of a second exemplary embodiment of an earpiece auditory device in accordance with the present invention;

FIG. 10B depicts an exemplary embodiment of a connector and a processing module of FIG. 10A prior to coupling;

FIG. 10C depicts an exemplary embodiment of a connector and a processing module of FIG. 10B after coupling;

FIG. 11A depicts an exemplary embodiment of at least a portion of the elements of a processing module of the device of FIG. 10A;

FIG. 11B depicts a second exemplary embodiment of at least a portion of the elements of a processing module of the device of FIG. 10A;

FIGS. 12A–12C illustrate a potentially disposable link module integral with a speaker module 1212, in accordance with an alternative embodiment of the present invention;

FIGS. 13A–13C illustrate a universal tip module detachably interconnectable with a speaker module, in accordance with embodiments of the present invention;

FIGS. 14A–14B illustrate the assembly of a link module and a universal tip module into a behind-the-ear/completely-in-canal (BTE/CIC) earpiece auditory device embodiment, including BTE processing module, in accordance with embodiments of the present invention;

FIGS. 15A–15B depict a further embodiment of CIC/BTE earpiece auditory device, including a link module incorporating a custom ear mold fastened by a detachable locking pin;

FIGS. 15C–15F illustrate details of the detachable locking pin assembly embodiment used in the link module embodiment of FIGS. 15A–15B;

FIGS. 16A–16B depict an alternative earpiece auditory device, in accordance with embodiments of the present invention, having a custom ear mold directly encapsulated onto a link module;

FIG. 17 depicts an anatomical view of the ear canal;

FIG. 18 depicts a disposable speaker unit according to representative embodiments;

FIG. 19 depicts a cushion tip according to representative embodiments; and

FIG. 20 depicts the disposable speaker unit of FIG. 18 and the cushion tip of FIG. 19 within an ear canal according to representative embodiments.

US 7,016,512 B1

5

DETAILED DESCRIPTION OF THE INVENTION

In one embodiment, the hearing aid of the '621 application has two components: a BTE component and a CIC component. Preferably, these components are mechanically isolated from each other. The BTE component, which is worn behind the ear, preferably includes at least a microphone. In one embodiment, the BTE also includes a power source, and sound processing circuitry (e.g., amplifiers, compressors, filters, etc.). Meanwhile, the CIC component is preferably shaped to fit into the ear canal of the patient in such a manner as to touch the bony portion of the ear canal. In one embodiment, the CIC component contains a speaker, the speaker preferably being operatively connected to the sound processing circuitry of the BTE component. In a preferred embodiment of the '621 application, because the BTE and CIC components are mechanically isolated from each other, electroacoustic feedback is greatly reduced. Additionally, because in a preferred embodiment, the CIC component is located so deep in the patient's ear canal as to touch the bony portion, the hearing aid does not cause the patient to experience the occlusion effect.

A preferred embodiment of the present invention expands upon the design of the hearing aid(s) disclosed in the '621 application. FIG. 1 depicts an exploded isometric view of an exemplary embodiment of a BTE/CIC earpiece auditory device of the present invention. In the embodiment of FIG. 1, earpiece auditory device 40 includes completely-in-canal unit 10, connector 20, and behind-the-ear unit 30. Preferably, when in use, behind-the-ear unit 30 is placed behind an ear of a user, while completely-in-canal unit 10 is inserted so deep into the user's ear canal as to touch the bony portion of the ear canal.

According to the illustrated embodiment, completely-in-canal unit 10 includes ear mold 11. Preferably, ear mold 11 is at least partially hollow on the inside. In one embodiment, completely-in-canal unit 10 also includes speaker receiving member 12, preferably at a first end of mold 11. Speaker receiving member 12 may be part of ear mold 11 itself or may be attached thereto (e.g., through an adhesive, screws, a detachable coupling, or some other fastening means). In some embodiments, receiving member 12 comprises a plate that includes opening 18. Furthermore, in one embodiment, member 12 also includes one or more speaker fastening grooves (e.g., groove 16). In addition to or in lieu of the above, in some embodiments, speaker receiving member 12 includes one or more mounting holes for receiving screws and/or other fastening means (e.g., mounting hole 9).

Ear mold 11 and/or speaker receiving member 12 may be made from hard material (e.g., acrylics), soft material (e.g., silicones or foam material), or some combination thereof. In one embodiment where mold 11 is made from hard material, at least a portion of the mold is covered with a foam boot or slip. The foam boot or slip may be fastened to mold 11 by numerous fastening means to include an adhesive, friction, screws, etc. Receiving member 12 may be made from the same or different material than that of ear mold 11.

The illustrated size and shape of ear mold 11 shown in FIG. 1 is by way of example only, for ear mold 11 may be of various different sizes and shapes, to include the dimensions of a particular user's ear (e.g., the ear mold may be customized/tailored to a particular user). Ear mold 11 may also be such that it provides a universal fit that is satisfactory for a number of users. For example, at least a portion of mold 11 may be made from foam (or similar material) or covered with a foam slip (or like component), either of which is able

6

to change shape (e.g., expand, compress, deform) to meet the dimensions of the user's inner and/or outer ear. In addition, ear mold 11 may be transparent, translucent, or opaque, or some combination thereof.

In a preferred embodiment, ear mold 11 is of a particular size and shape such that completely-in-canal unit 10 may be placed so deep into a user's ear canal as to touch the bony portion of the user's hearing canal. In one embodiment, the ability to produce a completely-in-canal unit of a sufficient size to place the unit so deep into the user's ear canal as to touch the bony portion is facilitated, at least in part, by limiting the number of elements included in completely-in-canal unit 10.

Moreover, in a preferred embodiment, in addition to ear mold 11, completely-in-canal unit 10 includes speaker 13. Any speaker suitable for use in an earpiece auditory device may be used as speaker 13 (e.g., earpiece device speakers available from Knowles Electronics, Inc.). It will be appreciated that the speaker of an earpiece auditory device is also known in the art as a "receiver". The term "speaker" is used here to avoid confusion with other possible components of device 40 described in detail below.

In some embodiments, in addition to the above, completely-in-canal unit 10 includes speaker fastener 14. Speaker fastener 14 may be made from any one of numerous suitable materials to include plastics and/or metals. In one embodiment, speaker fastener 14 includes one or more projections (e.g., projection 15). Moreover, in some embodiments, one or more of the projections of speaker fastener 14 include appendage 19. Furthermore, in one embodiment, in addition to or in lieu of the above, speaker fastener 14 includes one or more mounting holes (e.g., mounting hole 8) for securing speaker fastener 14 to ear mold 11 and/or receiving member 12 using screws or other fastening means.

In a preferred embodiment, the configuration of fastener 14 is such that at least a portion of speaker 13 fits within an area, at least partially, defined by fastener 14. For example, in one embodiment, as part of assembling device 40, speaker 13 is, at least partially, disposed within space 17 (as shown in FIG. 4). As can be in FIG. 5, space 17 is, at least partially, defined by a surface of speaker fastener 14. In the embodiments of FIGS. 4 and 5, the projection(s) of fastener 14 may help guide speaker 13 into space 17.

In some embodiments, speaker 13 is communicatively (e.g., electrically) and/or physically coupled to speaker fastener 14. Speaker 13 and fastener 14 may be fixedly coupled, such as the hard-wire coupling depicted in FIG. 1. On the other hand, speaker 13 and fastener 14 may be detachably coupled, e.g., through the detachable electrical hole and prong arrangement shown in FIG. 5. In some embodiments (e.g., the embodiments of FIGS. 4 and 5), at least a portion of speaker fastener 14 acts as a guard to protect the communicative coupling between speaker 13 and speaker fastener 14 from one or more undesirable elements (e.g., cerumen, moisture, and the like) that may be present in the environment in which speaker 13 and fastener 14 are used. Accordingly, preferably in such embodiments, speaker fastener 14 facilitates an insulated communicative coupling between speaker 13 and fastener 14.

As mentioned, preferably, ear mold 11 is at least partially hollow on the inside. Accordingly, in one embodiment, ear mold 11 may receive internally one or more other elements of device 40. In some embodiments, at least a portion of speaker fastener 14, along with speaker 13, which may be partially disposed therein, are passed through opening 18 in receiving member 12 and into ear mold 11 (e.g., the assembled portion of device 40 shown in FIG. 2). Similar to

US 7,016,512 B1

7

earlier discussions, in a preferred embodiment, speaker 13 and/or speaker fastener 14 are of a particular size and shape such that when speaker 13 and/or speaker fastener 14 are coupled to ear mold 11, the assembly of ear mold 11, speaker 13, and/or speaker fastener 14 may be placed so deep into a user's ear canal as to touch the bony portion of the user's ear canal.

Moreover, in one embodiment, speaker fastener 14 and/or speaker 13, are securely (and, in one embodiment, detachably) coupled to ear mold 11 and/or receiving member 12. In some embodiments, such a secure (preferably detachable) connection is facilitated by the projection(s) of fastener 14 engaging the fastening groove(s) of receiving member 12. In one of these embodiments, appendage 19 of the projection(s) engages the fastening groove(s). In addition to or in lieu of the above, speaker fastener 14 and/or speaker 13 may be secured to ear mold 11 and/or speaker receiving member 12 by passing at least a portion of a screw(s) or other fastening means through the mounting holes of receiving member 12 and speaker fastener 14 (e.g., the assembled portion of FIG. 2). In a preferred embodiment, the coupling between fastener 14, ear mold 11, and/or receiving member 12 is of sufficient strength such that unit 10 may be removed from the user's ear canal by pulling on connector 20.

Accordingly, speaker 13, fastener 14, receiving member 12, and/or ear mold 11 can be securely fastened together. However, in some embodiments, some or all of these elements can also be conveniently attached to and detached from each other, thus allowing for convenient and easy assembly and/or disassembly of earpiece device 40, as well as allowing for the replacement of any inoperative, defective, or otherwise unsatisfactory parts with relative ease.

For instance, if speaker 13 fails for some reason (e.g., speaker 13 is defective or the speaker simply becomes inoperative (a common earpiece auditory device malady)), in one embodiment, connector plate 14, with speaker 13 disposed therein, may be detached from ear mold 11, e.g., by depressing portions of ear mold 11, member 12, and/or fastener 14, thereby releasing the appendages of fastener 14, and pulling fastener 14 from ear mold 11. In addition to or in lieu of the above, in one embodiment, speaker connector plate 14 is detached from ear mold 11 and/or receiving member 12 by removing screws coupling fastener 14 to receiving member 12.

Furthermore, in one embodiment, after its removal from the inside of mold 11, speaker 13 may be separated from fastener 14 through the application of a pulling force (e.g., where speaker 13 and fastener 14 are coupled via a hole and prong arrangement). Thereafter, in one embodiment, the replacement speaker may be coupled to fastener 14 by pressing the electrical prongs of fastener 14 into the receiving holes of the replacement speaker (or vice versa). Then, in some embodiments, speaker fastener 14, and the attached replacement speaker, may be passed through receiving member 12 until the appendages of fastener 14 engage the grooves of receiving member 12.

In one embodiment, completely-in-canal unit 10 has an open mold configuration, meaning the ear canal of a user is at least partially open when completely-in-canal unit 10 is inserted so deep into the user's ear canal as to touch the bony portion. Moreover, in some embodiments, completely-in-canal unit 10 (e.g., ear mold 11) includes a vent(s) by which sound waves may pass over and/or through unit 10. In an embodiment of completely-in-canal unit 10 wherein unit 10 includes a vent(s), unit 10 also includes a filter to keep cerumen, dirt, moisture, and other undesirable elements from entering unit 10.

8

Furthermore, in one embodiment, the dimensions of a surface of receiving member 12 are such that member 12 may be flush with a surface of ear mold 11 (as an example, the assembled portion of device 40 shown in FIG. 2). Moreover, in one embodiment, at least one dimension of receiving member 12 is initially larger, in some instances substantially larger, than a dimension of ear mold 11 (an example of such a receiving member is depicted in FIG. 3). Then, as part of the assembly of device 40 in such embodiments, speaker receiving plate 12 is ground down or otherwise reduced in size, so as to be flush with a surface of ear mold 11.

The size and shape of the elements of unit 10, as well as the arrangement of the elements, depicted in FIG. 1 are by way of example only, for the elements may be of a different size and shape, as well as arranged in a manner different from that which is depicted in FIG. 1. Moreover, elements not depicted in FIG. 1 may be included in unit 10. For example, in one embodiment speaker fastener 14 or receiving member 12 includes a retrieval line for aiding a user in retrieving and/or inserting unit 10 into and out of the user's ear canal. Furthermore, elements included in FIG. 1 may be absent from unit 10. For example, in one embodiment, at least one of the elements of completely-in-canal unit 10 depicted in FIG. 1 is included as part of connector 20, behind-the-ear unit 30, and/or some portion of device 40 other than completely-in-canal unit 10. For instance, in some embodiments, speaker fastener 14 is part of connector 20, rather than unit 10. In addition to or in lieu of the above, in one embodiment, speaker 13 is part of connector 20, rather than unit 10.

In a preferred embodiment, in addition to completely-in-canal unit 10, earpiece auditory device 40 includes behind-the-ear unit 30. In a preferred embodiment, unit 30 includes processing module 33. In one embodiment, module 33 includes housing 37 (housing 37 preferably being made from plastic). Furthermore, in some embodiments, module 33 includes at least one or some combination of a microphone(s), a communications link(s), processing circuitry (which may include sound processing circuitry), and/or a power source. Preferably, the above described elements of module 33 are integrated with housing 37.

Any microphone suitable for use in an earpiece auditory device may be employed as the microphone(s) in embodiments of module 33 (e.g., microphones available from Knowles Electronics, Inc.). Moreover, the microphone(s) may be either omni, directional, or some combination thereof.

In addition, the earlier mentioned processing circuitry (which, in one embodiment, includes sound processing circuitry) may include any and all hardware, software, firmware, and/or the like, necessary for the intended operation of the earpiece auditory device. As non-limiting examples, the processing circuitry may include an amplifier(s) (in one embodiment, multi-channel and programmable), compressor(s), filter(s), packetizing circuitry, depacketizing circuitry, modulation circuitry, conversion circuitry, and/or the like. Such circuitry may include analog, programmable analog, digital circuitry, and/or a combination thereof. In one embodiment, the processing circuitry processes electrical (and/or other) signals that are to be provided to speaker 13, where the signals are converted to acoustic waves. In addition to or in lieu of the above, in one embodiment, the processing circuitry processes electrical (and/or other signals) for transmission (be it wireline or wireless) to a remote device(s).

US 7,016,512 B1

**9**

Moreover, in a preferred embodiment, the earlier mentioned communications link enables device 40 to communicate with a remote device (e.g., via wireline and/or wireless transmissions). In one embodiment, the communications link includes a wireless input receiver for receiving wireless transmissions (e.g., a radio frequency (RF) receiver or a magnetic induction coil), a transmitter for broadcasting wireless transmissions, and/or combinations thereof (e.g., a transceiver). These wireless transmissions may be radio RF transmissions, optical transmissions (e.g., infrared), magnetic induction transmissions, acoustic waves (e.g., ultrasonic), capacitive coupling transmissions, as well as other forms of wireless communications. In some embodiments, the wireless receiver, transmitter, etc., of the communications link includes accompanying circuitry.

With respect to the above discussed power source, in one embodiment, the power source of module 33 is a battery. In some embodiments, the power source of module 33 is re-chargeable. Furthermore, in one embodiment, the power source is external to module 33 (e.g., an adapter).

Preferably, the particular element or combination of elements that is included as part of a particular embodiment of module 33, as well as the make up of each element, depends upon the intended use of the particular embodiment of earpiece auditory device 40. For example, when earpiece auditory device 40 is to be used to convert acoustic waves from the user's environment into representations of the acoustic waves via electrical (and/or other) signals, whereby the signals are then processed and provided to speaker 13 (e.g. when device 40 is to be used as a hearing aid), module 33 preferably includes at least a microphone(s), processing circuitry, and a power source.

An example of such an embodiment of module 33 is provided in FIG. 6A. As illustrated, at least a portion of the interior of module 33 includes a connector 60 for communicatively (preferably detachably) and/or physically coupling module 33 to module fastener 31 (shown in FIG. 1) and/or connector 20. In one embodiment, such a communicative coupling is an electrical coupling. Preferably, connector 60 is communicatively (e.g., electrically) coupled to processing circuitry 61, which may include sound processing circuitry. In one embodiment, processing circuitry 61 is also communicatively coupled to microphone 62. Preferably, shuttle 33 also includes power source 63 (e.g., a battery).

In some of the above discussed embodiments, the sound processing circuitry of processing circuitry 61 includes high gain circuitry. However, in some embodiments, the sound processing circuitry may be low or no gain circuitry. Moreover, in some of the above embodiments, device 40 may amplify some sounds, while allowing other sounds to be provided to speaker 13 without amplification. Furthermore, in one embodiment, device 40 may allow some sounds to be provided directly to the user's ear drum without first being converted into electrical (and/or other) signals (e.g., the earpiece device is an open mold configuration and/or includes a vent(s)).

Furthermore, in one embodiment, the sound processing circuitry of module 33 includes sound amplitude reduction circuitry. For example, in some embodiments, earpiece auditory device 40 may be used as an electronic earplug or other sound reduction device. In one of these embodiments, module 33 includes sound amplitude reduction circuitry whereby sounds received at the microphone are reduced (sometimes greatly reduced) in volume before being provided to speaker 13, if such sounds are not eliminated altogether by the circuitry. Moreover, in one of these sound

**10**

reduction embodiments, device 40 may reduce the volume or eliminate certain sounds, while allowing other sounds to be provided to speaker 13 or directly to the user's ear drum (e.g., the earpiece device is an open mold configuration and/or includes a vent(s)).

In embodiments where earpiece auditory device 40 is to be used in a manner wherein electrical and/or other signals are to be directly inputted (either by wired or wireless transmissions) to device 40 and/or transmitted by device 40 (in wired or wireless form), e.g., when used as an earphone, monitor, or IFB device, module 33 preferably includes at least the earlier mentioned communications link, processing circuitry, and a power source. In one of these embodiments, the sound processing circuitry included in the processing circuitry of module 33 is high gain, low gain, no gain, and/or sound reduction circuitry.

An example of such an embodiment of module 33 is provided in FIG. 6B. As illustrated, at least a portion of the internal elements of module 33 includes connector 60 for communicatively (preferably detachably) and/or physically coupling module 33 to module fastener 31 and/or connector 20. Similar to FIG. 6A, in one embodiment, connector 60 is communicatively (e.g., electrically) coupled to processing circuitry 61, which may include sound processing circuitry. However, rather than being coupled to a microphone as in FIG. 6A, circuitry 61 is communicatively coupled to communications link 64. In the illustrated embodiment, shuttle 33 also includes power source 63 (e.g., a battery).

Furthermore, in embodiments where device 40 is to be used to receive and/or transmit data or other transmissions via a wired or wireless means to and/or from a remote device, e.g., a computer device (such as audio files, MP3 files, voice streams, video streams, Internet broadcasts, etc.) and/or a cell phone, preferably the communications link and/or processing circuitry of shuttle 33 is compliant with the various transmission formats, protocols (e.g., TCP/IP, Bluetooth), and/or interfaces necessary to receive and process the transmissions.

Moreover, in some embodiments, device 40 may be used to directly receive and/or transmit electrical (and/or other) signals, as well as convert acoustic waves into electrical (and/or other) signals. For example, in one embodiment, device 40 may convert the user's voice and/or other acoustic waves from the environment into electrical (and/or other) signals. Moreover, such signals may be processed and transmitted to speaker 13. In addition, such signals may be processed and transmitted to a remote device(s) (e.g., a cell phone, an intercom system). Furthermore, device 40 may receive signals from the remote device(s). In one of these embodiments, at least a portion of the interior of module 33 resembles the embodiment of FIG. 6A with the addition of communications link 64 communicatively coupled to processing circuitry 61.

Furthermore, in one embodiment, in addition to module 33, behind-the-ear unit 30 includes module fastener 31. In some embodiments, module fastener 31 facilitates the coupling of module 33 to connector 20. In one embodiment, at least a portion of module fastener 31 is made from plastic. Moreover, module fastener 31 may be transparent, translucent, opaque, and/or a combination thereof. In FIGS. 1 and 8, for purposes of illustration only, a portion of fastener 31 has been removed to enable the electrical prongs of one embodiment of device 40 to be seen.

In one embodiment, when earpiece auditory device 40 is assembled, fastener 31 is securely (preferably detachably) coupled to module 33 (as shown in FIG. 7). For example, in one embodiment, fastener 31 is of such a shape that it slips

US 7,016,512 B1

| 11 | 12 |

over at least a portion of module 33. Moreover, in one embodiment, fastener 31 includes one or more fastening projections (e.g, fastening projection 34) that engage one or more fastening notches of module 33 (e.g., notch 35) when fastener 31 is slipped over module 33 (thereby securing the attachment). In one of these embodiments, the one or more fastening projections include an appendage(s) for engaging the fastening notches. In addition to or in lieu of the above, fastener 31 may be coupled to module 33 by other means (e.g., screws, adhesives, and/or other fastening means). In a preferred embodiment, the coupling between fastener 31 and module 33 is of sufficient strength that completely-in-canal unit 10 may be removed from within the user's ear canal by pulling on connector 20, without separating fastener 31 from module 33. Furthermore, in one embodiment, the coupling between fastener 31 and module 33 is of sufficient strength that behind-the-ear unit 30 may be removed from behind the user's ear by pulling on connector 20.

In some embodiments, module 33 and fastener 31 can be detached from and/or reattached to each other. In one embodiment, this may be accomplished by depressing a surface(s) of fastener 31 and pulling the two pieces apart (e.g., an embodiment where the projection(s) of fastener 31 engage the notch(Es) of shuttle 33). In one embodiment, module 33 may be detached from fastener 31 by removing screws coupling the two components together.

Furthermore, in some embodiments, module 33 is communicatively (e.g., electrically) coupled to fastener 31. In one embodiment, the communicative coupling between module 33 and fastener 31 is fixed, e.g., hard-wired. In an alternative embodiment, the communicative coupling between shuttle 33 and fastener 31 is detachable, e.g., the detachable prong and hole connection shown in FIGS. 1 and 8. In one embodiment where fastener 31 is communicatively coupled to module 33, at least a portion of fastener 31 acts as a guard to protect the communicative coupling between fastener 31 and module 33 from one or more undesirable elements (e.g., moisture, dirt particles, etc.) that may be present in the environment in which unit 30 is used (e.g., the embodiments of FIGS. 1 and 8). Thereby, in such embodiments, fastener 31 preferably facilitates an insulated communicative coupling between the fastener and module. Moreover, in one embodiment, the projections of fastener 31 may help align electrical prongs of fastener 31 with receptacle holes of module 33 (or vice versa).

In addition, in some embodiments, fastener 31 includes a plurality of holes 36 that facilitate the passage of sound through fastener 31 and/or into module 33. In some of these embodiments, a filter 32 is included within fastener 31 to prevent foreign and unwanted particles (e.g., dirt and moisture) from getting inside fastener 31 and/or passing into module 33. In one embodiment, when the filter is no longer capable of providing satisfactory protection, the filter may be replaced by separating fastener 31 and module 33 (e.g., in the manner described above), removing the old filter from fastener 31, and placing a new filter therein. In some embodiments, rather than being included as part of fastener 31, filter 32 is part of module 33.

Preferably, module fastener 31 and/or module 33 are shaped so as to funnel sounds into the interior of module 33. For example, in one of the embodiments where module 33 includes a microphone, module fastener 31 and/or module 33 may be shaped so as to funnel sounds towards the microphone.

Moreover, as mentioned, in a preferred embodiment, when in use, behind-the-ear unit 30 is placed behind the cartilage of the user's ear. In one embodiment, fastener 31

and/or module 33 are of such size and shape that they are invisible to the casual observer when placed behind the cartilage of the user's ear. In addition, in some embodiments, fastener 31 and/or module 33 includes (or forms) an earhook that enables unit 30 to sit on top of the user's ear.

As discussed, in one embodiment, module 33 and fastener 31 can be securely fastened together. However, preferably, these individual elements can be easily detached from and reattached to each other, thus allowing for convenient assembly and disassembly, as well as replacement of any inoperative, defective, or otherwise unsatisfactory parts. For instance, if module 33 fails for some reason (e.g., moisture shorts the processing circuitry), in some embodiments, module 33 and fastener 31 can be detached from each other (in one embodiment, by depressing a surface(s) of fastener 31 and pulling the two pieces apart). A replacement module can then be selected. Afterwards, in one embodiment, fastener 31 can be coupled to the replacement module by slipping the fastener over the replacement module until the projections of fastener 31 engage the notches of the replacement module.

The dimensions and arrangement of the elements of behind-the-ear unit 30 shown in FIG. 1 is by way of example only, as the elements may be of a different size and shape, as well as arranged in a manner different from that which is depicted in FIG. 1. In addition, elements not depicted in FIG. 1 may be included in unit 30. On the other hand, elements included in FIG. 1 may be absent from unit 30. Furthermore, rather than being part of unit 30, some of the elements of unit 30 depicted in FIG. 1 may instead be part of connector 20, speaker module 10, or some portion of earpiece auditory device 40 other than MRP module 30. For example, in one embodiment, fastener 31 is part of connector 20.

In addition to the above, in one embodiment, connector 20 physically (preferably detachably) couples completely-in-canal-unit 10 to behind-the-ear unit 30. In a preferred embodiment, connector 20 includes at least one end that may be detachably physically coupled to unit 10 or unit 30. Also, in one embodiment, as part of the physical coupling of behind-the-ear unit 30 to completely-in-canal unit 10, connector 20 communicatively (e.g., electrically) couples completely-in-canal unit 10 to behind-the-ear unit 30. Moreover, in one embodiment, at least one of the earlier mentioned one or more ends of connector 20 that may be detachably physically coupled to unit 10 or unit 30 may be detachably communicatively coupled to unit 10 or unit 30.

In some embodiments, connector 20 includes hollow tubing 21 (preferably insulated and made from plastic). In one of these embodiments, wire cable(s) 22 is disposed within tubing 21. Preferably, only two or three wire cables are disposed within tubing 21. However, a greater or fewer number of wires can be disposed therein. For example, the processing circuitry of module 33 may require a greater or lesser number of wire cables within tubing 21. In an alternative embodiment, unit 10 and unit 30 are communicatively coupled via a wireless connection, and thus, wire cable(s) 22 are not present. Furthermore, as discussed earlier, in some embodiments, speaker 13, speaker fastener 14 and/or module fastener 31 are part of connector 20.

Preferably, wire cable(s) 22 is communicatively (e.g., electrically) and/or physically coupled to speaker fastener 14 (e.g., coupling 23 of FIG. 1). The communicative and/or physical coupling between wire cable(s) 22 and speaker fastener 14 may be fixed, such as through hard-wiring. On the other hand, the coupling between wire cable(s) 22 and speaker fastener 14 may be detachable, e.g., through a detachable electrical prong and hole arrangement.

Add00064

US 7,016,512 B1

13

Similarly, in one embodiment, wire cable(s) 22 is communicatively (e.g., electrically) and/or physically coupled to module fastener 31 (e.g., coupling 24 of FIG. 1). As was the case with respect to speaker fastener 14, the communicative coupling between wire cable(s) 22 and module fastener 31 may be fixed, such as through hair-drilling. On the other hand, the communicative coupling between wire cable(s) 22 and module fastener 31 may be detachable, e.g., through a detachable prong and hole arrangement.

In a preferred embodiment, connector 20 is of sufficient length to physically and/or communicatively couple unit 30 to unit 10 when unit 30 is placed behind-the-ear of a user and unit 10 is placed within the ear canal of a user so far as to touch the bony portion of the ear canal. Moreover, when in use, preferably a first portion of connector 20 is at least within the ear canal of the user. In some embodiments, e.g., when speaker 13 and/or speaker fastener 14 are part of connector 20, similar to the manner discussed earlier with respect to unit 10, a portion of connector 20 is inserted within and coupled to ear mold 11 of unit 10, e.g., through receiving member 12 (e.g., the assembled portion of device 40 depicted in FIG. 2). Accordingly, in one embodiment, a portion of connector 20, when in use, is part of an assembly that includes ear mold 11 and receiving member 12 of unit 10 that may be inserted so deep within the user's ear canal as to touch the bony portion. Furthermore, when in use, preferably a second portion of connector 20 is located behind the ear of the user (to include embodiments where fastener 31 is not part of connector 20). In addition, preferably, the dimensions of connector 20 are such that those portions of connector 20 not in the bony portion or outer portion of the user's ear canal or behind the user's ear are taut against the head of the user when device 40 is in use. In a preferred embodiment, the dimensions of connector 20 are such that connector 20 is indiscernible to one casually viewing the user when device 40 is in use.

Accordingly, completely-in-canal unit 10, connector 20, and behind-the-ear unit 30 may be physically and/or communicatively coupled together. In a preferred embodiment, one or more of these couplings are detachable, such that, unit 10 and/or unit 30 can be easily attached to and detached from connector 20 or vice versa, thus allowing for convenient and easy assembly of auditory device 40, as well as relatively easy replacement of any inoperative, defective, or otherwise unsatisfactory parts.

For instance, if connector 20 is deficient for some reason (e.g., a wire has failed and/or connector 20 is too long and thus is cosmetically undesirable when the device is in use), in one embodiment, the end of connector 20 coupled to unit 10 may be easily detached (at least relatively speaking) from unit 10 by pulling the pieces apart (e.g., embodiments where connector 20 is detachably coupled to fastener 14, such as through a hole and prong arrangement). Furthermore, in one embodiment, connector 20 may be detached from unit 30 by pulling apart a detachable coupling between connector 20 and fastener 31 (e.g., when connector 21 and fastener 31 are coupled via a hole and prong arrangement). In addition, an acceptable replacement connector may be selected. Afterwards, in one embodiment, one end of the replacement connector may be coupled to unit 10 by pushing fastener 14 and connector 20 together (e.g., a hole and prong coupling), while a second end of the replacement connector may be coupled to unit 30 by pushing connector 20 and fastener 31 together (e.g., a hole and prong coupling as well).

In some of the embodiments where speaker fastener 14 and/or module fastener 31 are part of connector 20, connector 20 may be separated from ear mold 11 by depressing a

14

portion(s) of ear mold 11, receiving member 12, and/or fastener 14 and pulling fastener 14 from ear mold 11. In embodiments where speaker 13 is part of unit 10, fastener 14 may then be removed from unit 10 by pulling speaker 13 from fastener 14 (e.g., where fastener 14 and speaker 13 are coupled via a hole and prong arrangement). In addition, in one embodiment, connector 20 may be separated from unit 30 by depressing a portion(s) of fastener 31 and pulling fastener 31 from module 33. A new connector may then be coupled (or the previous connector re-coupled) to unit 10 and/or unit 30 via one of the earlier described means for coupling fastener 14 to speaker 13 and ear mold 11 and/or coupling fastener 31 to shuttle 33.

Similar to earlier discussions, in a preferred embodiment, the coupling between connector 20 and unit 10 is of sufficient strength such that unit 10 may be removed from within the user's ear canal by pulling on connector 20. Moreover, in addition to or in lieu of the above, in one embodiment, the coupling between connector 20 and unit 30 is of sufficient strength such that unit 30 may be removed from behind the user's ear by pulling on connector 20.

The size, shape, dimensions, etc., of connector 20 shown in FIG. 1 are by way of example only, as connector 20 can be of numerous sizes and shapes. In addition, elements not depicted in FIG. 1 may be included in connector 20. For example, in one embodiment where speaker fastener 14 is part of connector 20, fastener 14 includes a retrieval line for aiding a user in retrieving and/or inserting unit 10 into and out of the user's ear canal. On the other hand, elements included in FIG. 1 may be absent from connector 20. Moreover, as mentioned, in at least one embodiment, connector 20 includes speaker 13, fastener 14, and/or fastener 31.

FIG. 9 depicts the embodiment of earpiece auditory device 40 shown in FIG. 1 after the embodiment of device 40 has been assembled. Again, it will be appreciated that the elements of device 40, as well as the arrangement of these elements, depicted in 9 are by way of example only, for earpiece auditory device 40 may have several configurations.

As a non-limiting example of such, FIGS. 10A, 10B, and 10C depict an alternative embodiment of earpiece auditory device 40. In the embodiment of FIG. 10A, similar to the embodiment illustrated in FIG. 1, earpiece auditory device 40 includes ear mold 11, speaker receiving member 12, speaker 13 and speaker fastener 14. The earlier discussions regarding ear mold 11, speaker receiving member 12, speaker 13 and speaker fastener 14 apply equally as well to the embodiments of these elements present in the embodiment of FIG. 10A.

Also similar to the embodiment of FIG. 1, device 40 also includes connector 20. The above discussions regarding connector 20 also apply equally as well to connector 20 of FIG. 10A. However, in the embodiment of FIG. 10A, rather than potentially including module fastener 31, connector 20 instead includes module fastener 100. Preferably, module fastener 100 is operable to plug into connector receptacle 120 of processing module 110 (as shown in FIGS. 10B and 10C).

Processing module 110 of FIGS. 10A, 10B, and 10C is similar to module 30, one difference being that module 110 does not potentially include fastener 31. Otherwise, the above discussions regarding module 30 apply equally as well to module 110.

Exemplary embodiments of at least a portion of the interior of module 110 are depicted in FIGS. 11A and 11B. In the embodiment of FIG. 11A, at least a portion of the

US 7,016,512 B1

**15**

interior of module 110 includes a connector 160 (which preferably includes receptacle 120) for communicatively (e.g., electrically) and/or physically coupling module 110 to connector 20. In one embodiment, such a coupling(s) is detachable. Moreover, in one embodiment, connector 160 is communicatively coupled to processing circuitry 140 (similar to earlier discussions, such processing circuitry may include sound processing circuitry). In the illustrate embodiment, processing circuitry 140 is communicatively coupled to microphone 130. In one embodiment, module 110 includes power source 150 (e.g., a battery).

Another exemplary embodiment of at least of a portion of the interior of module 110 is depicted in FIG. 11 B. Similar to FIG. 11 A, in the embodiment of FIG. 11B, the internal circuitry of module 110 includes connector 160 for communicatively (e.g., electrically) and/or physically coupling module 110 to connector 20. Also similar to FIG. 11A, in at least one embodiment, connector 160 is communicatively coupled to processing circuitry 140 (similar to earlier discussions, such processing circuitry may include sound processing circuitry). However, rather than being coupled to a microphone as in FIG. 11A, circuitry 140 is communicatively coupled to communications link 170. In the illustrated embodiment, module 110 also includes power source 150 (e.g., a battery).

Moreover, in one embodiment, at least a portion of the interior of module 110 resembles the embodiment of FIG. 11A with the addition of communications link 170 communicatively coupled to processing circuitry 140.

In various embodiments, the earpiece auditory device of the present invention overcomes the difficulties associated with prior earpiece auditory devices.

With regards to the problem of bulkiness and noticeability of earlier prior art auditory devices, as previously mentioned, when in use, preferably completely-in-canal unit 10 is positioned so deep inside the ear canal of a user as to touch the bony portion of the user's hearing canal. Accordingly, the unit is indiscernible to an observer. In addition, in one embodiment, fastener 31 and module 33 are of a particular size and shape such that, when placed behind the cartilage of the ear of a user, fastener 31 and module 33 are made invisible to an observer by the cartilage of the user's ear. Also as mentioned, in one embodiment, the dimensions of connector 20 are such that those portions of connector 20 not in the bony or outer portion of the user's ear canal or behind the user's ear when device 40 is in use are taut against the head of the user. Furthermore, in at least some of these embodiments, the dimensions of connector 20 are such that connector 20 is indiscernible to one casually viewing the user. Accordingly, in one embodiment, when device 40 is in use, its presence will be indiscernible to the casual observer. Therefore, the earlier problems of bulkiness and noticeability are reduced, if not alleviated, by the present invention.

With respect to the occlusion dilemma discussed earlier, because, in one embodiment, completely-in-canal unit 10 is inserted so deep in the user's ear canal as to touch the bony portion, the device does not cause the patient to experience the occlusion effect. Therefore, embodiments of the present invention reduce the occlusion effect without having to resort to vents, open mold configurations, etc. (although vents, open molds, etc., may still be used for other purposes).

Similarly, with regards to the feedback problems occurring with some prior art auditory devices (e.g., conventional hearing aids), in some embodiments, the microphone(s) of device 40 (or equivalent device(s)) is mechanically isolated

**16**

from the speaker(s) of device 40. Therefore, electroacoustic feedback is, at the very least, greatly reduced.

Accordingly, various embodiments of the present invention enable a user to have the benefit of a high-gain earpiece auditory device without the accompanying detriment of suffering from the occlusion effect.

In addition to the above, in some embodiments, at least portions of the earpiece auditory device are protected from one or more undesirable external elements (such as moisture, cerumen, dirt, etc.) to which certain prior art devices are susceptible.

Moreover, in one embodiment, the couplings of the earpiece auditory device do not require significant space in order to be implemented. Accordingly, significant device space and/or other limited space in around the user's ear need not be taken up by the couplings of embodiments of the present invention.

Furthermore, in one embodiment, the coupling(s) between the connector, the behind the ear component, and the completely-in-canal component is of sufficient strength that the completely-in-canal unit and behind-the-ear unit may be removed from the user's ear by pulling on the connector without any undesirable separation of the components.

Moreover, as mentioned earlier, in a preferred embodiment, one or more portions of the earpiece auditory device may be assembled with relative ease. As a result, in one embodiment, an earpiece auditory device in accordance with the present invention may be mass produced, while at the same time provide a tailored fit to one or more users.

For example, rather than waiting until a particular customer has been fitted, tested, etc., to manufacture an auditory device for that customer, the manufacturer(s) of at least one embodiment of an earpiece auditory device of the present invention may instead make available one or more mass produced components (and/or elements thereof) of an embodiment(s) of the earpiece auditory device. The user, or other individual, may then select from the above described components, elements, etc, those components, elements, etc., that provide the fit and functional capabilities desired by the user. The user, or other individual, may then assemble the device himself/herself.

To illustrate, the manufacturer(s) may make available a plurality of behind-the-ear units from which a behind-the-ear unit operable to facilitate a particular user's intended use for an earpiece auditory device may be selected. This plurality of behind-the-ear units may include units of different types, shapes, sizes (e.g., so that a user may select a behind-the-ear unit that is of a particular size so that the unit is made invisible by the user's ear when placed behind the user's ear), functional capabilities (e.g., two or more of the behind-the-ear units may have different sound processing circuitry), etc. However, two or more of the behind-the-ear units may be of the same type, shape, size, functional capability, etc.

The manufacturer(s) preferably may also make available a plurality of one or more elements of a completely-in-canal unit (e.g., a plurality of ear molds and/or a plurality of speakers) and/or a plurality of completely-in-canal units, from which a user, or other individual, may select at least one of the elements to be included in the completely-in-canal unit of the user's device. Similar to the earlier discussion, the plurality of one or more elements includes elements of different, types, shapes, sizes (e.g., multiple pre-made sizes of ear molds), functional capabilities (e.g., the plurality of one or more elements may include two or more speakers having different speaker performance characteristics), etc.

US 7,016,512 B1

17

However, similar to the above discussion, in one embodiment, two or more of the earlier mentioned plurality may be of the same type, shape, size, functional capability, etc. In one embodiment, the earlier mentioned plurality may include universal-fit tips, such as the foam tips, slips, boots, etc., described earlier, to provide a desired fit for the user. Furthermore, custom-made ear molds may be included as well.

In addition, in one embodiment, the manufacturer(s) may also make available a plurality of connectors from which a user may select a connector to couple (physically and/or communicatively) the selected behind-the-ear unit to a selected completely-in-canal component or the completely-in-canal unit that includes the one or more selected elements. In a preferred embodiment, at least one of the connectors includes at least one end operable to detachably couple (physically and/or communicatively) the connector to the selected behind-the-ear unit or completely-in-canal unit. Similar to the above discussions, the plurality of connectors may be of different types, sizes (e.g., different lengths), shapes, functional capabilities, etc. Moreover, two or more of the plurality of connectors may be of the same type, size, shape, functional capability, etc. Preferably, from the plurality of connectors, the user may select a connector of sufficient length to couple the selected behind-the-ear component, when placed behind the ear of the particular user, to the completely-in-canal unit, when placed inside the ear canal of the particular user so deep as to touch the bony portion of the user's ear canal. In another embodiment, preferably the user may select a connector of such dimensions that when in use, those portions of the connector not in the bony or outer portion of the user's ear canal or behind the user's ear are taut against the user's head.

The above, units, elements, etc., may be offered on an individual basis or in combination with other elements, sizes, shapes, etc. (e.g., one packet may contain an ear mold of a particular shape and size, while another packet may contain ear molds of various types, shapes and sizes, while yet another packet may contain a particular length of connector, and still another packet may contain a speaker and a connector already coupled together).

As discussed earlier, the user, or other individual, may then assemble the selected pieces together to form an earpiece auditory device fitting the user's ear structure, as well as the user's intended use for the device. Accordingly, a distributor, dispenser, or the user himself/herself, may make the initial assembly of the device, instead of the manufacturer. In addition, in one embodiment, the distributor, dispenser, user, etc., may tailor the device to fit the particular user's ear structure, as well as the user's intended use for the device, by determining which combination of the pre-made elements, sizes, shapes, etc., provides an optimal fit and operation for the particular user.

Moreover, not only is assembly made more convenient, but disassembly, re-assembly, repair, fitting, re-fitting, etc., is made convenient as well. Preferably, as a result, the device may be repaired, etc., without the need to send the device to a repair lab or return the device to the manufacturer, thereby saving the user from the earlier described hassle associated with sending the device to the manufacturer. The same holds true with refitting the device to a particular user if the initial fit was deficient in some manner. In such instances, the distributor/dispenser and/or the user may simply experiment with the various pre-made sizes until the optimal fit for the user is found.

Thus, preferably the present invention saves time and money for the user(s), the manufacturer(s), and/or the dis-

18

tributor(s)/dispenser(s). However, the manufacturer may still initially assemble the auditory devices and then make the other pre-made components commercially available for repair or replacement purposes.

Another notable advantage is that, in various embodiments, the earpiece auditory device discussed above may be used in a variety of applications. For example, embodiments of the earpiece auditory device may be used in a manner similar to conventional hearing aids.

In addition, embodiments of the earpiece auditory device may be used as earphones (or similar device(s)) for such electronic devices as televisions, radios, CD players, stereos, cell phones, computers (to include personal digital assistants and other processor based devices). As mentioned, in one embodiment, the earpiece auditory device may receive transmissions from and/or broadcast transmissions to a remote device(s) by wired or wireless means (e.g., radio frequency (RF) means, optical means, magnetic induction coil, etc.).

Moreover, in at least some embodiment(s), the earpiece auditory device may receive and/or broadcast data or other transmissions (be it via wired or wireless means) to a remote device (e.g., audio files, MP3 files, voice streams, video streams, Internet broadcasts, audio e-mails, etc). The device may be complaint with the various transmission formats, protocols (to include TCP/IP, Bluetooth, etc.), and interfaces necessary to receive and/or process such transmissions.

Embodiments of the earpiece auditory device of the present invention may also be used as monitors for recordings. For example, a musician, or other individual recording sounds, may hear sounds as they are being processed by studio equipment through an embodiment of the present inventions.

In addition, embodiments of the earpiece auditory device may be used as IFB devices, e.g., for newscasters, whereby audio may be provided to the newscaster.

In addition to manipulating sound in the manner described above, embodiments of the earpiece auditory device of the present invention may be used to decrease, muffle, or eliminate certain sounds. For example, as discussed earlier, in at least one embodiment the earpiece auditory device of the present invention may be used as an electronic ear plug.

FIGS. 12A–12C illustrate potentially disposable link module 1220 integral with speaker module 1212, in accordance with an alternative embodiment of the present invention. FIGS. 13A–13C illustrate universal tip module 1330 detachably interconnectable with speaker module 1212, in accordance with embodiments of the present invention. FIGS. 14A–14B illustrate the assembly of link module 1220 and universal tip module 1330 into behind-the-ear/completely-in-canal (BTE/CIC) earpiece auditory device embodiment 1440, including BTE processing module, for example processing module 110, in accordance with embodiments of the present invention.

Link module 1220, similar to connector 20 of FIGS. 10A–10C, at its proximal end is detachably coupled physically and communicatively to processing module 110 using, for example, previously described module fastener 100, to construct alternative BTE/CIC earpiece auditory device embodiment 1440. The physical size and shape of processing module 110 are designed to fit discreetly and comfortably behind the user's ear. In some embodiments, processing module 110 incorporates at least one user-operable switch 1450, which can control volume, change memory, and/or select the mode of operation of processing circuitry internal to processing module 110, for example t-coil, directional microphone, wireless communication, and the like. Embodi-

US 7,016,512 B1

19

ments of interior portions of processing module 110 are described above in connection with FIGS. 11A–11B.

Similar to connector 20, link module 1220 includes flexible tubular portion 1222, which physically and communicatively couples BTE processing module 110 with CIC unit 1410, functionally analogous with CIC unit 10, described above in connection with FIG. 1. Unlike connector 20, the distal end of link module 1220 is permanently attached to speaker module 1212, which at least partially encases speaker 1540 (refer to FIG. 15A). In some embodiments, one end of tubular portion 1222 is communicatively coupled to speaker 1540, e.g., by wiring connections, and then encapsulated with speaker 1540 into the shell of speaker module 1212, e.g., using a plastic injection molding operation. The tubing material of tubular portion is typically silicone, fluorocarbon (e.g., PTFE) or similar flexible plastic material, which is attached by gluing, laser welding, or other suitable technique. Preferably speaker module 1212 is formed of a hard and rigid plastic material.

In some embodiments, CIC unit 1410 includes a universal tip assembly, for example universal tip assembly 1330, incorporating conventional soft umbrella tip 1320 slipped on over the tubular neck of hollow sleeve 1310, as depicted in FIGS. 13A–13C. Sleeve 1310 is preferably made of a soft resilient urethane or silicone type polymer material. Umbrella tip 1320 is made of a polymer material softer than that of sleeve 1310, preferably a soft silicone or alternatively a polymer foam. Universal tips or ear molds, such as umbrella tip 1320, are normally available in a range of sizes which are selectable to fit any ear canal.

In one embodiment, speaker module 1212 and sleeve 1310 are configured to be releasably latched together. Speaker module 1212 and sleeve 1310 have similarly shaped cross-sections, such that speaker module 1212 is inserted into open end 1316 of sleeve 1310. Surfaces of speaker module 1212 are appropriately tapered and/or radiused, such that they deform and pry apart the walls of sleeve 1310. Rigid flange 1214 of speaker module 1212 slides over and outwardly deflects resilient strap 1314 of sleeve 1310. After flange 1214 clears strap 1314, flange 1214 engages slot 1312 of sleeve 1310, where it is latched securely into place by resilient strap 1314, which has elastically relaxed to its undeflected shape and position. CIC unit 1410 incorporating universal tip assembly 1330 and speaker module 1212 can then be inserted within any user's ear canal. To release sleeve 1310 from speaker module 1212, a user or dispenser pries strap 1314 outwardly using a suitable tool (e.g., thumbnail) until it clears flange 1214, and then withdraws speaker module 1212 from open end 1316 of sleeve 1310 (e.g., by applying moderate pulling force to tubular portion 1222 of link module 1220). Those skilled in the art will recognize that other releasable latching schemes can be employed, which fall within the scope and spirit of the present invention.

Advantageously, in embodiments of earpiece auditory device 1440, link module 1220 in its entirety including speaker module 1212 is dispenser replaceable by the professional without needing to be returned to the factory. Optionally, universal tip assembly 1330, which is inexpensive, can be separately dispenser or user replaceable.

FIGS. 15A–15B depict a further embodiment of CIC/BTE earpiece auditory device 1440, including link module 1520 incorporating custom ear mold 1510 fastened by a detachable locking pin. FIGS. 15C–15F illustrate details of detachable locking pin assembly embodiment 1550 used in link module embodiment 1520. Similar to link module 1220, link module 1520 includes module fastener 100, tubular portion

20

1522 similar to tubular portion 1222, and integrally attached speaker module 1212, which in the present embodiment is encapsulated together with hollow straight tube 1512 aligned along the axis of speaker 1540. Speaker module 1212 can be encapsulated into a variety of sizes and shapes, but for commonality of manufacturing is depicted with the same size, shape, and material as described in connection with FIGS. 12A–12C and 14A–14B.

Custom ear mold 1510 is made of a soft polymer material, for example an elastomer or silicone in the 3–40 durometer range, and is individually shaped to fit exactly within the ear canal of a particular user. In the present embodiment, custom ear mold 1510 is encapsulated around collar 1513, which contains a clearance hole dimensioned to slide over the outer diameter of hollow straight tube 1512. Preferably custom ear mold 1510 is fabricated using a form of rapid prototyping technology, for example stereolithography (SLA). With this technology, the surface of user's ear canal or an ear mold cast from the user's ear is optically scanned, and the scan data is used to control a selective polymerization or material removal process to replicate exactly the shape of the original scanned surface. In some implementations, the scan data is digitized, electronically stored indefinitely, and/or manipulated or processed as desired. In some versions a direct replica, e.g., custom ear mold 1510 is produced from the scan data. In other versions a negative shell or mold of acrylic or other suitable material is produced directly, from which custom ear mold 1510 is produced indirectly by a casting process.

To assemble CIC module 1530 of link module 1520, custom ear mold 1510 containing collar 1513, slides over hollow straight tube 1512 encapsulated into speaker module 1212, until custom ear mold 1510 seats against speaker module 1212. Hollow detachable locking pin 1514 containing flange 1515 is inserted through the open end of collar 1513 and is forced into hollow straight tube 1512. Because the outside diameter of flange 1515 is larger than the inside diameter of hollow straight tube 1512, detachable locking pin 1514 makes an interference fit with hollow straight tube 1512, thereby deforming the outer wall of hollow straight tube 1512 and locking custom ear mold 1510 onto speaker module 1212 through frictional force. CIC module 1530 containing custom ear mold 1510 can then be inserted within the user's ear canal. To disassemble CIC module 1530, detachable locking pin 1514 can be pried out of hollow straight tube 1512 using a suitable tool, for example a wedge, vise, or pliers. Detachable locking pin 1514, collar 1513, and hollow straight tube 1512 are preferably made of a resilient silicone or fluorocarbon (e.g., PTFE) type polymer material.

Alternatively, detachable locking pin assembly 1550 can be used to secure a conventional universal soft umbrella tip, similar to umbrella tip 1320, onto speaker module 1212.

FIGS. 16A–16B depict an alternative earpiece auditory device, in accordance with embodiments of the present invention, having a custom ear mold directly encapsulated onto link module 1620. Similar to link module 1520 depicted in FIGS. 15A–15B, link module 1620 incorporates module fastener 100, tubular portion 1522, and speaker module 1212 encasing speaker 1540. Custom ear mold 1610 similar to custom ear mold 1510 is directly encapsulated around speaker module 1212. Orifice 1612 in the tip of custom ear mold 1610 provides a sound conducting passage to speaker 1540. CIC module 1630 includes custom ear mold 1610 and speaker module 1212. The materials and

US 7,016,512 B1

<table>
<tr><td>21</td><td>22</td></tr>
</table>

fabrication technology used in custom ear mold 1610 are substantially the same as those used in custom ear mold 1510.

This nondetachable version is essentially a single-piece component that includes speaker module 1212 all the way to custom ear mold 1610. Speaker 1540 is thus completely encapsulated into a custom molded component, and accordingly would be disposable, such that if speaker 1540 failed, rather than repairing that speaker, an entire exact duplicate assembly can be recreated using the electronically stored scan data file of that particular ear mold. Everything including entire link module 1620 and from there downward would be replaced.

Detachability typically occurs between module fastener 100 at the proximal end of link module 1620 and BTE processing module 110. In other words, the complete custom version auditory device appears as a two-piece unit to the user or dispenser: just the BTE processor 110 and link module 1620 including integral speaker module 1212 and custom ear mold 1610, versus the three-piece configuration of universal version 1440.

In some embodiments, the distal end of link module 1220 or 1620 could be detachable from the speaker module and ear mold. However, it may be more cost effective and efficient not to add the complexity and expense of the additional distal connector pins to couple wires that go through that link to the speaker, but simply to make link module 1220 or 1620 disposable including integral speaker module 1212 and custom ear mold 1610.

In alternative embodiments, the proximal end of link module 1220 or 1620 could be nondetachably integrated with BTE processing module 110, thereby eliminating detachable module fastener 100, such that BTE/CIC earpiece auditory device 1440 can be manufactured as a single-piece disposable unit.

FIG. 17 depicts a cross section anatomical view of the ear canal in the transverse plane of the head. The ear canal can be described as having three segments. The first segment represents the medial concha cavity 1720 just behind the tragus 1721, which is relatively large and is surrounded by cartilaginous tissue 1722. The second cavity 1723, medial to the aperture 1724 of the external acoustic meastus 1711, is generally smaller and is also surrounded by cartilaginous tissue 1722. The third cavity 1725 defines the final canal segment near the tympanic membrane 1726 and is surrounded by dense bony tissue 1727. The tissue lining the cartilaginous region 1723 is relatively thick and has a well developed subcutaneous layer, thus allowing some expansion to occur. In contrast, the tissue 1729 lining the bony region 1725 is relatively thin and therefore, little or no tolerance for expansion exists in this region.

The shape of the ear canal, unlike what is shown in most artistic renderings, is rarely cylindrical or conical with gradual narrowing towards the tympanic membrane. Instead, most ear canals are nonuniform with various levels of contours. Specifically, the ear canal is generally "S" shaped with a first bend 1730 occurring approximately at the aperture of the ear canal and a second bend occurring at the cartilaginous-bony junction.

Many known hearing aid designs attempt to address the nonuniformity of the air canal. Specifically, many in-the-canal hearing aids utilize custom fittings to provide a hearing-aid cover that conforms to the shape of an individual's air canal. The custom fitting may be achieved by taking an impression of the ear canal by a dispensing professional. The purpose of the custom fitting is to provide an acoustic seal to facilitate improve audio performance and to prevent audio feedback. However, custom fittings are problematic. Specifically, when traversed through an individual's air canal which is typically non-uniform, the custom fittings may cause discomfort or, in some cases, other more serious complications (such as hematoma).

Representative embodiments provide an in-the-canal hearing aid design that enables an acoustic seal and improved acoustic performance while also enhancing user comfort. Referring now to FIG. 18, disposable speaker unit 1800 is shown. Disposable speaker unit 1800 includes speaker housing 1801 which encloses the electronic components that generate audio signals for the user. Speaker housing 1801 may advantageously possess a tubular portion that possess a diameter that is less than the diameter that a user's air canal. Specifically, the diameter of speaker housing 1801 is preferably less than the diameter of the air canal through the first and second segments of the air canal as shown in FIG. 17. Speaker housing 1801 further comprises arcuate raised ridge 1802 to facilitate retention of a cushion tip as will be discussed in greater detail below. Disposable speaker unit 1800 further includes wire portion 1803 and prongs 1804 to receive an electrical signal to drive the electronic components within speaker housing 1801. Prongs 1804 may advantageously facilitate a detachable electrical and mechanical connection to an audio processing module.

FIG. 19 depicts cushion tip 1900 that may be used to enhance user comfort according to representative embodiments. Cushion tip 1900 may be fabricated utilizing a suitable polymer material, silicone material, and/or the like. Cushion tip 1900 may be deformable and deflectable. Cushion tip 1900 includes empty tubular portion 1901 that receives speaker housing 1801. Tubular portion 1901 may be advantageously longer than speaker housing 1801. By implementing tubular portion 1901 and speaker housing 1801 in this manner, cushion tip 1900 may provide a degree of "play" that enhances user comfort when speaker housing 1801 is traversed through the user's ear. Cushion tip 1900 is further adapted to prevent housing unit 1801 from being pushed through the aperture of cushion tip 1900 during traversal through a user's ear canal. As shown in FIG. 19, cushion tip 1900 possesses sufficient structural rigidity by including reduced diameter 1902 to prevent speaker housing 1801 from being pushed through the aperture. Further, cushion tip 1900 prevents separation from speaker housing 1801 by applying an elastic force on arcuate raised ridge 1802 of speaker housing 1801 when speaker housing 1801 is removed from the user's ear canal.

As shown in FIG. 20, housing unit 1801 and cushion tip 1900 are shown to be inserted into the ear canal. Speaker housing 1801 and cushion tip 1900 are between the second and third segments of the ear canal (see discussion of FIG. 17). Accordingly, these components are disposed at a bend in the ear canal. Ordinary in-the-canal designs could cause user discomfort at this point because of the relatively rigid nature of the custom-fitted housing. However, representative embodiments enable cushion tip 1900 to deflect during traversal through the ear canal. The deflection acts to guide speaker housing 1801 through the canal without causing substantial impact of the rigid plastic housing to impact the user's canal. Also, when speaker housing 1801 is placed at its resting position (e.g., just within bony region 1725), cushion tip 1900 facilitates an acoustic seal thereby improving the listening experience of the user.

Although the present invention and its advantages have been described in detail, it should be understood that various changes, substitutions and alterations can be made herein without departing from the invention as defined by the

2/29/08, EAST Version: 2.2.1.0

US 7,016,512 B1

23

appended claims. Moreover, the scope of the present application is not intended to be limited to the particular embodiments of the process, machine, manufacture, composition of matter, means, methods and steps described in the specification. As one will readily appreciate from the disclosure, processes, machines, manufacture, compositions of matter, means, methods, or steps, presently existing or later to be developed that perform substantially the same function or achieve substantially the same result as the corresponding embodiments described herein may be utilized. Accordingly, the appended claims are intended to include within their scope such processes, machines, manufacture, compositions of matter, means, methods, or steps.

What is claimed is:

1. An at least partially in-the-canal module for a hearing aid comprising:

a speaker module that generates audio signals from an electrical driving signal, said speaker module having a tubular structure with a diameter that is smaller than the canal, said speaker module including an arcuate raised ridge; and

a cushion tip of elastic deformable material, said cushion tip including a tubular body enclosing said speaker module that applies an elastic force to said arcuate raised ridge to prevent removal of said speaker module from said cushion tip, said tubular body being longer than said speaker module to cause said cushion tip to deflect during navigation through the canal, and wherein a tip portion of said cushion tip possesses sufficient structural rigidity to prevent said speaker module from being pushed through said cushion tip during navigation through the canal, wherein during deflection said tip portion assumes an offset angle relative to said tubular body and said speaker module.

2. The at least partially in-the-canal module for a hearing aid of claim 1 further comprising:

an insulated wiring portion fixidly attached to said speaker module that enables said speaker module and said cushion tip to be removed from said canal and that communicates said electrical driving signal.

3. The at least partially in-the-canal module for a hearing aid of claim 2 wherein said insulated wiring portion is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to an audio processing module.

4. The at least partially in-the-canal module for a hearing aid of claim 1 wherein said elastic deformable material is a polymer material.

24

5. The at least partially in-the-canal module for a hearing aid of claim 1 wherein said elastic deformable material is a silicone material.

6. The at least partially in-the-canal module for a hearing aid of claim 1 wherein said tip portion is sized to substantially seal said canal when said tip portion is inserted into the bony portion of the canal.

7. A hearing aid comprising:

a behind-the-ear module comprising a microphone for receiving an audio signal and a signal processing component for generating an electrical driving signal;

a speaker module that generates audio signals from said electrical driving signal, said speaker module having a tubular structure with a diameter that is smaller than the canal, said speaker module including an arcuate raised ridge; and

a cushion tip of elastic deformable material, said cushion tip including a tubular body enclosing said speaker module that applies an elastic force to said arcuate raised ridge to prevent removal of said speaker module from said cushion tip, said tubular body being longer than said speaker module to cause said cushion tip to deflect during navigation through the canal, and wherein a tip portion of said cushion tip possesses sufficient structural rigidity to prevent said speaker module from being pushed through said cushion tip during navigation through the canal, wherein during deflection during said navigation said tip portion assumes an offset angle relative to said tubular body and said speaker module.

8. The hearing aid of claim 7 further comprising:

an insulated wiring portion fixidly attached to said speaker module that enables said speaker module and said cushion tip to be removed from said canal and that communicates said electrical driving signal.

9. The hearing aid of claim 8 wherein said insulated wiring portion is terminated by a plurality of prongs that provide a detachable mechanical and electrical connection to said behind-the-ear module.

10. The hearing aid of claim 7 wherein said elastic deformable material is a polymer material.

11. The hearing aid of claim 7 wherein said elastic deformable material is a silicone material.

12. The hearing aid of claim 7 wherein said tip portion is sized to substantially seal said canal when said tip portion is inserted into the bony portion of the canal.

* * * * *

March 3, 1964
J. G. PRENTISS ETAL
3,123,678

HEARING AID APPARATUS

Filed Dec. 13, 1955

3 Sheets—Sheet 1



Fig. 1

Fig.2

Fig.4

Fig.5

Fig.6

Fig.7

Fig.3

INVENTORS:
JOHN G. PRENTISS and
JOHN T. VALASKOVIC

BY John J. Pederson
ATTORNEY

March 3, 1964

Filed Dec. 13, 1955

J. G. PRENTISS ETAL
HEARING AID APPARATUS

3,123,678

3 Sheets-Sheet 2



*Fig. 8*



*Fig. 9*

INVENTORS:
JOHN G. PRENTISS and
JOHN T. VALASKOVIC

BY *John J. Pederson*

ATTORNEY

Add00072

March 3, 1964     J. G. PRENTISS ETAL     3,123,678
HEARING AID APPARATUS

Filed Dec. 13, 1955

3 Sheets-Sheet 3



*Fig. 10*     *Fig. 11*



*Fig. 12*     *Fig. 13*

INVENTORS:
JOHN G. PRENTISS and
JOHN T. VALASKOVIC

BY *John J. Pederson*

ATTORNEY

# United States Patent Office

3,123,678
Patented Mar. 3, 1964

1

3,123,678
HEARING AID APPARATUS
John G. Prentiss, Berwyn, and John T. Valaskovic, Chicago, Ill., assignors to Zenith Radio Corporation, a corporation of Delaware
Filed Dec. 13, 1955, Ser. No. 552,744
17 Claims. (Cl. 179—107)

This invention relates to wearable hearing aid instruments, and particularly to an improved electronic hearing aid of such special shape and compact configuration that the entire instrument can be supported by the external ear of the user.

*Introductory Discussion*

In order to appreciate fully the significance of the present invention, and its relationship to prior art developments, a brief review of the technical background may be helpful. Ever since the initial advent of the electronic amplifier, efforts have been made to to apply it to overcoming the handicap of those whose hearing is partially or wholly impaired. Early versions of the electronic hearing aid were extremely bulky and cumbersome by present day standards; the early wearable hearing aids commonly required separate cases of substantial size to house the amplifier itself and the necessary batteries to power the same. While it was feasible in some cases to mount the microphone in one of these cases, the ear piece (or bone-conduction vibrator) ordinarily had to be located on the user's head, and connected to the amplifier casing by wires. Wires connecting the amplifier to the batteries were also needed. By thus separating the major components, the sizes thereof were kept sufficiently low to permit them to be more or less effectively concealed by the user's clothing. However, both size and weight remained substantial, and represented a source of discomfort or annoyance, particularly if the user was at all sensitive to public recognition of his impaired hearing. This sensitivity of the hard of hearing in many cases prevented their acceptance of the technical advances which would have greatly alleviated their impairment, and it remains today a substantial obstacle to the adoption of the hearing aid by many persons who prefer to suffer a hearing impairment where the remedy involves bulky equipment or conspicuous wiring or appliances.

It is true that later advances in electronics, particularly the advent of efficient miniature thermionic tubes and associated components, and the development of small and light-weight batteries, have permitted the electronic hearing aid to be reduced to a single small casing containing microphone, amplifier and batteries. Such a unit can readily be carried in a vest pocket or elsewhere upon the person, but must still be connected by wires to an earpiece or vibrator on the user's head. Not only are these wires unsightly and objectionable to many persons, but they are subject to more or less continuous wear and motion, and hence need frequent replacement. A more serious objection to this system, which is typical of the art prior to the present invention, is that maximum concealment of the instrument casing, as in a pocket, produces two serious and related consequences. First, since the microphone is shielded acoustically from sounds originating away from the user's body, substantially greater amplification is needed than would be the case if the microphone were freely exposed. This increase in amplification, or sensitivity, makes the system especially sensitive to noise produced by movements of the wearer's clothing adjacent the microphone and/or its cord. The rustling sounds thus amplified and fed into the earpiece or other reproducer can only be attenuated at the expense of lessened output or reduced reproduction quality. The effort to make the instrument inconspicuous has thus been to some

2

extent self-defeating, and has produced its share of resistance to the use of hearing aids by many who could be greatly benefited by such assistance.

The present invention aims to solve the dilemma outlined above by a basically new approach to the design of wearable hearing aid devices. Essentially, the invention provides a hearing aid in which all of the components, including microphone, amplifier, battery supply and the earpiece or reproducer, are carried and supported directly by the user's ear, yet in such a way that the entire device is considerably less conspicuous than presently conventional appliances in this field. The satisfactory accomplishment of this result in a practical and acceptable device requires more than merely the use of miniature components and batteries. Several serious problems are raised by such an objective, and it is to the solution of these problems that the present invention is directed.

*Objects of the Invention*

From the foregoing discussion, it will have been realized that the principal object of the invention is to provide an electronic hearing aid appliance all of whose parts are carried and supported directly by the user's ear, or (in the case of binaural hearing assistance to be described below), by his respective ears. A related object of the invention is to provide such a hearing aid which is of such special shape and compact form that it is largely concealed by the ear, specifically by reason of being located behind and beneath the external helix of the ear. By this construction, not only is the instrument rendered in all cases quite inconspicuous, but in the instance of wear by women, it can be rendered wholly invisible. Not only is the wearer freed entirely from the need for connecting wires extending from the ear or head downward into the clothing, which is in itself a substantial improvement from the viewpoint of concealment, but the centralization of the entire apparatus at the ear enables the wearer to position and remove the unit at will. Thus, a very sensitive person is enabled to remove the appliance when going in public, for example, without disconnecting wires or connectors, and need not forego the benefits of hearing assistance at other times and places.

It is believed that the combined effect of this elimination of exposed wiring and unitary removability should go far toward overcoming the social or psychological opposition to hearing assistance which even today prevents large numbers of shy or sensitive persons from enjoying the benefits of adequate hearing. It is further considered that once these benefits are realized by such users of the present invention, a gradual acclimation to the use of the device will ultimately overcome excessive shyness to the end that full hearing acuity may be enjoyed at all times and places.

A collateral object of the invention is to provide a unitary hearing aid device so arranged and designed that a single instrument may be used in either the right or left ear, as occasion dictates or as a particular unilateral impairment requires. While the ordinary user normally prefers assistance always at a particular ear, there are occasions when a change is desired; e.g., depending upon one's orientation in a fixed group of people. The interchangeability as to left and right also has other practical merits. It permits a single type of unit to be manufactured, effecting production economies and minimizing inventory at the factory and all distribution points; the resulting saving in cost to the user may be substantial. Moreover, duplicate units may be used in both the user's ears to provide the advantages of binaural listening at minimum cost.

It has already been mentioned that a great disadvantage of prior art hearing aids is that the microphone concealed

Add00074

3,123,678

**3**

by clothing picks up considerable rustle noise therefrom. The centralization of the microphone on the head eliminates this failing, and of course since clothing no longer muffles the microphone, a desired signal output can be realized from a simpler and less expensive amplifier, or with less battery replacement expense. An advantage of the ear-supported microphone which is especially related to binaural hearing assistance, using an instrument at each ear, is that the directional axis shifts as the head is turned, so that direction estimation is related to head movements, and to differential intensity at the respective ears, in the natural way of persons having unimpaired hearing. This contrasts, for example, with efforts to obtain binaural hearing assistance by separate body-carried microphones, in which case the directional axis does not follow head movements.

A further object of the invention is to provide a hearing aid whose parts are shaped and related so that the assembly is self-supporting on the user's ear; that is, one in which the support function is accomplished as an incident to the other functions, and without requiring an auxiliary supporting device or devices. More specifically, the invention utilizes a portion of the complete assembly lying between the earpiece or reproducer and the electronic parts casing, both for carrying the signal conductors and for hanging the equipment in the desired inconspicuous location. No clips, headband or other auxiliaries are employed.

A further object of the invention is to provide a hearing aid of the above-described general type, in which the major electronic components are carried in a novel manner by a single chassis plate within a conforming casing of curved profile adapted to embrace the rearward surface of the external auditory meatus where the latter joins the integument of the skull, said casing being proportioned so as to be largely covered by the helix, the antihelix and the lobe of the auricle. Preferably, the upper end of the casing, where it approaches the horizontal line touching the top of the external meatus, has a firm but separable plug connection to a hook-shaped member adapted to support most of the weight of the casing upon the ear, and to convey the earpiece circuit conductors forwardly to a point just above and ahead of the tragus, where the conductors emerge to connect flexibly with the usual earpiece receiver held behind the tragus. The lower part of the curved casing, normally behind the lobe, may be somewhat wider than the upper end, and preferably receives through an opening at the extreme end thereof a single long-life battery such as a mercury cell held in position by a spring clip for ready removal and replacement. This organization of the parts permits easy battery replacement, adequate component space with maximum concealment, and satisfactory support from the ear, as well as facilitating proper matching of amplifier and earpiece during initial fitting or selection of the instrument.

Still another object of the invention is to provide an extremely compact amplifier and microphone assembly for wearable hearing aids and the like, carried upon a single one-piece flat chassis or support plate, with the thicker components of the assembly disposed in or passing through apertures in the plate to minimize the total thickness dimension of the unit. A subsidiary object of the invention related to the object just stated lies in the provision of a microphone mounting locating the microphone cartridge in an aperture in the support or chassis plate by frictional engagement with an intervening resilient gasket, which frictionally retains the cartridge in position as well as providing a vibration-reducing shock mount therefor, to minimize excessive shock to the cartridge and to reduce the noise and microphonics introduced into the sensitive input circuit of the amplifier.

An additional object of the invention is to provide a compact hearing aid instrument of the above type in which the arrangement of the self-contained microphone, with particular reference to its axis of maximum sensi-

**4**

tivity to the sound field, is such that direct acoustical feedback between the earpiece or reproducer and said microphone is minimized, whereby the tendency to oscillate or sing is eliminated, even when the amplifier is adjusted for maximum amplification or gain. The arrangement of the invention in this respect enables a substantial increase in the useful sensitivity of the device as compared with other head-supported hearing aids which have been proposed.

The above and other objects and advantages of the invention will best be understood by referring now to the following detailed specification of certain preferred embodiments of the invention, taken in connection with the appended drawings, in which:

FIG. 1 is a side elevation showing one form of the device in operating position upon the user's head.

FIG. 2 is a side view, to a larger scale, of the instrument shown in FIG. 1.

FIG. 3 is a further enlarged view of the device of FIG. 1, with the outer casing removed to show the internal construction.

FIG. 4 is a sectional view taken on the line 4—4 of FIG. 2.

FIG. 5 is a fragmentary sectional view taken on line 5—5 of FIG. 3.

FIG. 6 is a similar view taken on line 6—6 of FIG. 3.

FIG. 7 is another fragmentary sectional view taken on line 7—7 of FIG. 3.

FIG. 8 is a schematic wiring diagram of the hearing aid of the preceding figures.

FIG. 9 is a perspective view, with the cover turned aside, of a modified arrangement according to the invention.

FIG. 10 is a plan view of a further modified form of the invention, with the casing cover removed.

FIG. 11 is a sectional view taken on line 11—11 of FIG. 10, but with the complete casing and cover in place.

FIG. 12 is a view similar to FIG. 10 of a further form of the invention.

FIG. 13 is a sectional view taken on line 13—13 of FIG. 12.

All of the hearing aid embodiments shown in the drawings and described hereinafter have the common characteristic that the complete amplifier, including its input transducer or microphone, and its battery power supply, are constituted by an integral assembly whose shape and size are such that it can fit snugly behind the external ear of the wearer, being largely concealed thereby as seen from the front and at least partially concealed from the side. Moreover, all of the forms are related in that the signal output end of the assembly is so shaped or curved, alone or in combination with the output conductors or their sheath, that it can pass forwardly over the dorsal surface of the outer ear to support the entire unit in place without other fastening or attaching means. Moreover, this hook-like part, however constituted, carries the flexible conductors which thence lead downwardly into the usual earpiece, or transducer and ear mold, located behind the tragus of the ear and serving to couple the output energy of the amplifier into the ear canal itself. In all cases, the acoustical path leading to the sensitive element of the microphone is directed more or less rearwardly of the head. The combination of this directional orientation with the acoustic baffling provided by the ear flap itself, permits substantial amplifier gain without adverse feedback coupling between the earpiece as an output transducer and the microphone as an input element. In this respect the invention is clearly distinguished from unitary hearing aids supported upon spectacle frames or the like, in which the microphone is in more or less direct acoustical coupling with the output transducer or earpiece.

Referring now to FIG. 1 of the drawings, there is illustrated the use of a hearing aid in accordance with the invention, the casing of the same being designated as a whole by the reference numeral 10 and shown as occupying its normal position behind the flap or helix (and the

3,123,678

lobe) of the wearer's ear. At its upper end, where the casing 10 curves forwardly to extend along the dorsal surface of the skin joining the ear to the scalp, the casing merges into a curved sheath 12 forming a cover for the flexible short leads extending the output circuit to the conventional ear-contained reproducer 14 disposed at the entrance to the ear canal, and of course normally provided with a fitted ear mold, not shown, extending into the canal to provide a good acoustic seal with the canal. Also indicated by numerals are the exposed portion of a volume control knob 16, an opening 18 leading to the microphone, and an opening or cutout at the lower tip of the casing to receive the single cell battery 20 which supplies operating power to the amplifier.

The apparatus of FIG. 1 is shown to a larger scale in FIG. 2, in which the same parts bear identical reference numbers. The preferred microphone position within the casing 10 is indicated by the dotted lines 22. This figure more clearly shows the curved configuration of the casing 10, and the way in which at its upper end it receives a miniature plug 24 integral with the curved or hook-like sheath 12 carrying the reproducer conductors over the top of the ear. The conductors extend from the end of sheath 12 to the usual earpiece or miniature receiver 14, this flexibility permitting the device to be used with any normal shape or size of ear. It will be observed that casing 10 is arcuate in both its inner and outer profiles, or in other words is shaped rather like a bean; this shape is designated "reniform" herein by analogy to the shape of the kidney, and it is to be understood that in this connection the term refers to an arcuate casing which is rather thin and flat, and whose inner and outer profiles are both curved so that the inner profile will snugly engage the skin and cartilage of the ear where it extends outward from the scalp integument, while the outer profile will be concealed, as much as may be, by the helix and lobe or flap of the ear. The arcs need not be concentric, however, and as shown in FIG. 2 need not be arcs of circles. Preferably, the upper portion of the casing may be of smaller dimension both in the radial direction and in the direction of casing thickness than is the lower portion. This provides greater casing space at the lower end where the microphone 22 and battery 20 are located. The battery is disposed at the lower end of casing 10 because this location permits it to be readily installed or removed merely by sliding it out of a suitable spring clip within the casing, without disturbing the other parts.

FIGURE 3 of the drawings shows the internal arrangement of the instrument, the casing 10 being entirely removed, and the parts drawn to double the scale of FIG. 2. In this form of the invention, the entire amplifier assembly is mounted upon a single arcuate or reniform chassis plate 26 which may be formed of insulating fiber board, phenolic plastic or the like, and serving to mount the parts in their fixed relationships to one another. Certain of these parts, especially those of the greater thicknesses, are mounted in apertures in plate 26, as will be described below, for maximum compactness. This mounting arrangement for the microphone 22 is detailed in FIG. 4, in which the microphone itself is shown as encircled by a conforming rubber or neoprene flanged gasket 28 sized to fit snugly within an opening in the plate 26 and thereby to hold the microphone in place and at the same time insulating it against mechanical shocks. The microphone may, however, readily be slipped out of place when necessary for repairs or replacement. FIG. 4 also illustrates how plate 26 may be fitted into rabbets in the mating halves of the casing 10 (the lower half shell is indicated by numeral 30), and also indicates the way in which the upper or cover plate 32 of the microphone is channeled as at 34 to define an acoustic path leading towards the aperture 36 in the casing wall directed to the rear of the wearer's head.

At its lower end, the plate 26 is cut away as indicated at numeral 38 in FIG. 5, to receive and partially encircle the cylindrical cup of a conventional long-life unit cell

or dry battery 20, which is held in place by the pressure of a bifurcated spring clip 40 rivetted to the plate 26. The spring also forms one terminal of the battery connection, the other contact being formed by a metallic plate 42 secured to the underside of plate 26 so that the battery cup is held against it by the spring clip 40. The outer casing is apertured as already indicated to permit the cell to be removed at will.

Both of elements 22 and 20 thus lie partially on opposite sides of chassis plate 26, and the thickness of this plate is therefore accommodated in the casing without being additive to the thicknesses of these parts. The thinner components may be positioned on either side of plate 26, being for the most part on its upper surface. Thus, FIG. 6 shows the location of a potentiometer-type volume control 44 of conventional circular construction having the control dial or knob 16 already mentioned. An on-off switch for the battery circuit is indicated at 46, and is of known construction, both the potentiometer and switch being mounted upon the upper surface of the plate 26, although the contacts 48 of the switch may be below the plate and operated by a shaft or rod 50 urged against spring tension by a protuberance on the under side of the control dial 16.

At the narrow and relatively thinner upper end of the device, plate 26 carries usual spring contact clips 52 which deliver the amplified output to the conductors of plug 24 which pass through the sheath 12 as above described. This integral curved sheath is a very convenient feature, since it extends the hook-like shape of the chassis plate itself sufficiently far to provide firm engagement with the ear itself, yet permits ready change of the earpiece as required, merely by slipping plug 24 out of the mating relationship to clips 52. The latter are readily made to have sufficient grasp on plug 24 to prevent accidental loosening of the engagement. The weight of the entire instrument with the casing is only a few ounces, so that accidental disengagement is practically impossible. FIG. 7 shows the contact clips and plug in enlarged section.

The amplifier of the form of the invention described above utilizes four transistor stages for good amplification with light weight. The transistor themselves are indicated in FIG. 3 by numeral 54, merely to show how they may be disposed, with the other small components such as resistors and condensers, about the chassis plate 26. Actually, the transistors are preferably fitted into conforming apertures in the plate 26, their leads providing sufficient retaining force. The circuit itself is shown in FIG. 8 of the drawings, but since its detailed nature forms no part of the present invention, it will merely be pointed out that all of the transistors are of the PNP type, the variable inductance microphone 22 being connected between the base and emitter of the first stage transistor. Operating potential for all the emitters is furnished by battery 20, directly in the case of the last stage and through suitable resistors 56, 58 and 60 for the earlier stages. The necessary bias resistors and coupling and by-pass capacitors are indicated in usual symbolic form, and the volume control potentiometer 44 is connected between the collector of the second stage and the collector of the third stage (reading from left to right in the diagram) with the sliding contact connected to the base of the third stage. As has already been indicated, battery switch 46 may be ganged to potentiometer 44 to be opened at one extremity of the travel of the sliding contact. Power gains of 60 decibels or higher are readily obtained with this circuit, and with the physical arrangement of microphone and earpiece inherent in the chassis construction, such amplifications can be used without objectionable whistling or feedback troubles.

A modified construction is illustrated in the perspective view of FIG. 9, which shows the device with its casing cover 62 removed. The lower casing half is denoted by numeral 64, and the components are disposed therein in about the same arrangement as in FIG. 3. However, in

3,123,678

**7**

this case, no chassis plate as such is employed, the components being cemented or otherwise secured in the lower casing half 64. In this case, the microphone 66 may be loose in its position, being secured by the pressure of a resilient washer 68 when the casing cover 62 is in place. The acoustic channel again opens rearwardly of the head, as through a slot 70 in the casing cover. The battery (not shown in this view) slips through a casing aperture 72 where it is held, when the casing is closed, between a spring contact 74 and the contact plate 76 connected by a conductor 78 to the remaining parts. The cover 62 may be cemented in place, or it may be secured by small screws passing into the lower casing half itself. The reproducer 14 is again furnished with a plug here denoted 80 angled to direct the leads properly from the upper casing terminus 82 containing the contact clips 84. This modification of the invention illustrates the use of a complete 90° bend at the upper end of the casing, so that when plug 80 is in place, a complete hook is provided without requiring the separate cable sheath 12 of FIGS. 1 to 3.

Still another modification is shown in FIGS. 10 and 11 of the drawings. In this case, a common chassis plate 86 is again employed, similar to the plate 26 of the first form described. However, in the modified form, this plate 86 has an integral hook-like upper terminus 88 suitable for engaging the dorsal surface of the ear where it joins the head. This plate 86 again preferably lies midway between the upper and lower walls of the outer casing 90 (see FIG. 11), so that hook 88 is substantially on the median plane of the casing, an arrangement which enables the device to be hooked over either the right or left ear, which is of course true of the earlier-described forms of the invention. While no earpiece plug connector is illustrated in this form of the invention, such may be provided, if desired. Alternatively, the earpiece 14 may be uncoupled at its plug terminal 94, or reversed in direction merely by twisting its flexible leads to accommodate either ear location. FIG. 10 shows the battery receiving aperture as located on the rear casing wall at 96, but the arrangement of the other figures could equally well be employed. The microphone acoustic channel is directed through the casing aperture 98, as in the earlier mentioned forms. A resilient washer 68 (as in FIG. 9) wedges the microphone 97 in place when the case is closed by cover 92.

It is pointed out that, since the casing itself has merely a protective or concealing function, in the forms of FIGS. 1 to 3 and FIG. 10, being in effect carried upon the chassis plate rather than vice versa, a slip-on type of flexible housing could readily be employed. In any event, the material of the outer casing is preferably flesh-colored to blend inconspicuously with the user's skin.

FIGS. 12 and 13 show a further variant of the invention, in which the parts of the amplifier (and the microphone) are carried upon a base plate 100 preferably also of rigid insulating material, and having along its inner arc a metal flange or edge 102 secured to plate 100 as by rivets 104. The components of the amplifier itself are carried upon base plate 100 in the usual way, the thicker components such as the microphone 106 being recessed therein as shown in FIG. 13. At its upper and lower extremities, the flange 102 has secured thereto the extending loops 108, 110 of ductile wire or the like which lie in the median plane of the device and which may be bent or shaped to engage both the upper and lower peripheral ear surfaces where they merge into the head itself. These loops are preferably covered with flesh-colored plastic or the like so as to be relatively inconspicuous where they pass in front of the ear. An earpiece 14 is again connected to the amplifier by flexible leads and suitable plug to permit reversal for wear upon either of the user's ears. The chassis assembly may be encased as indicated at 112, 114 (the upper casing cover 112 is removed in FIG. 12), and the other parts are as described in connection with the previous embodiments.

While particular embodiments of the present invention

**8**

have been shown and described, it will be obvious to those skilled in the art that changes and modifications may be made without departing from this invention in its broader aspects, and therefore, the aim in the appended claims is to cover all such changes and modifications as fall within the true spirit and scope of this invention.

What is claimed is:

1. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to received acoustical signals for developing electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; means in addition to said casing for positively supporting said casing grippingly in said position; and means, including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustical energy into the auditory canal on the side of said external ear opposite said casing.

2. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to received acoustical signals for developing electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; means including an element of adjustably deformable shape for positively supporting said casing grippingly in said position; and means, including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustical energy into the auditory canal on the side of said external ear opposite said casing.

3. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to received acoustical signals for developing electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; and means, including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustic energy into the auditory canal on the side of said external ear opposite the casing and having an element in addition to said casing for positively supporting said casing grippingly in said position.

4. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to received acoustical signals for developing electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; and means, including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustic energy into the auditory canal on the side of said external ear opposite the casing and including an element adjustably deformable in shape for positively supporting said casing grippingly in said position.

5. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to received acoustical signals for developing

3,123,678

9

electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; means in addition to said casing and including a hook-shaped member projecting from said casing over the junction between the helix and the head for positively supporting said casing grippingly in said position; and means, including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustical energy into the auditory canal on the side of said external ear opposite said casing.

6. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to received acoustical signals for developing electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; means including a pair of hook-shaped members projecting forwardly from opposite ends of said casing for positively supporting said casing grippingly in said position; and means, including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustical energy into the auditory canal on the side of said external ear opposite said casing.

7. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to received acoustical signals for developing electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; means including a hook-shaped member projecting from said casing over the junction between the helix and the head for positively supporting said casing grippingly in said position with said hook-shape member having a stiffness sufficient to be shaped manually to conformingly engage the dorsal surface of the junction between the pinna and the head of the wearer; and means including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustical energy into the auditory canal on the side of said external ear opposite said casing.

8. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to received acoustical signals for developing electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; means in addition to said casing for positively supporting said casing directly from the ear of the wearer and grippingly in said position; and means, including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustical energy into the auditory canal on the side of said external ear opposite said casing.

9. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head with its upper end portion positioned near the upper terminus of said junction; an input transducer supported in said casing and responsive to received acoustical signals for developing electrical signals representative thereof; an amplifier supported in said casing and coupled to said input transducer for amplifying said electrical signals; means in addition to said casing for positively supporting said casing grippingly in said position; and means,

10

including an output transducer coupled to said amplifier, extending from said amplifier out of said upper end portion to the area behind the tragus on the side of said external ear opposite the casing and responsive to the amplified electrical signals for disseminating amplified acoustic energy into the auditory canal.

10. In combination: a hearing aid assembly, including an input transducer responsive to received acoustical signals for developing electrical signals representative thereof and an amplifier coupled to said input transducer for amplifying said electrical signals, of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; means for positively supporting said assembly grippingly in said position; and means, including an output transducer coupled to said amplifier, responsive to the amplified electrical signals for disseminating amplified acoustical energy into the auditory canal on the side of said external ear opposite said assembly.

11. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; means for positively supporting said casing in gripping engagement directly with the ear and in a position adjacent the rearward junction between the pinna and the head; an input transducer contained within said casing and responsive to acoustic energy; an amplifier contained within said casing and coupled to said input transducer; and means in addition to said casing, including an output transducer coupled to said amplifier, for disposal behind the tragus on the side of the external ear opposite said casing to disseminate amplified acoustic energy into the auditory canal.

12. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to acoustic energy; an amplifier contained within said casing and coupled to said input transducer; means, including an output transducer coupled to said amplifier, for disseminating amplified acoustic energy into the auditory canal; and means, including means for electrically coupling said output transducer to said amplifier, for positively supporting said casing directly in gripping engagement with the ear in a position adjacent the rearward junction between the pinna and the head.

13. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to acoustic energy; an amplifier contained within said casing and coupled to said input transducer; means, including an output transducer coupled to said amplifier, for disseminating amplified acoustic energy into the auditory canal; and means, including a pair of flexible conductors carried within a moldable hook-shaped sheath mechanically coupled to said casing with said conductors coupling said output transducer to said amplifier, for positively supporting said casing in direct gripping engagement with the ear and in a position adjacent the rearward junction between the pinna and the head.

14. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer supported in said casing and responsive to acoustic energy; an amplifier contained within said casing and coupled to said input transducer; means, including an output transducer coupled to said amplifier, for disseminating amplified acoustic energy into the auditory canal; and means, including a pair of flexible conductors carried within a moldable hook-

3,123,678

| 11 | 12 |

shaped sheath with said conductors and said sheath being mechanically coupled to said casing by a pair of separable electrical connector elements one of which is rigid with respect to said casing and the other of which is secured to said sheath, for positively supporting said casing in direct gripping engagement with the ear and in a position adjacent the rearward junction between the pinna and the head.

15. A hearing aid comprising: a reniform-shaped casing having a convex outer surface with an acoustic aperture therein and a concave inner surface with said casing being of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; an input transducer disposed in said casing adjacent said aperture and responsive to acoustic energy transmitted therethrough; an amplifier contained within said casing and coupled to said input transducer; means, including a pair of flexible, adjustably deformable conducting elements electrically coupled at one end to said amplifier, in addition and mechanically coupled to said casing for supporting the latter positively and grippingly in direct engagement with and immediately behind the ear; and means, including an output transducer coupled to the other end of said conducting elements, for disposal immediately behind the tragus to disseminate amplified acoustic energy into the auditory canal.

16. A hearing aid comprising: a reniform-shaped casing having a convex outer surface with an aperture therein and an inner surface of a contour generally corresponding to the curvature of the rearward junction between the pinna and the head with said casing being of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent said rearward junction; an input transducer disposed in said casing adjacent said aperture and responsive to acoustic energy transmitted therethrough; an amplifier disposed in said casing

and coupled to said input transducer; means, in addition and mechanically coupled to said casing, for positively supporting the casing in direct gripping engagement with and immediately behind the ear; and means, including an output transducer coupled to said amplifier for disposal immediately behind the tragus and, when said inner surface is disposed immediately adjacent said junction, on the side of the external ear opposite said casing, for disseminating amplified acoustic energy into the auditory canal.

17. A hearing aid comprising: a casing having an acoustic aperture and of a size enabling its disposal in a position substantially entirely behind the external ear and adjacent the rearward junction between the pinna and the head; means in addition to said casing for positively supporting said casing grippingly in said position; an input transducer supported in said casing and responsive to acoustical energy; an amplifier contained within said casing and coupled to said input transducer; and means, including an output transducer coupled to said amplifier, for disposal behind the tragus to disseminate amplified acoustical energy into the auditory canal on the side of the external ear opposite said casing.

References Cited in the file of this patent

UNITED STATES PATENTS

| D. 174,053 | Norris | Feb. 15, 1955 |
| 2,444,302 | Lybarger | June 29, 1948 |
| 2,513,746 | Rohr | July 4, 1950 |
| 2,641,327 | Balmer | June 9, 1953 |
| 2,930,858 | Hollingsworth | Mar. 29, 1960 |
| 3,035,127 | Strazalkowski | May 15, 1962 |

FOREIGN PATENTS

| 679,303 | Great Britain | Sept. 17, 1952 |
| 737,115 | Great Britain | Sept. 21, 1955 |

# CERTIFICATE OF SERVICE

      I hereby certify that on this 1st of November, 2013, I caused the foregoing **CORRECTED PRINCIPAL BRIEF FOR APPELLANT K/S HIMPP** to be filed electronically with the Clerk of the Court using the Court's CM/ECF System, which will serve via e-mail notice of such filing to the following CM/ECF-registered users:

Jonathan S. Franklin
Norton Rose Fulbright
801 Pennsylvania Avenue, N.W.
Washington D.C. 20004-2623
Tel.: (202) 662-0466
Fax: (202) 662-4643
Jonathan.franklin@nortonrosefulbright.com

*Attorney for Appellee, Hear-Wear*
*Technologies, LLC*

      I further certify that, upon acceptance from the Court of the e-filed document, the required six paper copies of the foregoing will be filed with the Court, via Federal Express or hand delivery, to the Clerk, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C., 20439.

                         Respectfully submitted,

                         /s/ Robert Greene Sterne
                         Sterne, Kessler, Goldstein & Fox, PLLC
                         1100 New York Avenue, N.W.
                         Washington, D.C. 20005
                         (202) 772-8555
                         (202) 371-2540
                         rsterne@skgf.com

Dated: November 1, 2013            *Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B). The brief contains 9,169 words, excluding the

parts of the brief exempted by Federal Rule of Appellate Procedure

32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally

spaced typeface using Microsoft® Word 2010 in 14 point Times New Roman.


/s/ Jason D. Eisenberg
Jason D. Eisenberg
Counsel for Appellant
November 1, 2013